DEBEVOISE & PLIMPTON LLP
David W. Rivkin
Suzanne M. Grosso
Claudio D. Salas
919 Third Avenue
New York, New York 10022
(212) 909-6000
*Attorneys for Plaintiff EM Ltd.*

DECHERT LLP
Robert A. Cohen
Charles I. Poret
Dennis H. Hranitzky
David M. Bigge
30 Rockefeller Plaza
New York, New York 10112
(212) 698-3500
*Attorneys for Plaintiff NML Capital, Ltd.*

GIBSON, DUNN & CRUTCHER LLP
Theodore B. Olson
Matthew D. McGill
1050 Connecticut Avenue, NW
Washington, D.C. 20036
(202) 955-8500
*Attorneys for Plaintiff NML Capital, Ltd.*



NOV 2 1 2007
U.S.D.C. S.D.N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------- x

EM LTD. and NML CAPITAL, LTD.,

        Plaintiffs,

v.

BANCO CENTRAL DE LA
REPÚBLICA ARGENTINA and
THE REPUBLIC OF ARGENTINA,

        Defendants.

--------------------------------------------------- x

No. 06-CV-7792

**AMENDED COMPLAINT**

    Plaintiff EM Ltd. ("EML"), through its attorneys Debevoise & Plimpton LLP, and

Plaintiff NML Capital, Ltd. ("NML"), through its attorneys Dechert LLP and Gibson,

Dunn & Crutcher LLP, bring this action for declaratory judgment against Banco Central

de la República Argentina (the "Central Bank") and the Republic of Argentina ("Argentina"), and for money judgments against the Central Bank, as the alter-ego of Argentina, and allege as follows:

## PRELIMINARY STATEMENT

1.     This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 to determine and resolve questions of actual controversy involving the relationship between the Central Bank and Argentina. In addition, the plaintiffs seek money judgments adjudging the Central Bank, as Argentina's alter ego, jointly and severally liable to satisfy the judgments that have been awarded, or will be awarded, to the plaintiffs against Argentina based on Argentina's default on its external sovereign debt.

2.     EML has a final, non-appealable judgment against Argentina which, with interest, currently totals over $763 million.  NML has a final, non-appealable judgment against Argentina worth over $290 million with interest, as well as five actions pending in this Court against Argentina in which judgments have yet to be entered.  NML has been granted summary judgment in one such case, and expects soon to be awarded summary judgment in the other four.  When final judgments have been entered in all six of NML's actions, NML estimates they will, together, total close to $1 billion.  All of these actions are based on Argentina's default on its external sovereign debt in late 2001.

3.     As a result of Argentina's concerted efforts to avoid paying its creditors, including its systematic movement of assets out of the United States so that its creditors cannot reach them, EML and NML have been unable to collect anything to satisfy their

2

judgments since they were awarded, and NML has been unable to secure any assets in aid of its anticipated judgments.

4.      At least $105 million of Argentina's assets are present in the United States in the form of the Central Bank's accounts at the New York branch of the Federal Reserve Bank. Although these assets are nominally held by the Central Bank, they are controlled by and belong to Argentina as a result of, among other things, its complete dominance over the Central Bank. In the past six years, Argentina has seized billions of dollars of reserves nominally held by the Central Bank to pay its own debts, has replaced five Central Bank Governors when they dared to disagree with the government on central banking independence or the implementation of central banking policy, has legislated to itself more and more power over the Central Bank, and has taken over the Central Bank's function as regulator of monetary policy to promote Argentina's own inflationary goals. In short, the Central Bank is an alter ego of Argentina.

5.      Argentina so extensively controls the Central Bank that a principal-agent relationship exists between them. Moreover, it would be manifestly unjust to give effect to the legal fiction that the Central Bank and Argentina are technically separate, which Argentina admittedly exploits in its ongoing wrongful efforts to avoid paying its creditors. Consequently, the assets of the Central Bank ought to be treated as Argentina's own and made available to satisfy the plaintiffs' judgments and expected judgments – like any other commercial assets of Argentina. Furthermore, money judgments should be entered against the Central Bank expressly adjudging it jointly and severally liable for the plaintiffs' judgments and anticipated judgments against Argentina.

3

## THE PARTIES

6.     Plaintiff EML is a limited liability corporation organized under Cayman Islands law with its registered office at Queensgate House, 113 South Church Street, George Town, Grand Cayman, Cayman Islands.

7.     Plaintiff NML is a limited liability corporation organized under Cayman Islands law with its registered office at Huntlaw Corporate Services, The Huntlaw Building, 75 Fort Street, PO Box 1350, Grand Cayman, Cayman Islands.

8.     Defendant Argentina is a foreign state as defined under 28 U.S.C. § 1603(a).

9.     Defendant the Central Bank, both as an agency or instrumentality of Argentina and as an alter-ego of Argentina, is a foreign state as defined under 28 U.S.C. § 1603(a). The Central Bank is headquartered at Reconquista 266, C1003ABF, Buenos Aires, Argentina, but it maintains assets outside of Argentina, including in the Southern District of New York.

## JURISDICTION AND VENUE

10.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1605(a)(1) because Argentina has consented to the jurisdiction of this Court and waived any claim of immunity with respect to this action – including but not limited to sovereign immunity – pursuant to Section 22 of an October 19, 1994 Fiscal Agency Agreement (the "FAA", Ex. 1), the terms and conditions of the bond purchased by EML (*see* terms and conditions of bond dated June 19, 2001, Ex. 2), and the terms and conditions of the bonds purchased by NML (*see, e.g.*, terms and conditions of bond dated February 3, 2000, Ex.

4

3; terms and conditions of bond dated July 21, 2000, Ex. 4). In the FAA, which governs both EML's and NML's bonds, Argentina "irrevocably waive[d] and agree[d] not to plead any immunity from the jurisdiction of any . . . court to which it might otherwise be entitled" in connection with any action to enforce a judgment based on the Plaintiffs' bonds. The terms and conditions of these bonds extend this waiver to any action to enforce such a judgment against any of Argentina's "revenues, assets or properties." This waiver can be imputed to the Central Bank as the alter-ego of Argentina. *Kensington Int'l Ltd. v. Republic of Congo*, No. 03 Civ. 4578, 2007 WL 1032269, at *15 (S.D.N.Y. Mar. 30, 2007); *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, No. 97 Civ. 6124, 1999 WL 307666, at *10-13 (S.D.N.Y. May 17, 1999), *aff'd*, 199 F.3d 94 (2d Cir. 1999).

11.     This Court also has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1330(a) & 1605(a)(2) because EML's and NML's claims are based upon commercial activities that Argentina undertakes in the United States, and upon activities that the Central Bank undertakes in the United States both as fiscal agent for and as the alter-ego of Argentina.

12.     This Court has personal jurisdiction over both Argentina and the Central Bank pursuant to 28 U.S.C. § 1330(b), which extends personal jurisdiction over a foreign state that is not immune from suit and that has been properly served with process pursuant to 28 U.S.C. § 1608(a).

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(1) because a substantial number of the events and omissions that gave rise to this action, including

5

the entry of the EML Judgment, occurred in this District, and the Central Bank maintains assets in this District against which Plaintiffs hope to enforce their judgments and anticipated judgments.

## FACTUAL ALLEGATIONS

### I.   EML's Judgment Against Argentina.

14.   Since December 2001, Argentina has been in default on a global debt security (referred to here for simplicity as a "bond") beneficially owned by EML. On April 10, 2003, EML filed an action against Argentina in this Court seeking to recover more than $700 million in principal and accrued interest that Argentina owed to it on this bond. On September 12, 2003, this Court granted EML's motion for summary judgment, holding that EML had an "unconditional legal right to collect on the bond" as a result of Argentina's default. *EM Ltd. v. Republic of Argentina*, No. 03 Civ. 2507, 2003 WL 22120745, at *2 (S.D.N.Y. Sept. 12, 2003). This Court entered an amended final judgment in the amount of $724,801,662.56 in favor of EML on October 27, 2003 (the "EML Judgment"). Ex 5.

Argentina appealed from the EML Judgment on November 25, 2003, and the Court of Appeals affirmed on August 31, 2004. *EM Ltd. v. Republic of Argentina*, 382 F.3d 291 (2d Cir. 2004). Argentina did not seek further review of the decision of the Court of Appeals, and the EML Judgment became final and non-appealable on November 30, 2004. Sup. Ct. R. 13.1.

15.   At a hearing on October 31, 2003, this Court ruled that the prerequisites for execution in aid of a judgment against a foreign state set forth in the Foreign

6

Sovereign Immunities Act, 28 U.S.C. § 1610(c), had been met, and that EML could seek execution in aid of the EML Judgment after January 29, 2004. Argentina has never challenged this ruling.

16.    As of November 1, 2007, the amount of the EML Judgment including interest owed by Argentina is $763,962,261 – none of which has yet been paid or collected.

## II.    NML's Judgment And Anticipated Judgments Against Argentina.

17.    Since December 2001, Argentina has been in default on certain Argentine securities beneficially owned by NML, including certain global bonds and certain Floating Rate Accrual Notes which matured on April 10, 2005 (collectively referred to here for simplicity as "bonds"). Since November 7, 2003, NML has commenced six actions in this Court seeking to recover on these bonds. The Court entered a final judgment for $284 million in favor of NML in the first of these actions, *NML Capital, Ltd. v. Argentina*, No. 03 Civ. 8845 (TPG), on December 18, 2006 (the "First NML Judgment"). Ex. 6. Argentina did not appeal from the First NML Judgment, and it became final and non-appealable on February 16, 2007. On May 10, 2006, this Court granted NML's motion for summary judgment in the second of its actions, *NML Capital, Ltd. v. Argentina*, No. 05 Civ. 2434 (TPG) (the "Second NML Action"). *See* Ex. 7. (Summons, complaint and order granting summary judgment). NML has four more actions against Argentina pending in this court, styled, respectively, *NML Capital, Ltd. v. Argentina*, No. 06 Civ. 6466 (TPG) (the "Third NML Action"), *NML Capital, Ltd. v. Argentina*, No. 07 Civ. 1910 (TPG) (the "Fourth NML Action"), *NML Capital, Ltd. v.*

7

*Argentina*, No. 07 Civ. 2690 (the "Fifth NML Action") and *NML Capital, Ltd. v. Argentina*, No. 07 Civ. 6563 (TPG) (the "Sixth NML Action"). Ex. 8. (Summonses and complaints in Third, Fourth, Fifth and Sixth NML Actions)

### III.   The Central Bank Is Argentina's Alter-ego.

18.    An instrumentality of a foreign state is considered to be the alter-ego of its parent when the state controls the instrumentality so extensively that a principal-agent relationship is created between them, or when giving effect to the nominal separateness of the instrumentality would work fraud or injustice. *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba ("Bancec")*, 462 U.S. 611, 623-27 (1983). In this case, Argentina has completely dominated the day-to-day functions of the Central Bank since at least 2001, and continues to do so today. Moreover, Argentina has admittedly exploited the legal fiction of the Central Bank's independence unjustly and fraudulently to avoid paying creditors like EML and NML.

19.    Argentina's dominance over the Central Bank is demonstrated in myriad ways, four of which stand out in particular:

- Under the Central Bank charter, the Argentine government owns the Central Bank and all profits it generates, and has the legal power to control all but a few of its functions. In recent years, Argentina has cut back on even these few areas of the Central Bank's nominal autonomy. Consequently, even the *legal* independence of the Central Bank is tenuous.

- Even in those few areas where the Central Bank is supposed to be autonomous, the Argentine government assures that the Central Bank will act as the government directs it to by replacing any Central Bank official who disagrees with the government on how the Bank is to be run, or otherwise tries to assert the Central Bank's limited nominal independence.

8

- In the area of developing and implementing monetary policy – the most critical of the Central Bank's few nominally independent functions – the government has utterly dominated the Central Bank in recent years. Since late 2004, Argentine President Nestor Kirchner has forced the Central Bank to pursue highly inflationary policies to serve the government's own political aims in violation of the Central Bank's mandate under its charter first and foremost to protect the value of the currency. In so doing, Kirchner has taken over one of the Central Bank's key day-to-day activities – buying and selling currency and securities in open market operations. Moreover, President Kirchner has commandeered the responsibility of determining the level of reserves that the Central Bank shall maintain.

- In December 2005, the Argentine government amended the law to make billions of dollars worth of the Central Bank's assets available to pay the government's own debts, and then commanded the Central Bank to pay nearly $9 billion to the IMF in January 2006 to satisfy one such debt. Yet even with this extraordinary legislation, the January 2006 payment to the IMF was illegal under the Central Bank charter.

A.   Argentina Owns The Central Bank And, By Law,
     Can Control Nearly All Of Its Activities.

20.   According to Article 1 of its charter, "[t]he Central Bank . . . is a self-administered institution of the National State governed by the provisions of [its charter] and other related legal rules." Ex. 9. The mandate and powers of the Central Bank are spelled out in its charter, under which:

- The government owns the Central Bank and all profits it generates, *see* Ex. 9, Art. 1 & 38; and

- The government may control virtually everything the Central Bank does, except (1) the Central Bank may only lend money to the government under limited circumstances and subject to clear restrictions on the amount and term of the loan, *id.*, Art. 19(a) & 20; and (2) the Central Bank "shall primarily and essentially maintain the value of legal tender," and in performing this function, it "shall not be subject to any order or instruction given by the National Executive Power." *Id.*, Art. 3.

9

21.     In the past six years, the Argentine government has enacted numerous laws that have either amended the Central Bank charter to serve the government's own policies, enabled the government to exert more control over the Central Bank, or both. The effect of these laws has been (1) to increase the already considerable control the government has over the selection and removal of Central Bank officials, (2) to expand the market for higher risk government bonds, thereby allowing the government to borrow more money, and (3) to increase the amount of money that the Central Bank itself can loan to the government, and expand the circumstances under which it can do so.  To illustrate:

- **Executive Decree 1373/1999** (Ex. 10), enacted on November 24, 1999, changed the mechanism by which the Governor, Vice-Governor, Directors and Trustees of the Central Bank are appointed, granting the Argentine President the authority to fill these posts "in commission" without seeking confirmation by the Argentine Senate.  President Kirchner has used this power to deprive Central Bank officials of a clear six-year term and mandate from the Senate.

- **Executive Decree 439/2001** (Ex. 11), enacted on April 17, 2001, granted Argentina's banks, which are regulated by the Central Bank, the ability to use government bonds to meet their reserve requirements, thereby increasing the captive market for these high-risk bonds.  Decree 439/2001 also made it easier for the Central Bank to advance funds to the government by removing certain pre-existing limitations on such advancements.

- **Law 25.561** (Ex. 12), enacted on January 6, 2002, (1) dismantled Argentina's convertibility system, (2) transferred extraordinary powers to the President that allow him, in effect, to rule by decree, and (3) enabled the Argentine government to seize for its own use billions of dollars in reserves that, under the convertibility regime, the Central Bank was legally required to maintain to support the currency.

10

- **Law 25.562** (Ex. 13), enacted on February 6, 2002, amended the Central Bank charter to implement further the dismantling of the convertibility regime, and to allow the Central Bank to loan the government even more money.

- **Executive Decree 401/2002** (Ex. 14), enacted February 28, 2002, like Decree 439/2001, expanded the market for government bonds by increasing the ability of financial institutions to comply with their reserve requirements by holding high-risk Argentine sovereign debt.

- **Law 25.780** (Ex. 15), enacted August 27, 2003, again increased the amount of money the Central Bank was authorized to loan the government.

B.    Argentina Controls The Day-To-Day Activities Of The Central Bank By Replacing Any Bank Official Who Refuses To Do Its Bidding.

22.    One of the most effective means for a parent government to exert control over its central bank is by sending a clear message that any bank official who refuses to implement the government's wishes or attempts to assert the bank's independence, can – *and will* – be replaced with another official who will do what the government wants. Consequently, there is a broad consensus among central banking experts that high turnover of central bank officials is a strong indication that the bank is controlled by the parent state. *See* Alex Cukierman, Steven Webb & Bilin Neyapti, *Measuring the Independence of Central Banks and Its Effect on Policy Outcomes*, THE WORLD BANK ECONOMIC REV. Vol. 6, No. 3 at 363-67 (1992). Ex. 16. Argentina is famous for the high turnover rate of its chief banking officials, its Governors. Since its founding in 1935, Governor turnover at Argentina's Central Bank has been among the highest – if not *the* highest – of any central bank in the world. Incredibly, the average tenure for a Governor of the Central Bank since 1935 has been eighteen months (compared to over five years,

11

on average, for central banks in developed countries).  *Id.* at 365.  *See* List of Central

Bank presidents and tenures at http://www.bcra.gov.ar.

23.    This pattern continues today.    Argentina has had a remarkable *six*

Governors since 2001:  Pedro Pou, Roque Maccarone, Mario Blejer, Aldo Pignanelli,

Alfonso Prat-Gay and Martin Redrado.   Governors Maccarone, Blejer and Pignanelli

each were in office for less than a year.  In each case, the Governor's departure was

preceded by a disagreement with the government over either monetary policy – which,

under the Central Bank's charter, *must* be made and implemented free of government

interference – or over the Central Bank's independence from the government generally.

In each case, the government's view prevailed.

24.    The replacements of former Central Bank Governors Aldo Pignanelli,

Mario Blejer and Alfonso Prat-Gay are illustrative.  When Governor Pignanelli resigned,

the Argentine daily La Nación reported that the differences between Pignanelli and the

Economy Ministry that had led to the resignation were "the consequence of a culture

based on the erroneous belief that [the Central Bank] can be permanently subject to

political back and forths or even at the service of the Economy Ministry." *Editorial I:*

*The New President of the BCRA,* LA NACIÓN (December 12, 2002) Ex. 17.  La Nación

added:

> The fruit of this culture is that in a little more than eighteen months
> the [Central Bank] has had five presidents, when the term of that
> autonomous entity's head is six years.  The contrast with countries
> such as the United States – where there have only been five
> Federal Reserve chairmen in the last fifty years – is obvious.
>
> . . .

12

> [Prat-Gay's] final success won't depend so much on his person and
> the technical ability of those who will doubtless accompany him,
> but rather on the political leadership exhibiting its willingness to
> respect the [Central Bank's] autonomy, in order to avoid political
> short-circuits and ensure that the set term for that important
> entity's president is respected. *Id.*

25.    Former Governor Mario Blejer identified Argentina's increasing

encroachment on the Central Bank's independence as the reason for his departure in

2002. *See Minister to Meet IMF over Aid Talks Problems: Argentina*, FINANCIAL TIMES

(June 26, 2002), Ex. 18 ("In his resignation letter, Mr. Blejer had complained about

growing infringements on central bank independence by the economy ministry.  Now

analysts say that much of the structure of the central bank has been filled by political

appointees who respond to various parts of the executive branch.").  Two weeks after his

resignation, Blejer told an interviewer that he and Economy Minister Lavagna clashed

over the Central Bank's independence. *Interview: Mario Blejer*, CENTRAL BANKING (Jan.

2003), Ex. 19.  Blejer "thought it was important to preserve central bank independence,"

while Lavagna "had a different conception." *Id.*  The Financial Times noted that with the

appointment of Mr. Blejer's successor, Aldo Pignanelli, the economy ministry "gained

more control over the notionally-independent central bank by getting its candidate

appointed to the board of directors and taking over its press office." *See* Ex. 18.

26.    Alfonso Prat-Gay, who was widely acclaimed as a central banking

"superstar" and who followed Pignanelli's short tenure, also left office after only a brief

stay.  In Prat-Gray's case, after serving out the final 20 months of the six-year term held

by Governors Pou, Maccarone, Blejer and Pignanelli before him, President Kirchner

refused to reappoint him in September 2004. *See* Executive Decree 1236/2004 (Ex. 20) (replacing Prat-Gay with Martin Redrado). The international financial community was shocked by Prat-Gay's replacement. By all independent accounts, Prat-Gay had done a superb job during his brief tenure, and significantly, he was the first person to be awarded Euromoney's prestigious "central bank Governor of the year" award after leaving office. Euromoney stated that Prat-Gay "built a credible central bank from almost nothing" and was "Argentina's most internationally respected policymaker." *Argentina ditches its respected central bank governor on eve of crucial bond exchange; Alfonso Prat-Gay is central bank governor of the year*, EUROMONEY INSTITUTIONAL INVESTOR (Sept. 1, 2004), Ex. 21.

27.     The only credible explanation for the decision not to reappoint Prat-Gay is that he was "widely known to oppose central tenets of [the Kirchner] administration's economic philosophy." *Id.*; *see also* Alejandro Alonso, *Dispute Over Policies Sparks Change in Argentina CenBnk Chief*, THE MAIN WIRE (Sept. 17, 2004), Ex. 22 ("Prat-Gay had repeatedly clashed with the administration . . . on the government's handling of the debt restructuring, the Central Bank's role in influencing the foreign exchange rate as well as the use to be made of the country's increasing foreign reserves").

28.     The Argentine press at the time reported that, in addition to clashing with Kirchner over debt restructuring and the use of reserves, Governor Prat-Gay had made two requests that were unpalatable to President Kirchner. First, he asked that if he were to continue as Governor, his appointment be ratified by the Argentine Senate so that he could have a full six-year term and a mandate from the Senate. Second, he asked that he

14

have some say over who would be appointed to the Central Bank directorships. President Kirchner refused, reportedly because he wanted full control over director appointments, and because he wanted Prat-Gay to serve "in commission" without a defined term or mandate. *Kirchner Changes Central Bank to Avoid Rifts in Debt Negotiations,* PÁGINA/12 (Sept. 18, 2004), Ex. 23. In resigning, Prat-Gay stated "basically the president and I have different views of what the role of the central bank should be." Ex. 21. This difference, according to Euromoney, was "about the degree of independence that a central bank should have." *Id.*

29.   Prat-Gay was replaced by Martin Redrado, "a man most analysts consider unlikely to assert much in the way of independence." *Id.* (one government official opined that "Redrado is Kirchner"); *A payment to the Fund was the spark that started the fire,* PÁGINA 12 (Sept. 19, 2004), Ex. 24; *Profits and losses,* PÁGINA/12 (Sept. 18, 2004) Ex. 25 ("The technical conditions and lineage of the pawns used in power games count for little. The only thing that matters is their willingness to play the required role at the opportune moment"). According to Lacy Gallagher, Latin America analyst at Credit Suisse First Boston, Prat-Gay's replacement "solidifies the prospect that the Central Bank will remain under the control of the ministry of economy and Kirchner. . . . Prat-Gay got fired because he was trying to be independent." Ex. 21.

30.   Martin Redrado has now held the position of Governor for three years. The explanation for his longevity, relative to most Central Bank Governors, lies in that, despite Redrado's occasional complaint, the Central Bank under his watch has dutifully implemented President Kirchner's every wish. As past experience indicates, Redrado

15

does not have much choice; he can either adopt the President's policies and implement them as the President directs, or be replaced.

C.    The Argentine Government Dictates Monetary Policy And
      Controls How It Is Implemented By The Central Bank.

31.    The key function of an independent central bank is to maintain the value of the currency and to keep inflation in check through day-to-day adjustments of the amount of money in circulation. This duty is enshrined in the Central Bank's charter: "[The Central Bank] shall primarily and essentially maintain the value of legal tender," Ex. 9, Art. 3, and is supposed to be undertaken by the Central Bank without interference or pressure from the government. *Id.* ("As regards the preparation and implementation of any monetary and financial policy, BCRA shall not be subject to any order or instruction given by the National Executive Power."). In direct violation of this restriction, at least in recent years, Argentina has controlled the Central Bank's formulation and day-to-day implementation of monetary policy. The result has been soaring inflation since 2005.

32.    A glaring example of how the government has taken over monetary policymaking from the Central Bank is President Kirchner's announcement in mid-2006 that it is for him to determine what level of reserves the Central Bank should maintain, and that, by the end of that year, the reserves had to reach US $30 billion. *See* Martin Boerr, *At this rate, the Central Bank's surplus will only last a year*, INFOBAE PROFESIONAL (August 14, 2006), Ex. 26 ("The experts . . . made it clear that the accumulation of reserves is not so much a policy of the Argentine Central Bank as an idée fixée of President Néstor Kirchner."); *US$634 million pay-out*, AMBITO FINANCIERO

16

(August 14, 2006), Ex. 27 ("The idea is for [Argentina] to have US$30 billion in international reserves by the end of [2006], because Nestór Kirchner has made this the target"). Under Article 3 of the Central Bank's charter, the government is prohibited from even influencing the process whereby the level of reserves held by the Central Bank is determined – let alone dictating what that level is to be.

33. In addition, between late 2004 and early 2007, acting on the orders of President Kirchner, the Central Bank purchased millions of U.S. dollars on a daily basis – and billions of dollars cumulatively – without taking the steps necessary to neutralize the inflationary effect of these purchases. *See* Daniel Fernandez Canedo, *Focus: Dollar creates pressure peak and interest rates rise fast and strong,* CLARÍN (June 23, 2005), Ex. 28 ("[The] Central Bank is following the President's wishes to the letter. So, day by day, [the] Central Bank is buying more dollars, to which end it is issuing more pesos."). This policy was initially adopted for purely political reasons: specifically, to keep down the value of the Argentine peso relative to the U.S. dollar, thus perpetuating Argentina's export-driven recovery, bolstering President Kirchner's popularity and bringing electoral victories to Kirchner's allies in congressional elections held in October 2005. *ARGENTINA: Still growing but inflation a worry,* LATIN AMERICA ECONOMY & BUSINESS (July 26, 2005), Ex. 29 ("The big problem is the pick-up in inflation which is largely a result of the government's refusal to let the peso appreciate against the dollar. This policy has kept Argentine exports competitive.").

34. For many months after the October 2005 elections, the Argentine government continued pressuring the Central Bank to purchase and accumulate dollars

17

without neutralizing the effect of those purchases to depress the value of the peso relative to the dollar, and for a new reason as well – to finance the government's debts. *See Argentine C-Bank Makes Record Dollar Purchase 2006*, LA NACIÓN (July 6, 2006), Ex. 30 ("Argentina must cancel a debt of some $3.0 bln (2.35 bln euro) at the beginning of next month, which is the reason BCRA [is buying] U.S. dollars at present"); *Argentina: bearish thoughts on the peso*, EUROMONEY INSTITUTIONAL INVESTOR (Feb. 6, 2006) Ex. 31.

35.    All the while it was ordering the Central Bank to purchase hundreds of millions of dollars daily, Argentina directed the Central Bank not to remove a corresponding amount of pesos from circulation in order to "sterilize" those purchases – which would have prevented those purchases' otherwise inflationary effects. *See* BCRA Weekly Balance Sheet, 2005, Ex. 32 (showing that, in 2005, "money in circulation" in Argentina grew from 37,376,289,000 to 48,337,320,000 pesos). As a result of this policy, Argentina's inflation exceeded 11% in 2005, (*see The Economy Grows Strong, But Inflation Becomes Again a Threat*, CLARÍN (Sept. 22, 2005), Ex. 33 (noting that inflation will be 11% in 2005)), and economists warned in 2006 that, if the policy continued, Argentina could face inflation of 15% during that year and 18% in 2007. *Warning by international banks that inflation could reach 18% in 2007*, LA NACIÓN (Apr. 5, 2006), Ex. 34 ("Argentina could see 15% inflation this year, and 18% in 2007 due to the Government's decision not to adopt market mechanisms to lower prices"). This warning proved prescient. *See Analysts are calculating real inflation*, LA NACIÓN (July 15, 2007) Ex. 35 ("[M]ost private economists believe that there is a gap between the

18

[official consumer price index ("CPI")] figure and what is now called 'real inflation'. . . . [T]he average [CPI growth since January 2007] indicated by the [group of independent] economists is 15%.").

36.     Even these figures may underestimate Argentina's actual inflation, as Argentina has resorted to price freezes, wage controls and manipulation of government economic statistics to create the illusion of lower inflation.  *See id.* ("The intensive manipulation of the retail price index by the Government has led to a wide gap between the [official] figure and private measurement findings."); *Economics for Dummies*, WALL ST. J., Feb. 20, 2007, at A16. Ex. 36 ("Recently, the Peronist government of President Nestor Kirchner sacked an official at its National Statistics and Census Institutue for refusing to agree to alter the 'methodology' used to calculate inflation."); Eliana Raszewski, *Argentina's leader negotiates price freeze; Agreements aimed at soothing inflation woes*, BLOOMBERG NEWS (Feb. 7, 2006), Ex. 37 ("Kirchner and Economy Minister Felisa Miceli negotiated agreements that require the companies to freeze prices for as long as a year, to help the government's fight against inflation."); *Inflation still the biggest worry*, EUROMONEY INSTITUTIONAL INVESTOR (Jan. 16, 2006), Ex. 38 ("Despite President Nestor Kirchner's claim that fighting inflation is his government's top economic priority, his administration has focused on the effects, rather than the core causes of higher prices. For instance, rather than commit to tighter fiscal and monetary policy, his government has browbeaten supermarkets into lowering prices on staple foods."); *The only question is when?* LA NACIÓN (May 21, 2006), Ex. 39 (the price

19

freezing orders "are just a sleight of hand so that the index does not reflect inflationary reality").

37.     Argentina's direction of the Central Bank to purchase dollars on a day-to-day basis and not to sterilize the effect of those purchases is largely responsible for the country's soaring inflation. *See* Fernando Laborda, *Recipes that proved his failure*, LA NACIÓN (Dec. 1, 2005), Ex. 40 ("The root of the problem is the monetary policy of supporting the dollar. It is the government who is causing inflation, and it then pressures companies to not raise prices. . . . This drop was not due to a reduction in revenue, but rather to an increase in spending, probably on account of the elections."); *see also The BCRA plays big to maintain US dollar rate*, LA NACIÓN (Oct. 19, 2005), Ex. 41 (noting that the Central Bank continued to buy hundreds of millions of U.S. dollars despite resulting inflation); *Argentina economy: Government rebuffs currency concerns*, THE ECONOMIST (Aug. 12, 2005), Ex. 42 ("the dollar purchases by the Central Bank are expanding the money supply and thereby contributing to rising inflation.").

38.     According to Bank of America's chief economist, Mickey D. Levy, growing inflation in Argentina is the result of "the [Central Bank's] lack of independence from the government." Hugo Alcado Mon, *They Warn of Inflation and Debt*, LA NACIÓN (Nov. 4, 2005), Ex. 43. Standard & Poor's has also questioned the lack of independence of Central Bank's monetary policy from the Government, which is necessary to fight against inflation. *Standard & Poor's Criticized the BCRA's Monetary Policy*, LA NACIÓN (Oct. 24, 2005), Ex. 44

D.   Argentina Can Seize The Central Bank's Assets At Will.

39.   Further evidence of Argentina's complete control over the Central Bank is the fact that the government can seize billions of dollars of Central Bank assets for its own use – and has done so at least twice in the past six years.  Indeed, the government does not even attempt to hide this fact; in the words of one Argentine official, "[Argentina's] reserves belong to the Government, not to Central Bank."  *Reserves Top US$25 Billion: Increase of 5.524 Billion So Far This Year*, CLARÍN (Aug. 2, 2005), Ex. 45.

40.   On December 15, 2005, President Kirchner announced his intention to use the Central Bank's foreign exchange reserves to pay the Argentine state's multi-billion dollar debt to the IMF.  This was accomplished without the approval of the Central Bank through two new Presidential Decrees which were later rubber-stamped by the Argentine legislature.  The first of these, Decree 1599/2005, (Ex. 46), amended Article 4 of Argentina Law No. 23,928 to provide that "[t]he reserves of the CENTRAL BANK OF THE ARGENTINE REPUBLIC . . . shall be allocated to back up to ONE HUNDRED PERCENT (100%) of the monetary base."  This Decree then created a new category of reserves known as "unrestricted reserves," comprised of the reserves in excess of the amount necessary to support the Argentine monetary base, and ordered that, "[a]s long as the monetary effect is neutral, the unrestricted reserves may be used for payment of obligations undertaken with international monetary authorities."  *Id.*  The remaining reserves were described as those reserves required to "support[] the monetary base."

21

41.    The second decree, Decree 1601/2005, (Ex. 47), wrested control over the Unrestricted Reserves from the Central Bank and conveyed them to the Argentine state. After reciting that "the current level of international reserves amply exceeds the margins necessary to maintain appropriate monetary and exchange policies," Decree 1601/2005 provides that "it is necessary and appropriate to order [implementation of] the mechanisms for payment of the pending debt to the INTERNATIONAL MONETARY FUND."   Accordingly, Decree 1601/2005 "instructed" the Argentine Ministry of Economy and Production to "take the pertinent steps" to cause payment to be made to the IMF from the Unrestricted Reserves. *Id.*

42.    On December 29, 2005, the Argentine Ministry of Economy and Production – which is part of the executive branch of government – issued Resolution No. 49, directing the Central Bank to repay the Argentine debt to the IMF and instructing "the SECRETARIAT OF THE TREASURY and the SECRETARIAT OF FINANCE, both reporting to this Ministry, . . . to implement an exchange of liabilities held by the NATIONAL GOVERNMENT with the CENTRAL BANK . . . as compensation for the transactions conducted with the [IMF]."   Resolution 49, Ex. 48.   Resolution No. 49 accomplished this "exchange of liabilities" by directing the issuance of a ten-year term "[n]on-transferable note" to the Central Bank. *Id.*

43.    As a result of these extraordinary new laws, over $8 billion of Unrestricted Reserves – roughly a third of the Central Bank's total reserves at the time – were used to pay the IMF's $9.8 billion loan to Argentina on January 3, 2006, even though that debt was Argentina's, not the Central Bank's.   Not surprisingly, Argentina was roundly

criticized by commentators for running "roughshod over the central bank's legal independence." *E.g., Kirchner and Lula: different ways to give the Fund the kiss off; Argentina, Brazil and the IMF*, THE ECONOMIST (Dec. 24, 2005), Ex. 49.

44.     All of these actions were in direct derogation of the Central Bank's charter. First, as stated above, under Article 3 of its charter, the Central Bank must not be "subject to any order or instruction given by the National Executive Power" concerning "the preparation and implementation of any monetary and financial policy." Ex. 9, Art. 3. Second, Article 19(a) of the charter prohibits the Central Bank from lending funds to the government except as provided under Article 20. *Id.*, Art 19(a). Despite Article 20 having been revised three times between 2001 and 2003 to make it easier for the Central Bank to loan the government money, the government's unprecedented use of the Central Bank's reserves to pay its debt to the IMF in January 2006 nevertheless violated Article 20.

45.     Under the original version of the Central Bank's existing charter, enacted in 1992, Article 20 permitted the Central Bank to finance the government by providing pesos to the government *only* if those pesos were exchanged, at market value, for government securities that could be traded on the open market. Moreover, there were strict limits as to the total value of such government securities that the Central Bank could hold at any one time. By 2006, the executive power had significantly altered Article 20 through various executive decrees. Among other things, these decrees enabled the Central Bank to make straight loans (or "advances") to the government of up to 12% of the monetary base as long as these funds were repaid within 12 months, and created a

23

loophole exempting from the 12% limit moneys loaned to the government to make payments to multi-lateral lenders like the IMF. *Id.*, Art. 20.

46.     Even with these amendments, however, Argentina's payment to the IMF in January 2006 violated Article 20 of the Central Bank charter. Article 20 still requires that all Central Bank loans to the government be repaid within one year, whereas the non-transferable, non-negotiable (and almost certainly unenforceable) note given by Argentina to the Central Bank in exchange for the use of the reserves has a repayment term of ten years.

47.     Moreover, the note appears to be a sham employed by Argentina to create the illusion that the Central Bank received something in exchange for the Unrestricted Reserves paid to the IMF in January. Tellingly, Argentina is rumored not to have paid the first US $200 million interest payment on this note when it came due on July 3, 2006. *A rumor under lock and key: Did the Ministry of the Economy fail to pay back a debt to the Central Bank*, CLARÍN (Aug. 12, 2006), Ex. 50. According to the Argentine press, "[t]he issue isn't so much the amount involved – some 200 million dollars – but the way that the political power's decisions impact an entity that retains very little of the independence that it should have by law." *Id.*

48.     Since Argentina paid off its debt to the IMF on January 3, 2006, many billions of dollars more in Unrestricted Reserves have accumulated. *Half the Reserves Paid to the Fund Already Recovered*, LA NACIÓN (May 6, 2006), Ex. 51; *Reserves Grow 25 Percent over the Year*, LA NACIÓN (May 6, 2006), Ex. 52.

24

49.    In addition to paying the IMF from the Central Bank's reserves, *(see Yesterday Argentina stopped being a creditor of the Monetary Fund*; LANACION.COM (January 4, 2006), Ex. 53), Argentina forced the Central Bank to purchase dollars in order to accumulate foreign currency for other government uses.  This money is reportedly not being deposited into the Central Bank's foreign exchange accounts for currency stabilization, but rather is being deposited into an account held in the name of the Argentine state.  *See Argentina Raises Money for Upcoming Debt Payment,* GLOBAL INSIGHT (July 27, 2006), Ex. 54 ("[T]he Central Bank has been increasing its daily purchases in the foreign exchange market, while trying to avoid excessive pressure over the exchange rate.  Consequently, purchases are not being made to recompose its foreign reserves but rather for the Treasury.").

50.    Upon information and belief, Argentina controls the day-to-day Central Bank in a variety of ways other than those examples provided above.  The Plaintiffs expect that these additional means of control will come to light through discovery.

## IV.    Giving Judicial Recognition To The Central Bank's Illusory Independence Will Injure EML And NML.

51.    The foregoing thoroughly demonstrates that the nominal legal distinction between Argentina and the Central Bank is illusory and that, in practice, Argentina exercises such extensive control over the Central Bank that a principal-agent relationship exists between the two entities.  Furthermore, any argument that the Central Bank's nominal independence should be recognized to shield the Central Bank's assets from Argentina's creditors would unjustly assist Argentina in avoiding paying the judgments

25

against it.   This Court recognized this fact in March 2005, when it observed, in connection with one of Plaintiffs' attempts to enforce the EML Judgment and NML's anticipated judgments: "The Republic has done everything possible to avoid the fruition of the lawsuits it agreed to have brought . . . . There's not a whimper of any idea that the Republic might pay the judgments which they really should pay."   Transcript of January 12, 2006 hearing, Ex. 55.

52.     Argentina's dealings with its Central Bank are entirely consistent with this pattern.  At the same time that Argentina has exercised complete control over the Central Bank, including using reserves nominally held by the Central Bank to pay its own debts, Argentina has sought to shield those assets from being used to satisfy EML's judgment and NML's anticipated judgment by contending that they are technically not its property.

53.     Between mid-2001 and 2003, the Central Bank, acting on the advice of the Argentine government and its "international counsel," transferred billions of dollars of foreign exchange reserves out of the United States to the Bank of International Settlements in Switzerland to shield those reserves from possible attachments by Argentina's creditors – a tacit acknowledgment that those reserves belong to Argentina, and could be subject to attachment if left in the United States.  Argentina's Cabinet Chief, Alberto Fernandez, described other measures taken to avoid paying the EML Judgment:

> Reserves of the Central Bank of the Argentine Republic on
> deposit in New York banks have been withdrawn, funds on
> deposit in the New York branch of Banco Nación have
> been repatriated, and salaries of Argentine officials posted
> to other countries are being deposited in Argentina or paid

26

in the form of cash sent via diplomatic pouch, which has
immunity.

*The Government Is Protecting Itself From Attachment*, LA NACIÓN, (Feb. 5, 2004), Ex.

56.

54.    The $105 million of foreign exchange reserves held by the Central Bank in

the Federal Reserve system are likely to be among the last assets controlled by Argentina

located in the United States.   Shielding these assets from attachment by Argentina's

creditors will thus greatly injure EML and NML by depriving them of a last clear

opportunity to enforce their present and anticipated judgments against assets located in

the United States.

### COUNT I

(For Declaratory Judgment)

55.    EML and NML repeat and reallege each and every allegation of

Paragraphs 1 through 54 of this Amended Complaint as set forth herein.

56.    A justiciable and actual controversy exists before this Court with respect

to whether the Central Bank is the alter-ego of Argentina.   A declaratory judgment

resolving this question is likely to (1) prevent future harm to EML and NML resulting

from Argentina's abuse of the Central Bank's nominal independence to shield its assets

from its creditors, (2) clarify or settle the legal rights of the parties to this action, and/or

(3) terminate a principal source of the insecurity and/or controversy that brought about

this action.

27

57.    An instrumentality like the Central Bank is the alter-ego of its parent state when the parent state controls the instrumentality so extensively that a principal-agent relationship exists between them, or where giving effect to the nominal separateness of the instrumentality would work fraud or injustice.

58.    In this case, Argentina undoubtedly controls the Central Bank, as demonstrated by the facts set forth above.  Moreover, the nominal distinction between Argentina and the Central Bank is illusory and only serves to aid Argentina in improperly shielding its assets from creditors like EML and NML.  Specifically, giving effect to the Central Bank's nominal separateness from Argentina would unjustly deprive EML and NML of the ability to recover at least $105 million in assets located in this District that, although nominally held by the Central Bank, are actually controlled by Argentina.

## COUNT II

(For Money Judgment Against The
Central Bank In Favor Of EML)

59.    EML repeats and reallege each and every allegation of paragraphs 1 through [58] of this Amended Complaint as set forth herein.

60.    On October 27, 2003, this Court entered the EML Judgment against Argentina for $724,801,662.56.  The EML Judgment became final and non appealable on November 30, 2004.

61.    As the alter ego of Argentina, the Central Bank is jointly and severally liable for all of Argentina's obligations.  Accordingly, EML is entitled to judgment expressly adjudging the Central Bank jointly and severally liable for the EML Judgment.

28

## COUNT III

(For Money Judgment Against The
Central Bank In Favor Of NML)

62.     NML repeats and reallege each and every allegation of paragraphs 1 through 58 of this Amended Complaint as set forth herein.

63.     On December 18, 2006, this Court entered the First NML Judgment against Argentina for $284,184,632.30.  The First NML Judgment became final and non-appealable on February 16, 2007.

64.     As the alter ego of Argentina, the Central Bank is jointly and severally liable for all of Argentina's obligations.  Accordingly, NML is entitled to judgment expressly adjudging the Central Bank jointly and severally liable for the First NML Judgment.

## COUNT VI

(For Money Judgment Against The
Central Bank In Favor Of NML)

65.     NML repeats and realleges each and every allegation of paragraphs 1 through 58 of this Amended Complaint as set forth herein.

66.     NML expects to be awarded judgment against Argentina in the Second NML Action.  As the alter ego of Argentina, the Central Bank is jointly and severally liable for all of Argentina's obligations.  Accordingly, NML will be entitled to judgment expressly adjudging the Central Bank jointly and severally liable for any judgment awarded against Argentina in the Second NML Action.

## COUNT V

(For Money Judgment Against The
Central Bank In Favor Of NML)

67.     NML repeats and realleges each and every allegation of paragraphs 1 through 58 of this Amended Complaint as set forth herein.

68.     NML expects to be awarded judgment against Argentina in the Third NML Action.  As the alter ego of Argentina, the Central Bank is jointly and severally liable for all of Argentina's obligations.  Accordingly, NML will be entitled to judgment expressly adjudging the Central Bank jointly and severally liable for any judgment awarded against Argentina in the Third NML Action.

## COUNT VI

(For Money Judgment Against The
Central Bank In Favor Of NML)

69.     NML repeats and realleges each and every allegation of paragraphs 1 through 58 of this Amended Complaint as set forth herein.

70.     NML expects to be awarded judgment against Argentina in the Fourth NML Action.  As the alter ego of Argentina, the Central Bank is jointly and severally liable for all of Argentina's obligations.  Accordingly, NML will be entitled to judgment expressly adjudging the Central Bank jointly and severally liable for any judgment awarded against Argentina in the Fourth NML Action.

13020152.1

## COUNT VII

(For Money Judgment Against The
Central Bank In Favor Of NML)

71.    NML repeats and realleges each and every allegation of paragraphs 1 through 58 of this Amended Complaint as set forth herein.

72.    NML expects to be awarded judgment against Argentina in the Fifth NML Action. As the alter ego of Argentina, the Central Bank is jointly and severally liable for all of Argentina's obligations. Accordingly, NML will be entitled to judgment expressly adjudging the Central Bank jointly and severally liable for any judgment awarded against Argentina in the Fifth NML Action.

## COUNT VIII

(For Money Judgment Against The
Central Bank In Favor Of NML)

73.    NML repeats and realleges each and every allegation of paragraphs 1 through 58 of this Amended Complaint as set forth herein.

74.    NML expects to be awarded judgment against Argentina in the Sixth NML Action. As the alter ego of Argentina, the Central Bank is jointly and severally liable for all of Argentina's obligations. Accordingly, NML will be entitled to judgment expressly adjudging the Central Bank jointly and severally liable for any judgment awarded against Argentina in the Sixth NML Action.

WHEREFORE, based on the allegations set forth above and/or additional facts that will be revealed through discovery EML and NML pray for judgments against the Central Bank and Argentina,

31

a. declaring, pursuant to 28 U.S.C. § 2201, that the Central Bank is the alter-ego of Argentina,

b. adjudging the Central Bank jointly and severally liable for the judgments that have been awarded, and that will be awarded, to EML and NML against Argentina based on Argentina's default on its sovereign debt,

c. for interest, costs, fees and other expenses associated with this action, including reasonable attorney fees, and

d. such other legal or equitable relief as this Court deems just and proper.

Dated:  November 21, 2007
New York, New York

DEBEVOISE & PLIMPTON LLP

By: _____
David W. Rivkin
Suzanne M. Grosso
Claudio D. Salas
919 Third Avenue
New York, New York  10022
(212) 909-6000
*Attorneys for Plaintiff EM Ltd*

DECHERT LLP

By: _____
Robert A. Cohen
Charles I. Poret
Dennis H. Hranitzky
David M. Bigge
30 Rockefeller Plaza
New York, New York 10112
(212) 698-3500
*Attorneys for Plaintiff NML Capital, Ltd.*

GIBSON DUNN & CRUTCHER LLP

By: _____
Theodore B. Olson
Matthew D. McGill
1050 Connecticut Avenue, NW
Washington, D.C.  20036
(202) 955-8500
*Attorneys for Plaintiff NML Capital, Ltd.*

13020152.1

## CERTIFICATE OF SERVICE

The undersigned certifies under penalty of perjury that on November 21, 2007 he caused to be served a true and exact copy of the annexed AMENDED COMPLAINT by hand on the following:

| | |
|---|---|
| Joseph E. Neuhaus, Esq.<br>Sullivan & Cromwell<br>125 Broad Street<br>New York, New York | Jonathan I. Blackman, Esq.<br>Cleary Gottlieb Steen &<br>Hamilton LLP<br>One Liberty Street<br>New York, New York 10006 |

LUIS A. LOPEZ