DEBEVOISE & PLIMPTON LLP
  David W. Rivkin
  John B. Missing
  Suzanne M. Grosso
  (EM@debevoise.com)
919 Third Avenue
New York, New York  10022
Tel. (212) 909-6000
  *Attorneys for Plaintiff EM Ltd.*

DECHERT LLP
  Robert A. Cohen
  Dennis H. Hranitzky
  David M. Bigge
  (NML@dechert.com)
1095 Avenue of the Americas
New York, New York  10036
Tel. (212) 698-3500
  *Attorneys for Plaintiff NML Capital, Ltd.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------- x

| | | |
|---|---|---|
| EM LTD and NML CAPITAL, LTD., | : | 06 Civ. 7792 (TPG) |
|     Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| THE REPUBLIC OF ARGENTINA and | : | |
| BANCO CENTRAL DE LA | : | |
| REPÚBLICA ARGENTINA, | : | |
|     Defendants. | : | |

---------------------------------------------------x

| | | |
|---|---|---|
| NML CAPITAL, LTD., | : | |
|     Plaintiff, | : | 07 Civ. 1910 (TPG) |
| | : | 07 Civ. 6563 (TPG) |
| v. | : | 08 Civ. 2541 (TPG) |
| | : | 08 Civ. 6978 (TPG) |
| THE REPUBLIC OF ARGENTINA, | : | 09 Civ. 1707 (TPG) |
|     Defendant. | : | 09 Civ. 1708 (TPG) |

---------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO CONFIRM ATTACHMENT ORDERS SIGNED ON JANUARY 11 AND 12, 2010

TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ........................................................................1

**STATEMENT OF FACTS**..........................................................................4

**I.    PLAINTIFFS' LITIGATION AGAINST THE CENTRAL BANK**.................5

  A.    History Of The Frozen $100 Million ...........................................5

  B.    Status Of The First Alter-Ego Motion And Alter-Ego Action ...................8

**II.   SUMMARY OF PREVIOUSLY INTRODUCED EVIDENCE ESTABLISHING ARGENTINA'S DOMINATION OF THE CENTRAL BANK** .................................................................11

**III.  NEW EVIDENCE FURTHER ESTABLISHING  ARGENTINA'S DOMINATION OF THE CENTRAL BANK** ....................................13

  A.    The Argentine Executive Branch Continues To Commandeer Central Bank Funds For Argentina's Own Use, Including Selective Repayment Of Debt ...............................................14

      1.    Access To Central Bank Reserves By Decree ...............................14

      2.    Access To Central Bank "Profits" ................................19

      3.    Access To Central Bank Reserves By  Amendment Of Central Bank Charter ....................................21

  B.    The Argentine Executive Branch Continues To Puppeteer The Central Bank's Governor .......................................22

  C.    The Argentine Executive Branch Continues To Dictate Monetary Policy, Including Directing The Central Bank To Manipulate The Exchange Rate To Further The Kirchners' Own Political Agenda And Punish Their Political Enemies ...........................................25

**ARGUMENT**...........................................................................26

**I.    LEGAL STANDARD GOVERNING  CONFIRMATION OF ATTACHMENTS** ..............................................................26

**II.   THE CENTRAL BANK IS AN ALTER EGO OF ARGENTINA**.................27

  A.    Legal Standard for Alter-Ego Showing ....................................27

  B.    Argentina Continues To Control The  Activities and Assets of the Central Bank ....................................................28

i

C.      Recognizing The Central Bank's Separate Juridical Status Would Countenance Argentina's Selective Recognition Of (Or Refusal To Recognize) The Valid Judgments Entered Against It ............................... 29

III.    **THE BCRA ACCOUNTS ARE NOT IMMUNE FROM ATTACHMENT, RESTRAINT OR EXECUTION UNDER THE FSIA** ................................................................................................................ **31**

**CONCLUSION** ................................................................................................ **34**

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Compagnie Noga d'Importation et d'Exportation S.A. v. Russian Federation*,
    361 F.3d 676 (2d Cir. 2004)........................................................................28

*De Letelier v. Republic of Chile*,
    748 F.2d 790 (2d Cir. 1984).......................................................................31

*EM Ltd. v. Republic of Argentina*,
    473 F.3d 463 (2d Cir. 2007).......................................................7, 31, 32, 33

*EM Ltd. v. Republic of Argentina*,
    552 U.S. 818 (2007)....................................................................................7

*First City, Texas-Houston v. Rafidain Bank*,
    150 F.3d 172 (2d Cir. 1998)..................................................................31, 34

*First National City Bank v. Banco Para El Comercio Exterior de Cuba*,
    462 U.S. 611 (1983)....................................................8, 11, 27, 28, 29

*JSC Foreign Economic Ass'n Technostroyexport v. International Development
    and Trade Services, Inc.*,
    306 F. Supp. 2d 482 (S.D.N.Y. 2004).............................................15, 18, 26

*Kensington International Ltd. v. Republic of Congo*,
    2007 WL 1032269 (S.D.N.Y. Mar. 30, 2007), *reversed sub nom. on other
    grounds, Kensington Intern. Ltd. v. Itoua*, 505 F.3d 147 (2d Cir. 2007)....................31

*McKesson v. Islamic Republic of Iran*,
    52 F.3d 346 (D.C. Cir. 1995) .....................................................................28

*Passalacqua Builders, Inc. v. Resnick*,
    933 F.2d 131 (2d Cir. 1991).......................................................................28

*Republic of Argentina v. Weltover*,
    504 U.S. 607 (1992)..................................................................................33

*Triton Container International Ltd. v. M/S Itaite*,
    No. 90 Civ. 7725, 1991 WL 255613 (S.D.N.Y. Feb. 25, 1991) .................................26

*United States Fidelity & Guaranty Co. v. Braspetro Oil Services Co.*,
    1999 WL 307666 (S.D.N.Y. May 17, 1999), *aff'd*, 199 F.3d 94 (2d Cir. 1999).........28

*Walter Fuller Aircraft Sales Inc. v. Republic of Philippines*,
    965 F.2d 1375 (5th Cir. 1992) ...................................................................28

iii

S TATUTES

28 U.S.C. § 1603 ................................................................................................33

28 U.S.C. § 1605 ................................................................................................33

28 U.S.C. § 1610 ........................................................................................1, 32, 33

N.Y. C.P.L.R. § 6201 .........................................................................................26

N.Y. C.P.L.R. § 6211 ...........................................................................................1

Foreign Sovereign Immunities Act,
    28 U.S.C. §§ 1601 *et seq*.................................................4, 7, 9, 26, 28, 31, 32

O THER A UTHORITIES

Fed. R. Civ. P. 64 ...........................................................................................1, 26

Fed. R. Civ. P. 69 ..............................................................................................26

*Immunities of Foreign States:  Hearing on H.R. 3493 Before the Subcomm. on*
    *Claims and Governmental Relations of the H. Comm. on the Judiciary*,
    93d Cong. 25 (1973) (statement of Charles N. Brower, Acting Legal Adviser,
    Department of State) ....................................................................................32

H.R. Rep. No. 94-1487, *reprinted in* 1976 U.S.C.C.A.N. 6604 ........................33

11 Jack B. Weinstein, Harold L. Korn, & Arthur R. Miller, New York Civil
    Practice: CPLR § 5222.05..........................................................................27

Plaintiff EM, Ltd. ("**EM**"), through its attorneys Debevoise & Plimpton LLP, and Plaintiff NML Capital, Ltd. ("**NML**"), through its attorneys Dechert LLP, respectfully submit this memorandum of law in support of their motion, pursuant to Rule 64 of the Federal Rules of Civil Procedure, Section 6211(b) of the New York Civil Practice Law and Rules ("**CPLR**"), and 28 U.S.C. § 1610, to confirm the *ex parte* attachment orders entered by this Court on January 11 and 12, 2010 directed to assets of Defendant The Republic of Argentina ("**Argentina**") nominally held by its alter ego, Defendant Banco Central de la República Argentina ("**BCRA**" or the "**Central Bank**") currently maintained at any of 43 named garnishees located within this Court's jurisdiction.

## PRELIMINARY STATEMENT

As this Court well knows, EM and NML hold final judgments against Argentina that collectively total, with interest, over $2 billion.[1]  Unfortunately, as the Court also knows too well, Argentina has yet to pay one dime toward satisfying those judgments. EM and NML have been forced as a result to spend considerable resources over the last several years locating Argentine assets against which Plaintiffs can execute—and then battling Argentina, which has waged a dogged campaign to protect those assets from collection.  The Court is in the process of deciding Plaintiffs' motion seeking attachment orders relating to approximately $100 million deposited, and currently frozen by stipulation and order, in a single account nominally held at the Federal Reserve Bank of New York ("**FRBNY**") in the name of the Central Bank.  That motion, which was filed

---

[1]  EM and NML respectively respectfully refer to the Declaration of Dennis H. Hranitzky dated September 25, 2006 [Case No. 06 Civ. 7792, Docket No. 10] and the Declaration of Robert A. Cohen dated September 25, 2006 [Case No. 06 Civ. 7792, Docket No. 8] for the detailed facts underlying their claims and judgments against Argentina.

over three years ago, arises from Plaintiffs' separate lawsuit against Argentina and its alter ego, the Central Bank.

This Court already found, in connection with Plaintiffs' pending motion regarding the frozen $100 million, that the Central Bank was an alter ego of Argentina as of December 30, 2005. In the ensuing four years, the Argentine Executive Branch has engaged and continues to engage in a series of widely-publicized acts that unequivocally demonstrate its continued and complete control over the Central Bank. These acts are remarkable not only because they demonstrate that the Central Bank remains an alter ego of Argentina, but also for the degree to which they evince Argentina's confidence in its ability to continue disregarding the U.S. legal system by whose laws it expressly agreed to be bound.

The most recent evidence of the Argentine Executive Branch's domination of the Central Bank includes the issuance of an emergency Executive Decree on December 14, 2009 by Argentine President Cristina Fernández de Kirchner mandating the transfer of Central Bank reserves into a dedicated Fund—*Fondo del Bicentenario para el Desendeudamiento y la Estabilidad*, or the Bicentennial Fund for Debt Reduction and Stability (the "**Bicentennial Fund**")—to be used for the repayment of Argentina's sovereign debt. When the Central Bank's then-Governor, Martín Redrado, refused to arrange an immediate transfer of reserves pending advice from the Central Bank's legal counsel, President Fernández de Kirchner issued another emergency Executive Decree on January 7, 2010 purportedly firing Redrado. On January 8, 2010, acting Central Bank Governor Miguel Angel Pesce reportedly directed Argentine banks to cease foreign currency transactions using BCRA's account(s) at the FRBNY and instead operate

through the BCRA's accounts at the Bank for International Settlements ("**BIS**") in Basel, Switzerland.

In light of these events, Plaintiffs obtained from the Court *ex parte* on January 11 and 12, 2010, attachment orders, restraining orders, writs of execution, and an "omnibus" order with respect to any and all accounts maintained in the name of the Central Bank at 43 financial institutions, including the FRBNY, located in Manhattan (collectively, the "**BCRA Accounts**").[2]   Those orders were vacated by a Stipulation and Consent Order entered on January 15, 2010, but *only* with respect to the single FRBNY account for amounts in excess of the frozen $100 million.[3]   Plaintiffs therefore now move to confirm the remainder of their newly-issued attachment orders (collectively, the "**January 2010 Attachments**")—*i.e.*, orders attaching $100 million at the FRBNY, and orders attaching subject property at any of the other garnishees.[4]   This new motion, which is based on the Central Bank's current alter-ego status and current commercial use of the BCRA Accounts, is separate from Plaintiffs' pending motion involving the Central Bank's alter-

---

[2]   Among other things, the omnibus order grants relief necessary to preserve Plaintiffs' priority rights as the only creditors to have invested considerable resources developing and litigating the status of the Central Bank as an alter ego of Argentina.  Copies of all of the attachment orders, restraining orders, writs of execution and omnibus order that Plaintiffs obtained on January 11 and 12, 2010 are attached as Exhibits 55 through 58 to the Declaration of Suzanne M. Grosso dated January 19, 2010 ("**Grosso Decl.**").

[3]   A copy of the Stipulation and Consent Order dated January 15, 2010 is attached as Grosso Decl. Ex. 59.  The vacatur released what BCRA represented to be an additional $1.8 million at the FRBNY.  BCRA apparently conducts regular "sweeps" of its FRBNY account at least three times per day to move reserves to Switzerland.  *See* Grosso Decl. Ex. 62 (*Where Are the BCRA's Reserves?*, LA NACIÓN (Jan. 13, 2010)).  According to the Argentine press, BCRA had already transferred $50 million from the FRBNY to BIS on the date Plaintiffs served their attachment order.  *See* Grosso Decl. Ex. 61 (*US$ 1.7 Million in Central Bank Funds in the United States Frozen*, LA NACIÓN (Jan. 12, 2010)).

[4]   Plaintiffs do not yet know if accounts are maintained in the Central Bank's name at any garnishee other than the FRBNY.

ego status as of December 30, 2005 and commercial use of the frozen $100 million on that date.  Accordingly, it is not necessary for the Court to decide the new motion in order to issue a written decision on the pending motion.

There can be no question that the Central Bank is today an alter ego of Argentina. Argentina persists in commandeering Central Bank assets for use by the Argentine Executive Branch (including repayment of Argentina's debt), usurping the Central Bank's responsibility for the country's monetary policy, and acting as the puppet master for Central Bank leadership.  The Central Bank, as an alter ego liable for Plaintiffs' judgments against Argentina, may invoke the protection of the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1601 *et seq.* ("**FSIA**"), only to the same extent as Argentina—which indisputably waived its assets' immunity from attachment under the FSIA.  Since Argentina cannot itself invoke the protection afforded to central banks under § 1611, the FSIA does not bar Plaintiffs' requested provisional relief if the BCRA Accounts are being used for commercial activity.  In light of the evidence Plaintiffs already uncovered through discovery about how the FRBNY account in which the frozen $100 million is deposited was being used for commercial activity in 2005, the Central Bank and Argentina are likely using the BCRA Accounts for some or all of the same commercial activities.

For these reasons, as explained in greater detail below, Plaintiffs' motion to confirm the January 2010 Attachments should be granted.

## STATEMENT OF FACTS

Plaintiffs' Statement of Facts is divided into three sections.  The first section summarizes for the Court's convenience Plaintiffs' litigation against the Central Bank.

The second section summarizes the alter-ego evidence Plaintiffs introduced through October 2008, when they filed a Second Amended Complaint against the Central Bank and Argentina.  The third section provides examples of alter-ego evidence since that time.

## I.      PLAINTIFFS' LITIGATION AGAINST THE CENTRAL BANK

### A.      <u>History Of The Frozen $100 Million</u>

The entire FRBNY account containing the frozen $100 million (the "**First FRBNY Account**") was initially attached and restrained by Plaintiffs in 2005 as a result of litigation involving the early repayment of Argentina's $9.8 billion debt to the International Monetary Fund (the "**IMF**").  Specifically, on December 15, 2005, then-President Néstor Kirchner issued two emergency Executive Decrees that *(a)* designated over $8 billion of Central Bank assets as so-called "freely available reserves" available to repay Argentina's debts to international financial organizations, and *(b)* directed the repayment of Argentina's debt to the IMF using these newly-designated Central Bank assets.  Since the repayment to the IMF was reportedly scheduled to be made on January 3, 2006, Plaintiffs acted quickly and obtained *ex parte* orders on December 30, 2005 restraining and attaching any Central Bank property held or located at each of the nine garnishee financial institutions in New York where Plaintiffs then had reason to believe the Central Bank may have maintained accounts (the "**IMF Motion**").  FRBNY was the only garnishee in possession of significant assets—*i.e.*, the First FRBNY Account—subject to the attachment and restraining orders.[5]

On January 9, 2006, the Court entered a Stipulation and Consent Order (the "**January 2006 Stipulation**") negotiated by the parties in response to concerns expressed

---

[5]     A copy of the FRBNY Garnishee Statement dated January 9, 2006 is attached as Grosso Decl. Ex. 3.

by Argentina and the Central Bank that the attachment and restraining orders not interfere with the alleged "day-to-day, ordinary course, central-banking functions of the Central Bank" pending resolution of their motion to vacate and Plaintiffs' cross-motion to confirm.  The January 2006 Stipulation amended the attachment and restraining orders to extend to property in the First FRBNY Account equal to not less than 95% of the amount credited to that account as of the close of business on January 6, 2006—or maintenance of approximately $100 million—pending a resolution of the cross-motions.[6]   On January 12, 2006, the Court vacated the amended attachment and restraining orders, but stayed the vacatur pending Plaintiffs' appeal.

On September 25, 2006, shortly after the Second Circuit heard oral argument on Plaintiffs' appeal in the IMF Motion, Plaintiffs brought a new lawsuit (Docket No. 06 Civ. 7792 (TPG)) against both Argentina and the Central Bank based on allegations and voluminous evidence that the Central Bank is an alter ego of Argentina (the "**Alter-Ego Action**").  At the same time, Plaintiffs moved on notice for the attachment and restraint of the $100 million then on appeal in the IMF Motion (the "**First Alter-Ego Motion**"). The parties negotiated another Stipulation and Consent Order that was entered by the Court on September 28, 2006 (the "**September 2006 Stipulation**"), which provided that the $100 million in the First FRBNY Account would remain frozen—and subject to the terms of the January 2006 Order—pending the later of the Second Circuit's decision on the IMF Motion or this Court's decision on the First Alter-Ego Motion.[7]

---

[6]    A copy of the Stipulation and Consent Order dated January 9, 2006 is attached as Grosso Decl. Ex. 4.  A copy of the transcript for the January 6, 2006 hearing that preceded the January 2006 order is attached as Grosso Decl. Ex. 5.

[7]    A copy of the Stipulation and Consent Order dated September 28, 2006 is attached as Grosso Decl. Ex. 6.

On January 5, 2007, the Second Circuit issued its decision on the IMF Motion affirming this Court's vacatur of the attachment and restraining orders directed to the $100 million held in the First FRBNY Account.  The Second Circuit concluded that the $100 million was immune from attachment and restraint under the FSIA because those funds remained property of the Central Bank notwithstanding the decrees issued by then-President Néstor Kirchner.  *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 465 (2d Cir. 2007).  At the same time, as this Court previously observed, the Second Circuit decision "almost reads like an invitation to raise [an alter-ego theory]."  Grosso Decl. Ex. 7 (Hearing Transcript (Feb. 2, 2007) at 18:17-25); *see also* Grosso Decl. Ex. 8 (Hearing Transcript (May 6, 2008) at 6:23-25); Grosso Decl. Ex. 9 (Hearing Transcript (Dec. 17, 2007) at 16:2-6).  The Second Circuit alternatively concluded that the $100 million was protected from attachment and restraint by sovereign immunity because there was no evidence that these particular reserves were to be used for repaying the IMF and, in any event, that a sovereign's repayment of its debt to the IMF is not a commercial activity under the FSIA.  *EM Ltd.*, 473 F.3d at 482.

Plaintiffs' petition for a writ of *certiorari* in connection with the IMF Motion was denied by the Supreme Court on October 1, 2007.  *EM Ltd. v. Republic of Argentina*, 552 U.S. 818 (2007).  However, pursuant to the September 2006 Stipulation (Grosso Decl. Ex. 6) and the January 2010 Stipulation (Grosso Decl. Ex. 59), the $100 million held in the First FRBNY Account remains frozen pending further order of this Court.

**B.**      **Status Of The First Alter-Ego Motion And Alter-Ego Action**

The Court has conducted multiple hearings and received several rounds of briefing and correspondence throughout 2007, 2008 and 2009 in connection with the First Alter-Ego Motion.

To date, the Court has issued a series of oral rulings on certain relevant factual and legal issues:

- *First*, the Court held that Plaintiffs' First Amended Complaint (filed on November 21, 2007, in the Alter-Ego Action) states "a perfectly good request for money judgment." Grosso Decl. Ex. 9 (Hearing Transcript (Dec. 17, 2007) at 25:15-16).

- *Second*, the Court rejected Defendants' contention that the doctrine of *res judicata* bars the First Alter-Ego Motion. *See* Grosso Decl. Ex. 8 (Hearing Transcript (May 6, 2008) at 3:20-22 ("I will start by saying that the res judicata argument made by the [Central Bank] I think is not valid.")).

- *Third*, the Court rejected Plaintiffs' contention that they need only establish a *prima facie* alter-ego case to sustain their burden of proof and continue the freeze of the $100 million held in the First FRBNY Account until a final decision has been issued on the merits in the Alter-Ego Action. *See* Argument Section I below.

- *Fourth*, the Court found that Plaintiffs satisfied their burden of establishing that the Central Bank was an alter ego of Argentina. *See* Grosso Decl. Ex. 8 (Hearing Transcript (May 6, 2008) at 8:24-25 ("Now I want to say—and I haven't written a formal decision— the plaintiffs make a very strong case of alter-ego.")); Grosso Decl. Ex. 10 (Hearing Transcript (May 30, 2008) at 28:14-16 (reiterating that the Court already "made a finding of alter ego[.]")).[8]

In a telephonic conference conducted on May 6, 2008, the Court advised the parties of its view that the record in the First Alter-Ego Motion was not yet developed

---

[8]     For purposes of the First Alter-Ego Motion, Plaintiffs bear the burden of establishing that the Central was an alter ego of Argentina as of December 30, 2005—the date the $100 million was initially attached and restrained in the IMF Motion. *See* Grosso Decl. Ex. 8 (Hearing Transcript (May 6, 2008) at 11:12-18.

enough to determine whether the First FRBNY Account was being used for commercial activity prior to December 30, 2005, the date on which it was originally frozen in the IMF Motion.  Plaintiffs subsequently served discovery requests on Argentina and the Central Bank, and a subpoena on the FRBNY, seeking information about the use(s) of the First FRBNY Account under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1601-1611. Defendants objected to Plaintiffs' requests, and the Court held another telephonic conference on May 30, 2008 to discuss the parties' dispute.  The parties thereafter agreed, subject to certain reservations of their rights, to limit the scope of Plaintiffs' requests, and discovery has concluded.  This remaining issue was fully-briefed as of August 16, 2009.[9]

Also during the May 6, 2008 telephonic conference, the Court directed Plaintiffs to re-plead their First Amended Complaint in the Alter-Ego Action in a format that did not require the simultaneous submission of voluminous referenced exhibits.  Plaintiffs filed a Second Amended Complaint on October 6, 2008 [Case No. 06 Civ. 7792, Docket No. 43].   The Second Amended Complaint describes extensive new evidence demonstrating Argentina's continued domination of the Central Bank during the two years that had passed since the First Alter-Ego Motion was filed in September 2006.  The Second Amended Complaint references press articles and other documents supporting Plaintiffs' alter-ego allegations, but does not attach copies of those materials.

_____

[9]   The Court conducted a telephonic conference on September 17, 2009 and requested certain additional information relating to the parties' briefing on the commercial activity issue. BCRA and Argentina responded by letter dated September 24, and Plaintiffs responded by letter dated September 30.  In a Memorandum dated October 6, 2009, the Court advised the parties that no further briefing was required.  In a subsequent Memorandum dated October 16, 2009, the Court advised that it was laying aside the parties' additional respective letters dated October 9 and 14 and would advise when or if any additional information was necessary.  [See Grosso Decl. Ex. 11 (Memorandum of October 6, 2009, No. 06 Civ. 7792); Grosso Decl. Ex. 12 (Memorandum of October 16, 2009, No. 06 Civ. 7792).]

On December 7, 2009, in response to a Memorandum from the Court dated November 24, 2009 [Case No. 06 Civ. 7792, Docket No. 58], Plaintiffs filed a declaration attaching as exhibits each press article and other document referenced in the Second Amended Complaint, regardless of whether such materials previously were submitted as exhibits to any declarations submitted in support of the First Alter-Ego Motion.  *See* Declaration of Dennis Hranitzky dated December 7, 2009 [Case No. 06 Civ. 7792, Docket No. 58].  On January 14, 2010, the Central Bank submitted its response to the materials referenced in the Second Amended Complaint that were not yet part of the record in the First Alter-Ego Motion—essentially, evidence demonstrating the Central Bank's alter-ego status during the period between September 2006 and October 2008. *See* BCRA's Supplemental Memorandum in Response to the December 7, 2009 Declaration of Dennis Hranitzky [Case No. 06 Civ. 7792, Docket No. 63].  Plaintiffs intend to submit their reply promptly.

In a telephonic conference conducted on January 8, 2010, the Court requested that the Central Bank provide *(a)* information regarding substantial transfers of Central Bank reserves from the United States, including during the period leading up to Argentina's default in 2001 (*see* Grosso Decl. Ex. 13 (Case No. 03 Civ. 2507 (TPG), Hearing Transcript (Jan. 8, 2010) at 5, 11)), and *(b)* the reason that the Central Bank stopped conducting certain types of investment transactions out of the First FRBNY Account on or around December 15, 2005 (*see id*. at 6-7).

II.   **SUMMARY OF PREVIOUSLY INTRODUCED
      EVIDENCE ESTABLISHING ARGENTINA'S
      DOMINATION OF THE CENTRAL BANK**

Plaintiffs provide in summary format below samples of the alter-ego evidence presented as of October 6, 2008, the date on which the Second Amended Complaint was filed in the Alter-Ego Action.  These samples are intended to provide context for the discussion in Section III below presenting new evidence demonstrating Argentina's continued complete domination over the Central Bank *to this day*.  Plaintiffs respectfully refer the Court to their prior submissions for a more detailed analysis of these and other examples:

*First*, the Central Bank's charter has always limited the Central Bank's independence as a separate legal entity.  Furthermore, the charter is a document drafted by Argentina and subject to amendment or preemption by the Argentine Executive Branch or Argentine Congress.  Since 1999, Argentina has amended the charter or otherwise enacted laws affecting the Central Bank's functions over *forty* times—and the overwhelming majority of those amendments and legislation cede even more control over the Central Bank's activities to the Executive Branch.  Second Amended Complaint, ¶¶ 29-30.

*Second*, Argentina has the power to appoint and remove Central Bank officials at will.  From 2001 through 2005, the Central Bank witnessed incredibly high turnover among its leadership, including its *six* different Governors—each of whom was supposed to serve a six-year term.  Among central banks world-wide, the Central Bank has one of the highest turnover rates.  High turnover of central bank officials is a leading indicator of lack of central bank independence in developing countries.  Indeed, many of the Central Bank Governors who have been forced to resign in recent years (some following only a

tenure as short as several months) have made clear that their resignations were due to Argentina's control of the Central Bank.  In contrast, current Central Bank Governor, Martín Redrado, managed—at least *until very recently* (*see* Section III.B below)—to hold on to his position for almost his entire six-year term by operating as a "yes man" for former Argentine President Néstor Kirchner and his wife, current Argentine President Cristina Fernández de Kirchner.  Second Amended Complaint, ¶¶ 31-41.

*Third*, according to its charter, the Central Bank is not supposed to be "subject to any order, recommendation or instruction given by the National Executive Power" with regard to "the preparation and implementation of a monetary policy and financial policy." Managing these policies free from political interference in order to stabilize the value of their country's currency and avoid inflation is a primary purpose of all truly independent central banks.  But in reality, the Argentine Executive Branch so thoroughly controls the preparation and implementation of these policies that the Central Bank is incapable of performing its prescribed duties.  For example, prior to the election of his wife in October 2007, then-President Néstor Kirchner directed the Central Bank to accumulate reserves at all costs in order to fuel Argentina's export-driven economy—and thereby garner the ongoing electoral support of the country's important agricultural sector.  The Kirchners reversed course in early 2008 when the agricultural sector turned against them—directing the Central Bank to drive up the value of the Argentine peso (thereby stifling agricultural exports) as a punishment to the sector and as a warning against a strike contemplated by the industrial sector.  Inflation is rampant as a result of the Kirchners' micro-management of Argentina's monetary and financial policies.  To mask this consequence, the Executive

Branch has resorted to manipulating official inflation statistics.   Second Amended Complaint, ¶¶ 42-57.

*Fourth*, the assets of a genuinely independent central bank cannot be raided by its parent government to pay the government's own debts.   Nevertheless, there are now almost *no* restrictions on Argentina's ability to use Central Bank assets for Argentina's own purposes, including repayment of Argentina's debts.   In 2005, then-President Néstor Kirchner—without the approval of the Central Bank and in violation of the limitations contained in the Central Bank's Charter on lending to the government—issued Executive Decrees earmarking over US$8 billion of BCRA reserves for an early repayment in full of Argentina's debt to the International Monetary Fund.   In 2008, current President Cristina Fernández de Kirchner issued Executive Decrees authorizing the use of BCRA reserves to repay Argentina's debt to the Paris Club—as well as any other foreign-currency denominated Argentine debt—and exempting such transactions from the Charter limitation.   The Central Bank once again was not consulted.   Second Amended Complaint, ¶¶ 58-71.

## III.   NEW EVIDENCE FURTHER ESTABLISHING ARGENTINA'S DOMINATION OF THE CENTRAL BANK

Since Plaintiffs filed their Second Amended Complaint on October 6, 2008, evidence demonstrating that Argentina completely dominates the Central Bank has continued to mount.   Argentina persists in commandeering Central Bank assets for use by the Argentine Executive Branch (including repayment of Argentina's debt), usurping the Central Bank's responsibility for the country's monetary policy, and acting as the puppet master for Central Bank leadership.

> **A.    The Argentine Executive Branch Continues To**
> **Commandeer Central Bank Funds For Argentina's**
> **Own Use, Including Selective Repayment Of Debt**

The Argentine Executive Branch views as limitless its ability to seize Central Bank funds for Argentina's own use, including the selective repayment of the country's debt (among other spending initiatives). Throughout 2009, the Kirchners financed their political patronage machine with funds appropriated from the Central Bank, Banco de la Nación Argentina, and Argentina's pension system. *See* Grosso Decl. Ex. 14 (*With This Legacy, Will the Dynasty Wish to Continue?*, LA NACIÓN (Nov. 29, 2009)). By all accounts, they intend to do the same thing in 2010. *See* Grosso Decl. Ex. 15 (*Public Financing Continues in 2010*, LA NACIÓN (Sept. 24, 2009)); Grosso Decl. Ex. 16 (*Debt and 2010 Financial Plan*, LA NACIÓN (Sept. 13, 2009)); Grosso Decl. Ex. 17 (*The Government Embellishes December Figures to Conceal the Deficit*, CLARÍN (Dec. 7, 2009) (describing the "varied accounting tricks" the government will use to "appear fiscally healthy")).

> **1.    Access To Central Bank Reserves By Decree**

The most recent example of the Argentine Executive Branch's complete domination of the Central Bank is the creation of a US$6.57 billion fund to pay Argentina's debts using Central Bank reserves. On December 14, 2009, President Cristina Fernández de Kirchner issued emergency Executive Decree 2010/2009, establishing the *Fondo del Bicentenario para el Desendeudamiento y la Estabilidad*, the Bicentennial Fund for Debt Reduction and Stability. *See* Grosso Decl. Ex. 18 (Decree 2010/2009: Establishing the Bicentenary Fund for Debt Reduction and Stability, Amending Law No. 23.928). The Fund will use more than one-third of the Central Bank's "freely available" foreign currency reserves (or 14% of the total foreign currency

reserves) to make debt payments in 2010.  *See id.*; Grosso Decl. Ex. 19 (*Argentina Takes Steps to Lower Risk Perception*, DOW JONES INT'L NEWS (Dec. 14, 2009)).  Specifically, the Kirchner administration intends to use the Fund to pay private creditors with debts coming due in 2010; any settlement or debt exchange with holders of defaulted bonds or the Paris Club of creditor nations will reportedly be separate.  *See* Grosso Decl. Ex. 18 (Decree 2010/2009) (stating that the objective of the Fund is "advancing payment of the public debt of the National Treasury maturing in the year 2010" for "payments due to Multilateral Agencies . . . and payments due to private creditors")); Grosso Decl. Ex. 19 (*Argentina Takes Steps to Lower Risk Perception*, DOW JONES INT'L NEWS (Dec. 14, 2009) (stating that according to Economy Minister Amado Boudou, the reserves will not be used to settle Paris Club debts, and describing the planned debt exchange)).  The Fund will be created by a transfer of Central Bank funds to the Treasury that effectively constitutes a loan with zero interest.  *See* Grosso Decl. Ex. 18 (Decree 2010/2009) (stating that in exchange, the Central Bank will receive a Treasury Bill with a "maximum [interest] rate of 1-year LIBOR [London Interbank Offered Rate] less 1 percentage point"); Grosso Decl. Ex. 20 (*Argentine Zero Interest Loan Proves Irresistible*, BLOOMBERG (Dec. 20, 2009) (reporting that the benchmark LIBOR rate is currently 0.25%)).

Section 1 of the Decree amends Article 6 of Argentine Law 23.928 (the so-called "Convertibility Law") to provide that "[t]he freely available reserves may be applied to the payment of obligations contracted with international financial organizations ***and to the payment of debt service on the public debt of the National State.***"  Grosso Decl. Ex. 18 (Decree 2010/2009) § 1 (emphasis added).  Then, as explained in the recitals to

the Decree, "[t]he Fund will be managed by the MINISTRY OF THE ECONOMY AND

PUBLIC FINANCE," and

> . . . shall be established in the amount of SIX BILLION
> FIVE HUNDRED SIXTY-NINE MILLION U.S.
> DOLLARS (US$6,569,000,000), or its equivalent in other
> currencies, representing payments due to multilateral
> agencies in the sum of TWO BILLION ONE HUNDRED
> EIGHTY-SEVEN MILLION U.S. DOLLARS
> (US$2,187,000,000), and payments due to private creditors
> in the amount of FOUR BILLION THREE HUNDRED
> EIGHTY-TWO MILLION U.S. DOLLARS
> (US$4,382,000,000), *which [BCRA] will transfer to the
> National Treasury from the freely available reserves*.

Grosso Decl. Ex. 18 (Decree 2010/2009), at p. 4 (recitals) and §§ 2 and 3 (emphasis

added).

Alfonso Prat-Gay, who served as Governor of the Central Bank from 2002 to

2004 and is now a member of the Argentine Congress, believes the Decree creating the

Bicentennial Fund is illegal, because the Central Bank should be an independent

institution and not have its reserves appropriated at the Argentine Executive Branch's

will.  Grosso Decl. Ex. 21 (*Harsh Criticism by the Opposition of Use of BCRA Funds*, LA

NACIÓN (Dec. 15, 2009)).  Other observers in Argentina have harshly criticized this use

of Central Bank funds to repay sovereign debt as violating the independence ostensibly

required by the Central Bank charter and the Argentine Constitution because President

Cristina Fernández de Kirchner acted without the required Congressional approval.  *See,

e.g.*, Grosso Decl. Ex. 22 (*Reserves Belong to Cristina*, ÁMBITO FINANCIERO (Dec. 16,

2009)); Grosso Decl. Ex. 23 (*Government Frees Up Resources to Raise Cash and

Maintain Spending*, CLARÍN (Dec. 15, 2009)).[10]

---

[10]   *See* Grosso Decl. Ex. 25 (*Argentine Opposition Fights Kirchner's Debt Plan*, WALL ST. J.
(Dec. 30, 2009) (explaining that a group of opposition lawmakers asked an Argentine federal

On January 8, 2010, an Argentine federal court stayed further implementation of the Bicentennial Fund and Decree 2010/2009.  Grosso Decl. Ex. 24 (Decision of María José Sarmiento, *Federico Pinedo et al. vs. National Government Decree 2010/09 for Constitutional Appeal under National Law 16,986*, Court's Emergency Proceeding Register, page 4–5/471 (Jan. 8, 2010)).  The stay will remain in place for at least another week.  Grosso Decl. Ex. 66 (*Judicial Decision to Be Delayed Another 10 Days*, LA NACIÓN (Jan. 15, 2010)).  Not surprisingly, the Kirchner administration has appealed the decision.  *See* Grosso Decl. Ex. 27 (*Argentine Gov't Appeals Rulings on Central Bank*, REUTERS (Jan. 9, 2010)).  The Argentine federal judge who issued the stay now finds herself subjected to an unsolicited police presence and public reprimand from the Kirchners.  Grosso Decl. Ex. 65 (*"I've Never Seen Anything Like It in 30 Years," said Judge Sarmiento*, LA NACIÓN (Jan. 10, 2010)).  For example, the Argentine Executive Branch recently filed criminal charges against one of the legislators who challenged the Bicentennial Fund—and in the charging documents characterized Judge Sarmiento as a "necessary accomplice" to procedural fraud.  Grosso Decl. Ex. 64 (*Government Accuses Representative Pinedo*, LA NACIÓN (Jan. 15, 2010)).  President Cristina Fernández de Kirchner has publicly derided Sarmiento as a "delivery judge."  Grosso Decl. Ex. 70 (*Argentine Central Bank Reserves Dispute Adds Another Player: New York Judge*, MERCOPRESS (Jan. 13, 2010)); *see also* Grosso Decl. Ex. 71 (*Judges Denounce More Pressure from the Government*, ÁMBITO FINANCIERO (Jan. 18, 2010) (quoting Ricardo

---

court for a stay and a declaration that the authorizing decree is an unconstitutional exercise of power absent legislative approval)); Grosso Decl Ex. 26 (*The Court Awaits an Answer*, CLARÍN (Jan. 6, 2010) (explaining that upon a motion brought by San Luis Province challenging the decree authorizing the fund, the Argentine Supreme Court has ordered the administration to explain "the background and bases" for the decree)).

Recondo, President of the Argentine National Judges Association, in his denunciation of the government for putting pressure on the judges and for disregarding the system of checks and balances)).

The decision to establish the Bicentennial Fund—and the accompanying decision to fire the Central Bank's Governor, Martín Redrado, for his failure to implement the Fund immediately (*see infra* Section III.B)—are further evidence of President Cristina Fernández de Kirchner's belief, shared by her husband, that the Argentine Executive Branch can dip into Central Bank reserves for purposes unrelated to central banking.  *See* Grosso Decl. Ex. 22 (*Reserves Belong to Cristina,* ÁMBITO FINANCIERO (Dec. 16, 2009); Grosso Decl. Ex. 23 (*Government Frees Up Resources to Raise Cash and Maintain Spending*, CLARÍN (Dec. 15, 2009) ("A collateral effect of the decision [to create the fund] is that it further blurs the lines between the Central Bank and the State.")).  A senior economist at Goldman Sachs described the use of Central Bank reserves for debt repayment as "clearly negative from an institutional standpoint" because "it weakens the central bank and provides the government with extra rope to extend a notoriously profligate spending stance that is often shaped according to political criteria."  *See* Grosso Decl. Ex. 28 (*Argentina to Tap Reserves for Debt Payment Fund*, REUTERS (Dec. 14, 2009)).  The Executive Branch's actions in this regard indeed are only a short step removed from using the reserves to pay for current spending.  *See* Grosso Decl. Ex. 29 (*Argentina Govt's Move to Woo Investors Becomes a Headache*, DOW JONES INT'L NEWS (Dec. 21, 2009)).

Tellingly, the Argentine Executive Branch is now exploring other ways to access the Central Bank's reserves in lieu of the Bicentennial Fund.  One possibility is to draw

from the Central Bank's "earnings," which for 2009 could exceed AR$20 billion.  Grosso

Decl. Ex. 68 (*The Government has Already Moved to Plan B:  BCRA [Central Bank]*

*Earnings,* ÁMBITO FINANCIERO (Jan. 12, 2010)).   Another possibility is to amend the

Central Bank Charter to increase the amount that BCRA can provide to the Argentine

Treasury.   Grosso Decl. Ex. 63 (*Measures to Prevent Embargos Studied*, La Nación

(Jan. 14, 2010)); *see also* Grosso Decl. Ex. 36 (Charter Act No. 24,144, Article 20

(specifying limits for temporary advances)).  The Kirchners have previously utilized both

strategies (*see* Sections III.A.2 and III.A.3), each of which provides further evidence of

their complete domination of the Central Bank.

## 2.   Access To Central Bank "Profits"

The Argentine Executive Branch makes regular use of "profits" earned by the

Central Bank to, among other things, fund the government budget and disguise the

Kirchner administration's poor fiscal management.  For example, in 2008, the Central

Bank delivered to the Treasury more than AR$4 billion—almost three times as much as

the amount allotted in the 2008 Budget.  *See* Grosso Decl. Ex. 30 (*BCRA Assists the*

*Treasury*, EL CRONISTA (Dec. 18, 2008) (explaining that, although in the 2008 budget the

Central Bank was meant to have extended a maximum of AR$1.4 billion to the Treasury,

"in 2008 it has fully exceeded this figure, given that it is around [AR]$4 billion")).  The

AR$4 billion was treated by the Kirchners as "make-up" to "avoid showing a tighter

fiscal surplus."  *Id.*

In mid-2009, the Government demanded AR$3 billion in Central Bank profits

immediately following the mid-term elections.  *See* Grosso Decl. Ex. 31 (*BCRA Helps*

*Government with $3 Billion*, ÁMBITO FINANCIERO (July 6, 2009)).  The Argentine press described the reason for this demand in no uncertain terms:

> Immediately following the close of the elections, the Minister of the Economy, Carlos Fernández, sent an urgent letter to Martín Redrado, President of the Central Bank. The objective was to obtain the proceeds of the monetary authority to increase the accounts of the Treasury.  As a result, $ 3 billion have already been transferred and will be vital: this collaboration by the Central Bank is what will prevent the June fiscal accounts from producing a fiscal deficit, despite a significant increase in preelection expenditures.

*Id*.  Put another way, the Kirchners paid for their politically-motivated pre-election spending using Central Bank "proceeds."

Soon thereafter, the Treasury insisted that the Central Bank transfer an additional AR$1.4 billion in "profits."  *See* Grosso Decl. Ex. 32 (*Ministry of the Economy Requests Funds from BCRA to Cover Increase in Costs*, LA NACIÓN (July 1, 2009)).  When the Central Bank initially balked at the transfer, the Ministry of the Economy insisted that "if the transfer of funds does not complicate the balance sheet of the monetary institution, there is no reason why the State should be denied this money, as it is the owner."  Grosso Decl. Ex. 33 (*Aim to Limit Increase in Spending*, LA NACIÓN (July 2, 2009)).

In total, the Central Bank transferred an estimated AR$4.4 billion to the Treasury in 2009, not counting advances.  *See* Grosso Decl. Ex. 34 (*The Central Bank Shall Have Record Earnings in 2009: $10 Billion*, ÁMBITO FINANCIERO (Dec. 7, 2009)).  The Argentine Executive Branch is counting in 2010 on another US$2.6 billion of "profits" from the Central Bank.  *See* Grosso Decl. Ex. 35 (*The Senate, Ready to Approve a Budget with Accounts of Fiction*, CLARÍN (Nov. 10, 2009)).

### 3.    *Access To Central Bank Reserves By Amendment Of Central Bank Charter*

The Argentine Executive Branch continues to access Central Bank reserves for Argentina's use through amendments to the Central Bank's charter.  Article 19(a) of the charter prohibits the Central Bank from lending funds to the Argentine government except as otherwise provided under Article 20.  *See* Grosso Decl. Ex. 36 (Charter Act No. 24,144).   As originally drafted, Article 20 was very restrictive; in recent years, Article 20 has been amended by decree and legislation to make it significantly easier for the Central Bank to loan money to Argentina.  One example is an amendment to Article 20 that enables the Central Bank to make "advances" to Argentina of up to 12% of the monetary base, so long as Argentina repays the Central Bank within one year.  *See id.*

President Cristina Fernández de Kirchner further expanded Argentina's ability to access Central Bank reserves through another amendment to Article 20.  Specifically, her 2009 Budget Law, which was passed November 6, 2008, excludes from the 12% calculation all "advances solely allocated to payment of outstanding obligations with multilateral lending agencies and to the repayment of obligations in foreign currency." *See* Grosso Decl. Ex. 37 (Article 72 of The Budget for Expenses and Resources of the National Administration for the Fiscal Year 2009); Grosso Decl. Ex. 38 (*Budget Approved with No Changes*, LA NACIÓN (Nov. 6, 2008) (announcing passage of the law)); Grosso Decl. Ex. 39 (*2009 Budget: The Senate Made It Law Without Changing One Single Aspect of It*, CLARÍN (Nov. 8, 2008) (same)).  The 2009 Budget Law thus permits the Kirchners to use Central Bank reserves without violating the Central Bank's charter.

21

**B.**    **The Argentine Executive Branch Continues**
          **To Puppeteer The Central Bank's Governor**

The Kirchners' continued control over the Central Bank depends on their being able to control the Central Bank's leading official, its Governor.  Governors who did not abide by the Kirchners' wishes were forced to resign (*see* Section II).  For over five years, the Kirchners did not find it necessary to fire the Central Bank's current Governor, Martín Redrado, because he implemented their wishes dutifully.  As an example of Redrado's prior willingness to implement the Kirchners' wishes, when the financial crisis hit in October 2008, Néstor Kirchner simply called Redrado to give him direct instructions on how the Central Bank should respond on a day-to-day level.  As the Argentine press colorfully described October 29, 2008:

> [The] telephone of Martín Redrado . . . never stopped receiving messages by order of Néstor Kirchner.  The former President. . . . spoke at least three times with the Head of Cabinet, Sergio Massa.  Automatically, the official called Redrado, who instantly offered 1000 million dollars to depressurize the meteoric rise of the dollar.  Just an hour had passed since the start of operations.

Grosso Decl. Ex. 40 (*Kirchner Gave Order to Intervene*, LA NACIÓN (Oct. 30, 2008)); *see* Grosso Decl. Ex. 41 (*Kirchner Picks Up Duties in the Matrimonial Division of Power*, LA NACIÓN (Nov. 2, 2008)).

Redrado's relationship with the Kirchners dramatically changed this past week, when he resisted the immediate transfer of Central Bank reserves to the Bicentennial Fund pending advice from the Central Bank's legal counsel.  On January 6, 2010, President Cristina Fernández de Kirchner called for Redrado's resignation.  *See* Grosso Decl. Ex. 42 (*Argentina Seeks Central Bank Ouster Over Debt Plan*, BLOOMBERG (Jan. 6, 2010)); Grosso Decl. Ex. 43 (*The Reserves, or Your Job*, ECONOMIST (Jan. 7, 2010)).

When Redrado did not step down, maintaining that he could not be fired without the participation of Congress, President Fernández de Kirchner fired him by emergency Executive Decree.   Grosso Decl. Ex. 44 (Executive Decree 18/2010) (characterizing decree as one of urgency and necessity).   Miguel Angel Pesce, another senior Central Bank official, who had very recently made public statements in favor of the Fund, took the helm and moved quickly to try to implement the Fund.   *See* Grosso Decl. Ex. 45 (*The Central Bank Vice-President Puts More Pressure on Redrado*, ÁMBITO FINANCIERO (Jan. 7, 2010) (quoting Pesce as stating that it is "necessary to comply with" the decree ordering the establishment of the Bicentennial Fund because "the provision . . . has the force of law")); Grosso Decl. Ex. 2 (*Pesce Arrived Early and Authorized the Account, But Did Not Manage to Transfer Funds*, CLARÍN (Jan. 9, 2010) (describing steps Pesce took to implement Fund)).   Pesce additionally ordered that Argentine banks conduct their foreign currency transactions through the Central Bank's account at the BIS, rather than through the Central Bank's account at the FRBNY.   *See* Grosso Decl. Ex. 1 (*Arrangements Made for Carrying Out Foreign Exchange Operations in Switzerland in Order to Avoid the Seizing of Accounts*, LA NACIÓN (Jan. 8, 2010)); Grosso Decl. Ex. 2 (*Pesce Arrived Early and Authorized the Account, But Did Not Manage to Transfer Funds*, CLARÍN (Jan. 9, 2010)).

Redrado brought a legal challenge to his involuntary ouster, and on January 8, 2010, an Argentine federal judge ordered him to be reinstated—a decision the Kirchner administration quickly appealed, with President Fernández de Kirchner calling Redrado a "squatter" at the Central Bank.   Grosso Decl. Ex. 69 (*US Judge Freezes Central Bank Funds*, BUENOS AIRES HERALD (Jan. 13, 2010)); *see also* Grosso Decl. Ex. 46 (Decision

of María José Sarmiento, *Hernán Martín Perez Redrado vs. National Government—National Chief Executive--Decree 18/10 for constitutional appeal under National Law 16,986 (No. 8/2010)*, Court's Emergency Proceeding Register, 4–5 (53) (Jan. 8, 2010)); Grosso Decl. Ex. 27 (*Argentine Gov't Appeals Rulings on Central Bank*, REUTERS (Jan. 9, 2010)).  Although Redrado has nominally retained the position of Central Bank Governor, his actual authority continues to diminish, as the BCRA Board of Directors, dominated by Kirchner allies, takes away his power.  For example, the Board stripped Redrado of the ability to represent BCRA outside of Argentina without specific Board authorization, and reversed one of Redrado's prominent personnel decisions.  *See* Grosso Decl. Ex. 60 (*BCRA Board of Directors Takes Another Step to Corner Redrado*, LA NACIÓN (Jan. 15, 2010)).  The Central Bank's second-in-command, Pesce, continues to wield operational control.  *See* Grosso Decl. Ex. 67 (*Redrado Issues Orders but Loses Control of the BCRA [Central Bank]*, LA NACIÓN (Jan. 12, 2010)).

The Argentine Executive Branch's decision to remove Redrado confirms that the Central Bank is anything but independent. Indeed, President Cristina Fernández de Kirchner's Cabinet Chief, Aníbal Fernández, said that in Argentina, "the president makes decisions, not the president of the central bank," adding that "Redrado has assumed economic positions that don't have anything to do with the economic policy of the government."  Grosso Decl. Ex. 47 (*Argentina Banker Resists Ouster*, WALL ST. J. (Jan. 7, 2010)).  Moody's analyst Juan Pablo Fuentes commented that the firing of Redrado "underscores the lack of importance the government attributes to the central bank's independence." Grosso Decl. Ex. 48 (*Argentina 'Kills' Bank Independence, Moody's Economy.com Says*, BLOOMBERG (Jan. 6, 2010)).

C.    **The Argentine Executive Branch Continues To Dictate
Monetary Policy, Including Directing The Central Bank To
Manipulate The Exchange Rate To Further The Kirchners'
Own Political Agenda And Punish Their Political Enemies**

The Kirchners continue to usurp the Central Bank's role in effecting monetary
policy.  Leading up to Argentina's 2009 mid-term elections, President Cristina Fernández
de Kirchner ordered the Central Bank to use all means necessary to maintain a
"politically correct" exchange rate to prevent a rapid devaluation of the peso that might
be viewed as the consequence of her administration's poor fiscal management.   In
March 2009, for example, she ordered the Central Bank to "take actions . . . to contain the
dollar" in an attempt "to prevent the exchange rate of United States currency from
becoming a factor that could divert votes."  Grosso Decl. Ex. 49 (*US$ 1 Billion Sought
from International Organizations to Contain the Dollar*, EL CRONISTA (Mar. 25, 2009)).
Her motivation was transparent; as the Argentine financial press reported at the time,
"halting or at least significantly slowing the rise of the Dollar does stem from economic
interests, ***but mainly from political ones***."  Grosso Decl. Ex. 50 (*Central Bank to Take
Action Today to Halt Dollar Rise*, ÁMBITO FINANCIERO (Mar. 25, 2009) (explaining that
"[e]xcessive devaluation could mean a hard blow for the Government, especially as the
elections draw near"));  *see* Grosso Decl. Ex. 51 (*Redrado Floods Market with Dollar
Futures that Will Mature During the Elections*, EL CRONISTA (June 4, 2009) ("The
decision has been made:  to tame the domestic [dollar-to-peso] exchange market at all
costs, using measures as aggressive as necessary, to ensure an 'ideal' rate of exchange for
the dollar at election time."))  So motivated were the Kirchners—in fact, Néstor Kirchner
also was running for a Congressional seat—that the Central Bank had sold in the first six
months of 2009 reserves worth some US$878 million—or 80% of all dollars sold in

25

during the entire year in 2008.  Grosso Decl. Ex. 52 (*Sale of Dollars by Central Bank Now Amounts to 80% of Everything "Sacrificed" in 2008*, EL CRONISTA (June 17, 2009)).

**ARGUMENT**

## I.    LEGAL STANDARD GOVERNING CONFIRMATION OF ATTACHMENTS

The New York Civil Practice Law and Rules apply to Plaintiffs' requested relief. *See* Fed. R. Civ. P. 64 (referring to state law for pre-judgment attachment procedures); Fed. R. Civ. P. 69 (referring to state law for post-judgment execution procedures).

To obtain an order of pre-judgment attachment, the party seeking  the order must show the existence of one of the factors set forth in CPLR § 6201—two of which are relevant here:

> 1.      the defendant is a nondomiciliary residing without the state, or is a foreign corporation not qualified to do business in the state; or
>
> *      *      *
>
> 3.      the defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts.

Additionally, this Court has previously ruled in connection with motions seeking similar relief that Plaintiffs must demonstrate they are likely to succeed in showing *(a)* the existence of the alleged alter-ego relationship, and *(b)* that the assets they seek to attach or restrain are not protected by sovereign immunity under the FSIA.[11]

---

[11]   Plaintiffs continue to maintain, and hereby preserve the argument, that under New York law governing attachments—which this Court must apply under Federal Rules of Civil Procedure 64 and 69—they need only make a *prima facie* showing of their entitlement to relief. *See*

All of these standards are met with respect to both defendants.  *First*, as this Court has repeatedly ruled, Argentina is a nondomiciliary "residing" outside New York which has demonstrated time and again that it will do everything in its power to evade satisfaction of valid judgments—including by moving its attachable assets (and specifically those of the Central Bank) out of this jurisdiction.  *Second*, this Court has entered final judgments against Argentina in favor of each EM and NML.  *Third*, it is probable that, with respect to NML's six pre-judgment actions against Argentina, NML will succeed in obtaining final judgments in its favor.  *Fourth*, the Court has also already ruled that Plaintiffs demonstrated a likelihood of success in establishing that the Central Bank is an alter ego of Argentina as of December 30, 2005; as discussed below, that ruling is additionally supported by very substantial subsequent evidence.  *Fifth*, as also discussed below, the BCRA Accounts that are the subject of this motion are not protected by sovereign immunity.

## II.      THE CENTRAL BANK IS AN ALTER EGO OF ARGENTINA

### A.      <u>Legal Standard for Alter-Ego Showing</u>

The legal standard for establishing that an entity is an alter ego of a foreign state was established by the Supreme Court in *First National City Bank v. Banco Para El Comercio Exterior de Cuba (Bancec)*, 462 U.S. 611 (1983).  In that case, the Court affirmed a district court order that found that a state-owned bank very much like the

---

*JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 306 F. Supp. 2d 482, 488 (S.D.N.Y. 2004) (granting attachment under New York law upon preliminary showing of alter-ego status); *Triton Container Int'l Ltd. v. M/S Itaite*, No. 90 Civ. 7725, 1991 WL 255613 at *4 (S.D.N.Y. Feb. 25, 1991) (granting attachment where "a *prima facie* case has been made"); 11 Jack B. Weinstein, Harold L. Korn, & Arthur R. Miller, New York Civil Practice: CPLR § 5222.05, at n.2 (standard for issuance of restraining order is a "*prima facie* showing of a right to relief").

Central Bank was an alter ego of the Cuban government—holding that the presumption of separateness between a state-owned corporation and the state should be disregarded "where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created," or where recognizing the alter ego's alleged separate status "would work fraud or injustice."  462 U.S. at 629.[12]

### B.   Argentina Continues To Control The Activities and Assets of the Central Bank

This Court has already determined that, as of December 30, 2005, Plaintiffs satisfy one of *Bancec's* two alternative bases for disregarding the presumption of separateness between the Central Bank and Argentina, based on the degree of control exercised by Argentina over the Central Bank.  As described above, the new evidence presented to date (taken either on its own or in combination with the evidence previously presented as of December 30, 2005) strongly supports that the Central Bank continues to this day to be an alter ego of Argentina.  There can be no question that the "control of [the Central Bank lies] exclusively in the hands of the Government" and its role is "to

---

[12]   While the Supreme Court, in *Bancec*, affirmed district court ruling on the "fraud or injustice" prong, 462 U.S. at 632, the Court extensively addressed the alter ego prong.  Although the Court in *Bancec* eschewed any "mechanical test" for determining when such an alter-ego relationship exists, *Bancec* and its progeny have identified a number of factors that may be relevant to the analysis.  *See Walter Fuller Aircraft Sales Inc. v. Republic of Philippines*, 965 F.2d 1375, 1380-83 (5th Cir. 1992) (factors include government's control over entity's day-to-day activities; level of economic control exerted by government; and benefits enjoyed by government from control over alter ego); *United States Fidelity & Guaranty Co. v. Braspetro Oil Servs. Co.*, 1999 WL 307666 (S.D.N.Y. May 17, 1999) (addressing day-to-day control), *aff'd*, 199 F.3d 94 (2d Cir. 1999); *Passalacqua Builders, Inc. v. Resnick*, 933 F.2d 131 (2d Cir. 1991) (addressing benefit factor); see also *Compagnie Noga d'Importation et d'Exportation S.A. v. Russian Federation*, 361 F.3d 676, 696 (2d Cir. 2004) (Jacobs, J., concurring) (affirming that debt incurred by provincial government could be enforced against national government subject to FSIA limitations, adding "the President's power to fire [provincial] ministers at will and call for the [provincial government's] resignation is a veto *de facto*, *i.e.*, the [provincial government] is not going to do anything the President opposes"); *McKesson v. Islamic Republic of Iran*, 52 F.3d 346 (D.C. Cir. 1995) (finding alter ego where Iran, *inter alia,* forced a state company to disregard its commercial mission).

further Governmental purposes." *Bancec*, 462 U.S. at 617 (finding Banco Para El Comercio Exterior De Cuba an alter ego of Cuba).[13]

### C. Recognizing The Central Bank's Separate Juridical Status Would Countenance Argentina's Selective Recognition Of (Or Refusal To Recognize) The Valid Judgments Entered Against It

The alternative *Bancec* requirement, that the protection afforded by recognition of separate juridical status would be used by the parent for fraud or injustice, is also met here. As the Court observed just last year: "[T]he Republic has thus far used every imaginative way in law and propriety to—and maybe not such propriety, but anyway, they want to block these plaintiffs from ever recovering a dime." Grosso Decl. Ex. 10 (Case No. 03 Civ. 2507 (TPG), Hearing Transcript (May 30, 2008) at 12:7-14); *id.* at 26:2-23 ("I am not impressed with the morality of the Republic of Argentina in its absolute steadfast refusal to honor its lawful debts."). Argentina's dealings with its Central Bank are entirely consistent with this Court's observations regarding Argentina's steadfast refusal to satisfy valid judgments entered against it.

At the same time that Argentina has exercised such extensive control over the Central Bank that a principal-agent relationship exists, Argentina has sought to shield the Bank's assets by falsely contending that they technically are not Argentina's property. The falseness of Argentina's contention that the Central Bank's assets are not Argentina's property is further evidenced—and tacitly acknowledged—by the words of Argentina's then-Cabinet Chief, Alberto Fernández, in 2004, describing some of the measures taken

---

[13]   The mere creation of the Bicentennial Fund and the firing of Redrado by emergency Executive Decree confirms that the Executive Branch continues to believe the Central Bank's reserves are a public piggy bank over which the Central Bank has little control. Thus, even a successful challenge to the Fund and/or Redrado's permanent reinstatement would not affect the Central Bank's alter-ego status ***today***—especially in light of the voluminous other evidence of the Central Bank's current complete domination by the Executive Branch.

by Argentina *even before its default* to avoid satisfying its legal obligations to its creditors.  (Fernández was appointed to his position by then-President Néstor Kirchner upon taking office in 2003).  As Alberto Fernández stated:

> Reserves of the Central Bank of the Argentine Republic on deposit in New York banks have been withdrawn, funds on deposit in the New York branch of Banco Nación have been repatriated, and salaries of Argentine officials posted to other countries are being deposited in Argentina or paid in the form of cash sent via diplomatic pouch, which has immunity.

Grosso Decl. Ex. 53 (*The Government Is Protecting Itself from Attachment*, LA NACIÓN (Feb. 5, 2004)).[14]  In fact, between mid-2001 and 2003, the Central Bank, acting on the advice of the Argentine government and its "international counsel," transferred billions of dollars of foreign exchange reserves out of the United States to the Bank of International Settlements in Switzerland.  There would have been no reason to shield those reserves from possible restraint or attachment unless they in fact belong to Argentina.

Moreover, Argentina has made Central Bank reserves a primary source of assets from which to repay Argentina's external debt.  If the Court were to recognize the Central Bank's separate juridical status, Argentina in effect would be permitted to pick and choose which of its creditors it will repay, and which will be left high and dry.  Shielding the BCRA Accounts would greatly injure EM and NML by depriving them of a rare opportunity to enforce their present and anticipated judgments.

---

[14]   In Plaintiffs' pending motion with respect to the frozen $100 million, this Court ordered further briefing on Argentina's actions taken to evade creditors.  *See* Grosso Decl. Ex. 13 (Case No. 03 Civ. 2507 (TPG), Hearing Transcript (Jan. 8, 2010) at 5-7, 11).

III.   **THE BCRA ACCOUNTS ARE NOT IMMUNE FROM ATTACHMENT, RESTRAINT OR EXECUTION UNDER THE FSIA**

The Central Bank, as an alter ego, is liable for Plaintiffs' judgments against Argentina.  *See De Letelier v. Republic of Chile*, 748 F.2d 790, 794 (2d Cir. 1984) ("foreign state instrumentality is answerable just as its sovereign parent would be" upon a finding of alter ego).  Accordingly, the Central Bank may invoke the protection of FSIA only to the same extent as Argentina.  *See Kensington Int'l Ltd. v. Republic of Congo*, 2007 WL 1032269, *13 (S.D.N.Y. Mar. 30, 2007) (holding that, if plaintiff established state-owned entity to be the alter ego of Congo, then "the only immunity at issue is Congo's immunity"), *reversed sub nom. on other grounds*, *Kensington Intern. Ltd. v. Itoua*, 505 F.3d 147 (2d Cir. 2007).

Argentina indisputably waived its assets' immunity from attachment under the FSIA through the Fiscal Agency Agreement and Terms and Conditions governing the underlying bonds.  Section 1611(b)(1) of the FSIA—which grants special protection for property "of a foreign central bank . . . held for its own account"—does not provide immunity because the Central Bank is serving as Argentina's alter ego.  It would be implicated by this motion only if ***Argentina*** were entitled to invoke that special protection.  Argentina undeniably cannot claim immunity pursuant to § 1611.  As a consequence of it being Argentina's alter ego, and as this Court already observed, neither can the Central Bank.  *See* Grosso Decl. Ex. 8 (Case No. 06 Civ. 7792 (TPG), Hearing Transcript (May 6, 2008) at 8:17-21 (reflecting this Court's ruling that an alter-ego finding would "include[e] the consequence of Section 1611 not being applicable")); *EM Ltd.*, 473 F.3d at 481 n.18 (quoting *First City, Texas-Houston v. Rafidain Bank*, 150 F.3d 172, 174 (2d Cir. 1998), for observation "that if central bank were alter ego of [foreign]

instrumentality, central bank would be subject to jurisdiction under the FSIA's commercial activity exception to immunity to the same extent as [the other instrumentality]").

Thus, the only remaining inquiry is whether the BCRA Accounts are being used for commercial activity in the United States pursuant to § 1610(a)(2).[15]  The statute provides that:

> A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act.  The commercial character of an activity shall be determined by reference to the *nature* of the course of conduct or particular transaction or act, rather than by reference to its *purpose*."

---

[15]  Argentina and the Central Bank have adopted a classic smoke and mirrors defense in arguing that the $100 million at issue in the First Alter-Ego Motion is immune from execution under § 1611(b) of the FSIA—and Plaintiffs anticipate that the same defense will be asserted with respect to this motion.  Simply put, the Central Bank is not entitled to the protection afforded independent central banks under § 1611(b) because the Central Bank is an alter ego of Argentina.  Thus, even if the Central Bank had used or is using accounts located in New York for central banking activity (which Plaintiffs dispute in any event) does not change the fact that such activity is commercial activity for purposes of § 1610(a)(2).  Section 1611(b) extends immunity *"notwithstanding the provisions of section 1610"* to a central bank's assets "held . . . for its own account."  The "notwithstanding" clause would be sheer surplusage if § 1611(b) did not presume that certain central banking activities also constitute commercial activities.  *See EM Ltd.*, 473 F.3d at 485 ("Section 1611(b)(1) provides a central bank with special protections from a judgment creditor who *would otherwise be entitled to attach the central bank's funds under 28 U.S.C. § 1610*.") (emphasis added); *Weston Compagnie de Fin. Et D'Investissement, S.A.*, 823 F. Supp. 1106, 1112 (S.D.N.Y. 1993) ("[T]he structure of the FSIA makes clear [that] *property of a central bank held for its own account is a category of property used for commercial activity*.") (emphasis added); *Immunities of Foreign States:  Hearing on H.R. 3493 Before the Subcomm. on Claims and Governmental Relations of the H. Comm. on the Judiciary*, 93d Cong. 25 (1973) (statement of Charles N. Brower, Acting Legal Adviser, Department of State) ("The purpose of section 1611(b) is to prevent in all circumstances attachment of or levy of execution upon these two categories of property of foreign states, even if these relate to the commercial activities of a foreign state *and would otherwise come within the scope of section 1610*.") (emphasis added).  *See* Plaintiffs' Reply Mem. of Law Regarding the Use of the FRBNY Account in Support of Their September 28, 2006 Motion for Orders of Restraint and Pre-Judgment Attachment, dated June 19, 2009, and letter to the Court dated August 6, 2009.

28 U.S.C. § 1603(d) (emphasis added).  The Supreme Court made clear in *Republic of Argentina v. Weltover*, 504 U.S. 607 (1992) that:

> However difficult it may be in some cases to separate "purpose" (*i.e.*, the reason why the foreign state engages in the activity) from "nature" (*i.e.*, the outward form of the conduct that the foreign state performs or agrees to perform), . . . the statute unmistakably commands that to be done.

*Id.* at 617.[16]  *Weltover* therefore establishes that the motivation for opening the Other Accounts is entirely irrelevant for purposes of § 1610(a)(2)—the only question for this Court is whether the BCRA Accounts are being used for "the *type* of actions by which a private party engages in 'trade and traffic or commerce.'"  *Weltover*, 504 U.S. at 614 (quoting Black's Law Dictionary 270 (6th ed. 1990)).[17]

While it is difficult to discern from publicly-available sources how the Other Accounts are being used, the activities for which BCRA the First FRBNY Account was used in 2005—about which the parties have engaged in discovery and submitted extensive briefing to the Court—are probative with respect to how the BCRA Accounts are currently being used.  Plaintiffs have established that, between October and December 2005, BCRA used the First FRBNY Account for, among other things, overnight investments in repurchase agreement ("**Repo**") and federal funds ("**Fed Funds**")

---

[16]  Although *Weltover* dealt with the "commercial activity" exception to jurisdiction under 28 U.S.C. § 1605, as opposed to attachment and execution under 28 U.S.C. § 1610, its discussion of the definition of "commercial activity" applies equally to both sections, as they are both governed by the definition of "commercial activity" in Section 1603. In fact, Congress made clear in the legislative history of Section 1610 that "commercial activity" under Section 1610(a)(2) "include[s] . . . commercial activities encompassed by section 1605(a)(2)."  H.R. Rep. No. 94-1487, at 28, *reprinted in* 1976 U.S.C.C.A.N. 6604, 6627.

[17]  *Compare EM Ltd.*, 473 F.3d at 484 (holding that Argentina's potential use of the First FRBNY Account to repay IMF was not commercial activity because IMF loans "are not available in the commercial market").

33

transactions, and foreign exchange transactions.  Each of these commercial activities—as well as the others revealed through discovery—is plainly commercial in nature, because any private actor could undertake them in trade or commerce.  The BCRA Accounts are likely being used for some or all of the commercial activities for which the First FRBNY Account was being used.[18]

## CONCLUSION

For the foregoing reasons and based on the foregoing authorities, Plaintiffs request that the Court confirm the January 2010 Attachments.

Dated:   January 19, 2010
             New York, New York

Respectfully submitted,

DEBEVOISE & PLIMPTON LLP

By:     /s/ Suzanne M. Grosso
          David W. Rivkin
          John B. Missing
          Suzanne M. Grosso
          (EM@debevoise.com)
919 Third Avenue
New York, New York  10022
Tel. (212) 909-6000

*Attorneys for*
*Plaintiff EM Ltd.*

DECHERT LLP

By:     /s/ Robert A. Cohen
          Robert A. Cohen
          Dennis H. Hranitzky
          David M. Bigge
          (NML@dechert.com)
1095 Avenue of the Americas
New York, New York  10036
Tel. (212) 698-3500

*Attorneys for*
*Plaintiff NML Capital, Ltd.*

---

[18]   *See* Plaintiffs' Mem. of Law Regarding the Use of the FRBNY Account in Support of Their September 28, 2006 Motion for Orders of Restraint and Pre-Judgment Attachment, dated March 30, 2009, filed under seal April 1, 2009 [Case No. 06 Civ. 7792, Docket No. 45)], and Plaintiffs' associated reply brief, dated and filed under seal June 19, 2009 [Case No. 06 Civ. 7792, Docket No. 53)].  The Court might consider granting the attachment and ordering discovery regarding the current use of the BCRA Accounts similar to the discovery it previously ordered in connection with the frozen $100 million in the First FRBNY Account.  *See First City, Texas-Houston, N.A. v. Rafidain Bank*, 150 F.3d 172, 177 (2d Cir. 1998) (holding that plaintiff's judgment against a government instrumentality found to fall into commercial activity exception warrants further discovery).