UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/7/10
```

EM LTD.,                                   :

                 Plaintiff,        :        03 Civ. 2507 (TPG)

       - against -              :        **OPINION**

THE REPUBLIC OF ARGENTINA,                 :

                 Defendant.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

NML CAPITAL, LTD.,                         :

                 Plaintiff,        :        03 Civ. 8845 (TPG)

       - against -              :

THE REPUBLIC OF ARGENTINA,

                 Defendant.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

NML CAPITAL, LTD.,                         :

                 Plaintiff,        :        05 Civ. 2434 (TPG)

       - against -              :

THE REPUBLIC OF ARGENTINA,                 :

                 Defendant.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

```
- - - - - - - - - - - - - - - - - - - - - - - - - - x
NML CAPITAL, LTD.,                        :

                    Plaintiff,            :    06 Civ. 6466 (TPG)

            - against -                   :

THE REPUBLIC OF ARGENTINA,                :

                    Defendant.            :
- - - - - - - - - - - - - - - - - - - - - - - - - - x
EM LTD. and NML CAPITAL, LTD.,            :

                    Plaintiffs,           :    06 Civ. 7792 (TPG)

            - against -                   :

BANCO CENTRAL DE LA REPUBLICA             :
ARGENTINA and THE REPUBLIC
OF ARGENTINA,                             :

                    Defendants.           :
- - - - - - - - - - - - - - - - - - - - - - - - - - x
BANCO CENTRAL DE LA REPUBLICA             :
ARGENTINA,
                                          :

                Interested Party.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - x
```

In September 2006 the two plaintiffs in the above cases moved for provisional relief with respect to approximately $100 million deposited by the Central Bank of Argentina ("BCRA") in the Federal Reserve Bank of New York ("FRBNY"). The purpose was to secure expected judgments, and to secure a judgment actually entered, against the Republic of Argentina in cases based on the Republic's default on its bond indebtedness.

-3-

The motions are granted.

As of September 2006, EM had obtained a judgment in case 03 Civ. 2507, dated October 27, 2003. Subsequent to September 2006, NML obtained a judgment in case 03 Civ. 8845, dated January 10, 2007, and judgments in cases 05 Civ. 2434 and 06 Civ. 6466, dated June 12, 2009.

In September 2006 both plaintiffs, EM and NML, filed a new action, 06 Civ. 7792, against the Republic and BCRA, seeking a declaration that BCRA is the alter ego of the Republic. In November 2007 the complaint in that action was amended, adding counts seeking money judgments against BCRA for amounts owed to plaintiffs on account of the Republic's bond default. In October 2008 a second amended complaint was filed pursuant to the court's order and in compliance with the Federal Rules of Civil Procedure.

Before discussing the September 2006 motions further, it is necessary to summarize proceedings in the District Court and the Court of Appeals regarding earlier applications as to the same funds.

### The Earlier Applications

On December 30, 2005 plaintiffs filed motions in cases 03 Civ. 2507, 03 Civ. 8845, and 05 Civ. 2434, seeking pre-judgment attachment and restraining notices, as appropriate to the particular case. These remedies were sought with respect to $105 million on deposit in the name of BCRA at the FRBNY.

-4-

The theory of plaintiffs in making these motions was as follows. The President of the Republic of Argentina had issued two decrees that gave the Republic the authority to use funds of BCRA to repay the Republic's indebtedness to the International Monetary Fund. Funds of BCRA were so used, although not any of the $105 million on deposit at the FRBNY. In any event, plaintiffs argued that the decrees had the effect of making the $105 million the property of the Republic, rather than funds belonging to BCRA. Plaintiffs then argued that payment of the Republic's debt to the IMF was "commercial" activity, thus allowing attachment and restraint of these alleged funds of the Republic under the relevant provision of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1610. Plaintiffs also argued that there had been a waiver of the § 1611 immunity granted to central banks so that, even if the funds were still the property of BCRA, they could be attached and restrained. The Part I judge of this court granted the motions, and thus attachments and restraints were effected as to the $105 million.

On January 9, 2006, the parties entered into a stipulation and consent order to the effect that any garnishee holding an account or accounts in the name of BCRA "shall maintain in such account(s) a sum equal to not less than 95 percent of the amount credited to such account(s) as of the close of business on January 6, 2006[.]" As of the close of business on January 6, 2006, BCRA had on deposit approximately $105 million at the FRBNY, which was the only garnishee where funds were found. In accord with this

-5-

stipulation and consent order, approximately $100 million in BCRA funds has remained frozen at the FRBNY since January 9, 2006.

However, the regularly assigned judge vacated the attachments and restraints. The court, in a bench opinion of January 12, 2006, rejected plaintiffs' arguments and held that the presidential decrees did not change the ownership status of the funds of BCRA deposited at the FRBNY, and that in any event the repayment of the loan to the IMF would not have been commercial activity, noting, of course, that the $100 million was not actually used for this purpose. The court also held that there had been no waiver of central bank immunity. The court held that the $100 million could not be attached or restrained. However, the attachments and restraints in accordance with the January 9, 2006 stipulation and consent order remained in effect pending appeal.

Upon application of plaintiffs, the District Court certified the matter for appeal under 28 U.S.C. § 1292(b). The Court of Appeals accepted the appeal.

In an opinion issued January 5, 2007, the Court of Appeals affirmed. EM Ltd. v. Republic of Argentina, 473 F.3d 463 (2d Cir. 2007). The Supreme Court denied certiorari on October 1, 2007. The Court of Appeals rejected the arguments of plaintiffs, expanding considerably on the District Court's bench opinion. An important point for present purposes is the court's extensive discussion of plaintiffs' potential argument that BCRA was the alter

ego of the Republic and that, for this reason, funds of BCRA should be treated

as funds of the Republic. 473 F.3d at 476-80. The court noted that plaintiffs

chose not to make arguments of alter ego, "even though the Republic's alleged

misdeeds cited in plaintiffs' briefs might have lent some credence to these

arguments." Id. at 480. Footnote 17, which appears at that point in the

court's opinion, states:

> For example, the Republic's alleged
> interference with BCRA's affairs and efforts
> to remove attachable assets from the United
> States arguably could have supported
> disregarding BCRA's separate juridical
> status in order to avoid fraud or injustice.
> This approach, rather than the legally
> unsupported one advanced by plaintiffs,
> might provide a means by which creditors
> could "avoid allowing Argentina to play a
> shell game to deprive creditors of their
> legitimate remedies." Br. of Appellant NML
> 36.

The court went even farther and stated, id. at 480, n.18, that if the court had

agreed with what plaintiffs did argue regarding the Republic's ownership and

control of BCRA funds at the FRBNY, there would be no need to be concerned

about any specific waiver for BCRA. The footnote states:

> We note, however, that if we agreed with
> plaintiffs' arguments concerning the effect of
> the Decrees on ownership and control of the
> FRBNY Funds, it would not be necessary to
> consider plaintiffs' arguments regarding the
> effect of the Republic's waiver on BCRA, as
> the Republic indisputably waived its assets'
> immunity from attachment under 28 U.S.C.
> §§ 1610(a)(1) and (d)(1). Cf. Rafidain Bank,
> 150 F.3d at 174 (noting that if central bank

-7-

> were alter ego of other instrumentality,
> central bank would be subject "to
> jurisdiction under the FSIA's commercial
> activity exception to immunity to the same
> extent as [the other instrumentality]").

The significance of these footnotes in connection with the present motion will be discussed later in this opinion.

In any event, the Court of Appeals held that plaintiffs had not shown they were entitled to the attachments and restraints on the basis of the arguments then made.

### The Present Motions

As earlier described, in September 2006, while the Court of Appeals proceeding was still pending, plaintiffs EM and NML commenced an action against both the Republic and BCRA, seeking a declaratory judgment to the effect that BCRA is the alter ego of the Republic. At the same time, plaintiffs notified the Republic and BCRA that they intended to move for attachments and restraining notices in the cases that were involved in the December 2005 applications (03 Civ. 2507, 03 Civ. 8845, 05 Civ. 2434, and 06 Civ. 6466), and that these new motions would be based on the alter ego theory, a theory not presented in the December 2005 applications.

In a Stipulation and Consent Order dated September 28, 2006, agreed to by the plaintiffs, the Republic, and BCRA, it was recognized that plaintiffs were moving for attachments and restraints as to the $100 million "on the ground that the Central Bank is the alter ego of Argentina (the 'Alter

-8-

Ego Motion')." It was further agreed in effect that the hold on the $100 million would remain in place pending the decision by the court on the Alter Ego Motion.

In view of the Stipulation and Consent Order of September 28, 2006, plaintiffs did not make formal applications for attachment and restraints. The parties, including BCRA, have treated the September 28, 2006 Stipulation and Consent Order as the making of those motions. See Minutes of February 22, 2010.

As described earlier in this opinion, only one judgment had actually been obtained by plaintiffs as of September 2006. This was in 03 Civ. 2507. However, by now judgments have been obtained in 03 Civ. 8845, 05 Civ. 2434, and 06 Civ. 6446. No judgment, of course, has been obtained in the declaratory judgment action filed in September 2006 (06 Civ. 7792). From a technical standpoint it appears that, under the applicable New York law, attachments are pre-judgment remedies, whereas the restraints involved in these proceedings are post-judgment remedies. It may be that by now the applications for attachment and restraint should all be considered applications for restraints, in the four cases where judgments have been entered. However, no one has been concerned with this issue. But the court believes that the nature of the applications now before it should be defined. Thus the court considers that the applications in 03 Civ. 2507, 03 Civ. 8845, 05 Civ. 2434, and 06 Civ. 6466 should be considered as applications for post-judgment

-9-

restraints. The application in 06 Civ. 7792 should be considered an
application for pre-judgment attachment.  BCRA is not a party to 03 Civ.
2507, 03 Civ. 8845, 05 Civ. 2434, or 06 Civ. 6466. As to 06 Civ. 7792, both
the Republic and BCRA are named as defendants.

On the issue of personal jurisdiction, the court is proceeding on
the present motions in the first four cases in the same manner as both the
District Court and the Court of Appeals proceeded in connection with the
December 2005 applications. Since the Republic is the defendant in those
actions, there is jurisdiction to determine whether the funds in question can be
the subject of process because they are in effect the funds of the Republic.
Although BCRA is not a party to those actions, it is accorded due process
because it is allowed to appear as an Interested Party. In fact, in connection
with the current motions, almost the entirety of the voluminous submissions
on the defense side have been made by BCRA.

The Stipulation and Consent Order of September 28, 2006
recognized that the attachment and restraint issues now before the court
would be decided with respect to the declaratory judgment action, 06 Civ.
7792, as well as respecting the other actions. It has been stipulated that the
time for the Republic and BCRA to answer or move with respect to the
complaint in 06 Civ. 7792 is extended until after the decision on the
attachment and restraint issues currently before the court.

## Statement of Facts

BCRA and the Republic, joined by the Federal Reserve Bank of New York as amicus curiae, argue against the seizure of the funds. Their arguments are able as far as they go, but there are essential realities that they entirely ignore.

### Assurances In Bonds

The bond instruments contain the most emphatic assurances regarding litigation rights in the event of defaults. Each bond refers to the "Fiscal Agency Agreement" relating to the particular bond issue. The Fiscal Agency Agreement and the bonds confirm each other in their solemn averments that bond holders, suffering defaults on their bonds, have the right to sue and obtain binding judgments against the Republic. Thus, the bonds contain the following provision:

> The Republic has in the Fiscal Agency Agreement irrevocably submitted to the jurisdiction of any New York state or federal court sitting in the Borough of Manhattan, The City of New York and the courts of the Republic of Argentina (the "Specified Courts") over any suit, action, or proceeding against it or its properties, assets or revenues with respect to the Securities of this Series or the Fiscal Agency Agreement (a "Related Proceeding") except with respect to any actions brought under the United States federal securities laws. The Republic has in the Fiscal Agency Agreement waived any objection to Related Proceedings in such courts whether on the grounds of venue, residence or domicile or on the ground that the Related Proceedings have

> been brought in an inconvenient forum.
> The Republic agrees that a final non-
> appealable judgment in any such Related
> Proceeding (the "Related Judgment") shall
> be conclusive and binding upon it and may
> be enforced in any Specified Court or in any
> other courts to the jurisdiction of which the
> Republic is or may be subject (the "Other
> Courts"), by a suit upon such judgment.

The bonds go on to provide that, to the extent that "the Republic or any of its

revenues, assets or properties" shall be entitled to immunity from suit, or be

entitled to immunity "from attachment prior to judgment, from attachment in

aid of execution of judgment, from execution of a judgment or from any other

legal or judicial process or remedy, . . . the Republic has irrevocably agreed not

to claim and has irrevocably waived such immunity to the fullest extent

permitted by the laws of such jurisdiction and consents generally for the

purposes of the Foreign Sovereign Immunities Act to the giving of any relief or

the issue of any process in connection with any Related Proceeding or Related

Judgment." This is followed by certain qualifications not here relevant.

These provisions are obviously designed to convey the message in

strong terms that, although the Republic might default, there will be a viable

remedy. The bonds provide for convenient jurisdiction and other features

designed to facilitate litigation leading to a judgment that would be "conclusive

and binding upon" the Republic and which could "be enforced." There is a

waiver of sovereign immunity which would appear to any reader to be

generously broad, and this waiver is surely intended to fortify the idea that a

-12-

bondholder suffering a default could, without hindrance or obstruction, be afforded the remedy of an enforceable judgment. These provisions resound with all the appearances of good faith.

Repudiation of Assurances

Unfortunately, the Republic has turned these assurances into a dead letter. The good faith was in the words but not in the deeds.

It is true that the Republic has duly consented to the jurisdiction of the federal court in New York City, and has been reasonably cooperative in litigation leading to the entry of many judgments against the Republic based on defaulted bonds. However, as it turns out, this has all been largely pro forma. As we know, judgments are worthless without the ability to enforce them. Despite the commitment in the bonds that there could be judgments which "may be enforced," the Republic has done everything in its power to prevent such enforcement.

Stepping back a bit, it should be noted that the bulk of the litigation has been devoted to the question of finding assets to attach or execute on because the Republic will not pay the judgments. But little has been said about the underlying, fundamental fact that the Republic has the duty to pay these judgments. A judgment debtor has an obligation to pay.

In all the years of litigation, the Republic has shown not the slightest recognition of this obligation to pay. And it is clear beyond any question that the Republic, as it went on from the crisis of 2001, has at times

-13-

had resources at its command to pay the judgments, or at least to make substantial part-payments. But the Republic thus far pays <u>nothing</u> on these judgments.

Counsel for the Republic have put forth the idea that the Republic cannot really be expected to pay these judgment debts, because this would greatly upset the bond holders who accepted an exchange offer. However, the bonds do not contain any provision to the effect that the full measure of indebtedness on the bonds, and the full rights to recover on judgments, are set aside by an exchange offer. The parties who accepted the exchange offer have no right to prevent payment to those who did not.

In February 2005 the Argentine Congress passed a law (Law 26,017) providing that the Argentine government "shall be prohibited from conducting any type of in-court, out-of-court or private settlement" with respect to the bonds that had not been exchanged pursuant to exchange offer. This means that the Republic has literally proclaimed its repudiation of its legal obligations.

<u>Recovery Efforts By Plaintiffs</u>

Since there has been no payment of the judgments, plaintiffs have been forced to seek recovery against property. On this subject, it is surely true that the Republic of Argentina does not keep substantial funds or other assets in New York which can be recovered against.

What plaintiffs have done is to attempt to recover against funds in

-14-

the hands of Argentine entities other than the Republic, on the theory that the Republic has attachable interests in such funds. These efforts have been problematic and thus far largely unsuccessful. But the efforts have not been frivolous. They have been serious and reasonable steps impelled by the fact that the Republic has refused to provide a normal, regular path to recovery.

The current motions deal, of course, with the Argentine central bank, BCRA. But the situation of BCRA is part of a broader picture, and, before going into the details about BCRA, it is appropriate to illustrate what that broader picture involves. Such an illustration is provided by the Republic's dealings with Argentine pension funds.

The relationship between Argentine private pension funds and the Republic was described in an opinion handed down by this court on December 11, 2008, Aurelius Capital Partners v. The Republic of Argentina (07 Civ. 2715). The Court of Appeals reversed the District Court ruling and vacated the attachments and restraints allowed by the District Court. Aurelius Capital Partners v. The Republic of Argentina, 584 F.3d 120 (2d Cir. 2009). However, this reversal had nothing to do with the findings of the District Court regarding the Republic's relationship with the pension funds. These findings were not overturned, or even criticized. Indeed, the Republic and the funds basically conceded these facts.

Briefly this is the situation. The private pension funds were established to prevent the Republic from appropriating assets which were

-15-

supposed to be used to provide pensions to Argentine citizens. However, in 2001, by executive decree, the pension law, which had limited to 50% the amount of the assets of a pension fund which could be invested in Argentine public debt, was amended to provide that 100% could be so invested. That year the pension funds made heavy investments in Republic bonds maturing in 120 days. All of these bonds were defaulted 30 days after issuance. Investments by the pension funds in Republic debt were clearly not appropriate, safe investments. The investments were a device by which the Republic in effect appropriated monies from the pension funds and the investments surely involved a disproportionate share of the assets of the funds, reaching as high as 70.69% in 2002.

It is not well to overdo the significance of a metaphor. But the reference of Judge Cabranes to a shell game is apposite indeed. See EM Ltd., 473 F.3d at 480 n.17. When the Republic wishes to use the funds of a particular entity, there is no real separation, at least to keep the Republic away from the money. But when plaintiffs in these cases are seeking to recover on their just judgment debts, the situation shifts and a wall of separation suddenly appears.

## Alter Ego Issue Regarding BCRA

It should be stated at the outset that, to some extent, the court relies on press articles for what is described in this section of the opinion. In some instances the press articles are simply a convenient source of

uncontested facts. This occurs when the press refers to certain laws or decrees promulgated by the Argentine government, and it also occurs when the press describes certain clear-cut financial steps taken by the Republic or BCRA. However, the court has also relied in certain instances on press items where the facts may be contested. The reason for the court's reliance in these instances is that the financial press in Argentina, in the United States, and elsewhere is likely to be well versed concerning financial issues which they report about, including matters in Argentina, and because well-established press organs are likely to contain accurate quotations. In the view of the court, it would be a departure from reality to ignore what is said in the financial press. However, the court has treated the press items with caution, and has made use of them only where there appears to be a sound factual basis, rather than mere opinion or rumor.

In connection with the alter ego issue, the extensive record before the court is well captured in an October 26, 2009 article in the Wall Street Journal by Mary Anastasia O'Grady, who writes frequently about Latin American affairs. She writes:

> One way a president can boost poll numbers in a bad economy is to wrest control of the central bank and start printing lots of pesos.

The article goes on to describe how the Argentine economy "was flat on its back" after the 2001-02 collapse of convertibility, the monetary arrangement that pegged the peso to the dollar. Nestor Kirchner became president in 2003

-17-

and, according to the article, introduced heavy governmental intervention in the Argentine economy.  As part of this, "Mr. Kirchner took control of the Central Bank."

### Turnover in BCRA Leadership

Plaintiffs argue that the high rate of turnover in the position of BCRA governor in the years leading up to the present action is another indicator of significant Republic control over BCRA.

The BCRA charter provides for governors to serve six-year terms. Pedro Pou served as BCRA Governor from August 5, 1996 to April 25, 2001, a period of 4 years, 263 days.  Roque Maccarone served from April 25, 2001 to January 18, 2002, a period of 268 days.  Mario Blejer served from January 28, 2002 to June 25, 2002, a period of 148 days.  Aldo Pignanelli served from June 25, 2002 to December 11, 2002, a period of 169 days.  Alfonso Prat Gay served from December 11, 2002 to September 23, 2004, a period of 1 year, 287 days. Martin Redrado served from September 23, 2004 to January 29, 2010, a period of 5 years, 128 days.  Mercedes Marco del Pont was appointed February 3, 2010.

Thus, BCRA over the past 15 years has featured four very short-term governors (Maccarone, Blejer, Pignanelli, and Prat Gay) with terms ranging from 148 days to almost 2 years, over a period of about 3 ½ years, sandwiched in between two longer-term governors with terms of nearly five years or longer (Pou and Redrado).

It should be noted that the tenures of three of the four short-term governors were apparently marked by disagreement with the Republic over BCRA independence. For example, as the Financial Times reported on June 26, 2002, Blejer in his resignation letter had complained of "growing infringements on central bank independence by the economy ministry." Pignanelli's resignation was reported by La Nacion on December 12, 2002 to be "the consequence of a culture based on the erroneous belief that [BCRA] can be permanently subject to political back and forths or even at the service of the Economy Ministry." And Prat-Gay was reported in Euromoney Institutional Investor on September 1, 2004 to have disagreed with the Republic's president "about the degree of independence that a central bank should have."

Further, while Martin Redrado held the position for more than five years, it could be argued that his longevity was the result not of weakening government control but of Redrado's willingness to do what was asked of him. Redrado was a political ally and former deputy foreign minister of President Nestor Kirchner who, unlike his predecessors, had no central banking experience prior to his appointment. Later in this opinion there will be a discussion of the Republic's use of reserves held by BCRA. There is no evidence that Redrado resisted such use until events in late 2009 and early 2010, all of which will be discussed later.

The changes in BCRA leadership just described occurred in the context of certain problems in compliance by the Republic with the law. Under

the terms of Article 7 of the BCRA charter as enacted in 1992, any appointment

by the Argentine president of the BCRA governor, deputy governor, or directors

requires the approval of the Senate. However, Executive Decree 1373/1999,

enacted on November 24, 1999, amended Article 7 by authorizing the Argentine

President to appoint the BCRA Governor, Vice-Governor, and Directors and

Trustees for an interim period ("in commission") pending approval by the

Argentine Senate. The defendants' experts argue that this is not a vehicle for

doing away with the basic requirement of Senate approval, but merely an

administrative procedure to avoid a gap in office in the event of an unexpected

resignation. However, there is little doubt that an unconfirmed BCRA official is

more vulnerable to the executive will.

These appointments "in commission" are contrary to Article 99 (19)

of the Argentine Constitution, which provides that "the President is empowered

to fill vacancies requiring the consent of the Senate and occurring during its

recess, by means of appointments on commission expiring at the end of the

next legislative session." In apparent violation of this provision, President

Nestor Kirchner appointed Pignanelli as Governor and Rafael Norberto Iniesta

and Ricardo Alberto Ferreiro as members of the BCRA Board of Directors when

the Senate was in session, and these appointments did not expire at the end of

that year's session. In fact, Pignanelli resigned after nearly six months in office

without ever being approved or rejected by the Senate. Further, in the case of

Directors Iniesta, Ferreiro, and Alejandro Henke, Kirchner dismissed them

before the Senate could ratify or reject them, even though Decree 1373/1999 does not grant any power of dismissal of officials appointed "in commission." In fact, pursuant to Article 99 (19) of the Argentine Constitution, officials appointed "in commission" cannot be removed by the President and their appointments only end due to the Senate's formal rejection or the Senate's silence at the end of the next legislative session.

Defendants argue that the "in commission" power is nothing more than an interim appointment power, noting that all but one of the last five BCRA governors appointed "in commission" were subsequently confirmed within two months by the Senate, the exception being Pignanelli. However, this argument does not take into account the two BCRA directors who served "in commission" for almost a year without Senate confirmation before being removed by the President. Further, the fact that most of the governors were eventually confirmed by the Senate does not in any way abrogate the expanded power granted to the President by Executive Decree 1373/1999.

BCRA's Monetary
Transactions

The focus of the alter ego issue has to do with certain activities of the Argentine government in respect to funds of BCRA. In defending against the alter ego claim, BCRA starts with the BCRA charter, contained in Law 24,144/92, enacted in 1992. Chapter I, Article 3 of the charter provides:

> As regards the preparation and implementation of any monetary and financial policy, BCRA shall not be subject

-21-

to any order or instruction given by the
National Executive Power.

A description of BCRA's monetary and financial policies and the
implementation of such policies is laid out in the declarations of Juan Basco,
BCRA Senior Manager of Open Market Operations; Laura Ines D'Amato, BCRA
Senior Manager of Economic Research; and Carlos Gustavo Gerscovich,
formerly Legal Manager of BCRA and now Professor of Law at the University of
Buenos Aires. The following is a summary of these declarations.

BCRA is charged by law with the power and responsibility to issue
and to monitor the Argentine peso. BCRA regulates the peso supply.
According to the BCRA declarants, the main objective of BCRA in monetary
policy is to achieve price stability. BCRA develops an annual monetary
program, presumably with regard to the volume of pesos needed and the
stabilization of the value of those pesos, and this monetary program is
presented each December to the Argentine congress. Short-term adjustments
are made in the monetary supply on a day-to-day basis. Increases in the
supply can be achieved by purchasing various forms of securities. Decreases
in the supply can be achieved by selling such securities. According to the
declarants, the day-to-day decisions on these matters are all made without any
direction from the Executive Branch of the Republic.

The accumulation of international reserves, including U.S. dollars,
is said to be an important factor in achieving price stability. BCRA purchases
foreign currency on the foreign exchange market. BCRA contends that the

-22-

accumulation of international reserves assures that BCRA is in a position to cushion the Republic's economy against internal shocks and to protect the value of the Argentine peso. Management of the international reserves is a fundamental part of BCRA's implementation of monetary policy. BCRA acquires international reserves by issuing pesos to purchase the international currencies. But, in order to prevent the country from being flooded with excess pesos, BCRA engages in "sterilization." This means that BCRA removes pesos from circulation by selling securities and receiving pesos in return.

Basco is (or at least was as of the time of his declaration dated October 25, 2006) responsible for purchasing U.S. dollars and carrying out sterilization to avoid having those purchases result in excess circulation of pesos. Basco has asserted that he would speak to the Governor of BCRA two or three times a day regarding the level of reserves to be achieved, and whether to buy or sell the pesos for the purpose of controlling the money supply. The Executive Branch of the Republic was not consulted in these activities, according to Basco.

Changes in Argentine Law Regarding the Accumulation
of Reserves and Government Borrowing from BCRA

Beginning in 2001, in the wake of the Argentine financial crisis, significant changes were enacted in Argentine law relating to (1) BCRA's accumulation of reserves, and (2) government borrowing from BCRA. The following is a chronology of those developments.

-23-

Argentine law regarding BCRA's accumulation of reserves is governed by Chapter I, Article 4 of the BCRA charter. Article 4© provides that BCRA has as one of its functions to "concentrate and administer its reserves in gold, currency and other external assets." Something known as the "Convertibility Law" (Law No. 23,928 of March 28, 1991) established a Currency Board and directed BCRA to maintain reserves equal to 100% of the monetary base. Any amounts in excess of this 100% were considered excess reserves. When the Currency Board was discontinued in response to the financial crisis of 2001, Law No. 25,561 of January 6, 2002 modified the Convertibility Law to provide that all of the reserves of BCRA should be designated as supporting the monetary base.

However, on December 15, 2005, the government of Nestor Kirchner issued Executive Decree 1599/2005, providing that BCRA reserves in excess of the amount required to back the monetary base could be used for debt payments to international monetary authorities. Such excess reserves were denominated "unrestricted reserves," while those required to support the monetary base were given the odd name "freely available reserves." See EM Ltd., 473 F.3d at 468 n.4. Executive Decree 1601/2005, issued the same day, explicitly permitted payment of the Republic's debt to the International Monetary Fund out of the unrestricted reserves. Decree 1599/2005 was approved by the Argentine Congress in Law 26,076, passed January 10, 2006.

Argentine law regarding government borrowing from BCRA is

-24-

governed by Chapter V, Articles 19-20 of the BCRA charter. Article 19(a) prohibits the bank from lending funds to the Republic except as provided under Article 20 of the charter. Under the original version of the charter, enacted in 1992, Article 20 permitted BCRA to finance the Republic only through the purchase, at market value, of Argentine government securities that could be traded on the open market. Additionally, growth in BCRA's holdings of government securities could not exceed 10% per calendar year, and no more than one-third of the "freely available reserves" could be held as government securities, as set forth in Chapter VIII, Article 33.

Since 2001, the Argentine government has enacted various laws that have either amended the BCRA charter to serve the Republic's policies, or enabled the Republic to exert more control over BCRA, or both. The effect of these laws has been (1) to expand the market for higher risk Republic bonds, thereby allowing the Republic to borrow more money, and (2) to increase the amount of money that BCRA itself can loan to the Republic and expand the circumstances under which it can do so.

Executive Decree 439/2001, issued on April 17, 2001, granted Argentina's banks the ability to use Republic bonds to meet their reserve requirements, thereby increasing the market for such bonds. This decree also exempted Republic bonds acquired by BCRA in open market transactions from pre-existing limitations on the annual increase and total holdings of such

-25-

bonds by BCRA.  Thus, Decree 439/2001 permitted BCRA to purchase Republic bonds in the secondary market essentially without limitation.

Law 25,561, enacted on January 6, 2002, has been referred to earlier in connection with the laws regarding international reserves.  Regarding the subject now under discussion, it should be noted that this law granted the Republic extraordinary powers during a temporary period of economic crisis. These powers were initially granted for three years, but the law has not been allowed to lapse.  Law 25,561 provides the Executive wide latitude to regulate by decree, and this is said to have permitted the Republic to issue the decrees of December 2005.

Law 25,562, enacted on February 6, 2002, amended the BCRA charter to allow the bank to make direct, temporary advances to the Republic in an amount as large as 10% of the Republic's tax collections over the previous twelve months.  All advances granted pursuant to this provision were to be "reimbursed within twelve months," and if any such loan remained unpaid after this time, the power to make further such loans was suspended until repayment.  In addition, Law 25,562 eliminated the requirement under Article 33 that such securitized lending be limited to one-third of overall reserves, thereby raising the limit on BCRA lending to the Republic by eliminating the maximum threshold.

Law 25,780, enacted September 5, 2003, added a cap on total BCRA advances which could be made to the Republic pursuant to Law 25,562.

Law 25,780 provided an upper limit on such advances of 12% of the monetary base (defined as the money in circulation plus the total demand deposits of financial entities held with BCRA). However, loans from BCRA used to pay outstanding obligations to "multilateral lending agencies" were explicitly exempted from this upper limit.

BCRA's Accumulation and Use of Dollars

Plaintiffs contend that beginning in late 2004, President Nestor Kirchner directed BCRA to begin purchasing U.S. dollars, so that increased amounts of pesos were issued, thus lowering the value of the peso in order to promote exports and obtain the votes of portions of the electorate. The court believes that this occurred, although the details about this activity are not spelled out in the record.

What is clear from the record, and is of great significance to the motions now before the court, is that in 2005 the Republic caused BCRA to make large-scale purchases of U.S. dollars in order to use those dollars to repay a debt of the Republic to the IMF. The Argentine daily Clarin reported on June 23, 2005 that BCRA was following President Nestor Kirchner's instructions "to the letter" by purchasing dollars on a daily basis, and had accumulated by that date nearly $23 billion of reserves. In June 2005 alone, according to Latin American Economy & Business, BCRA purchased a record $1.7 billion. Numerous other news sources also laid responsibility for this strategy squarely at the feet of President Kirchner, including Infobae

-27-

Profesional ("The experts . . . made it clear that the accumulation of reserves is not so much a policy of the Argentine Central Bank as an idée fixe of president Nestor Kirchner") and Ambito Financiero ("The idea is for [Argentina] to have $30 billion in international reserves by the end of the year, because Nestor Kirchner has made this the target").

It is uncontested that by the end of 2005 BCRA held U.S. dollar reserves in excess of what was needed for the support of the monetary base. The Court of Appeals has found that, as of this time, BCRA had about $26.8 billion in reserves and needed $18.4 billion to cover the monetary base, leaving an excess of $8.4 billion. 473 F.3d at 468.

It was at this juncture that the Republic issued Executive Decree 1599/2005 of December 15, 2005, providing that BCRA reserves in excess of the amount needed for the backing of the monetary base could be used for payment of debts to international monetary authorities, which excess reserves were denominated "unrestricted reserves." Decree 1599/2005 was approved by the Argentine Congress in Law 26,076. Decree 1601/2005 was issued on December 15, 2005, permitting payment of the Republic's debt to the International Monetary Fund out of the unrestricted reserves.

The total amount paid to the IMF was $9.5 billion, and the payment was made in early January 2006. This was, of course, more than the $8.4 billion referred to by the Court of Appeals. The precise facts about the payment are not entirely clear. There is some indication in the evidence that

the total amount of dollar reserves was $28.045 billion instead of $26.8 billion, and that the entire $9.5 billion payment to the IMF was made out of the dollar reserves held by BCRA.  However, at a hearing held on January 12, 2006, an attorney for one of the plaintiffs stated that approximately $8 billion was taken from BCRA for payment of the IMF debt and $1 billion was borrowed from the Venezuelan leader, Hugo Chavez.

Regardless of the precise details, the basic fact is that more than $8 billion, constituting almost a third of the U.S. dollar reserves held by BCRA, was used to pay an indebtedness of the Republic (not, of course, an indebtedness of BCRA).  Also, this debt payment was not due in January 2006, and in fact was not due until 2009.  The reason for the early payment was because of President Kirchner's desire to make such a payment in accordance with his political purposes.

All that BCRA received in return was a 10-year note.  This arrangement was contrary to the requirements of the amended BCRA charter, under which advances to the Republic were to be repaid within 12 months. There is an indication in the record that the Republic missed its first interest payment on the note, due in July 2006, and only made the payment when urged to do so by the Republic's New York attorneys.  It would appear that the 10-year note is more appearance than substance.

In any event the idea of a loan by BCRA to the Republic to be repaid in 10 years was a violation of Article 20 of the BCRA charter, which

-29-

provides:

> All advances granted pursuant to this
> article shall be reimbursed within twelve
> months . . . .

BCRA declarant Gerscovich argues that Executive Decrees
1599/2005 and 1601/2005 do not violate the BCRA charter because they were
issued pursuant not to Article 20 of the charter but to Article 39 of the 1933
Complimentary Permanent Budget Law. Article 39 permits BCRA to enter into
"transitory financial operations" necessary to facilitate the processing of loans
negotiated by the government with foreign entities. However, there is nothing
transitory about BCRA's loan to the Republic, which is for a ten-year term, and
in any case this law does not give authority to BCRA to itself loan money to the
government.

To return to the year 2004, what is claimed is that the Republic
manipulated the U.S. dollar balances at BCRA in order to reduce the value of
the peso. But whatever occurred in this regard, as far as the record now
shows, did not involve the actual removal or appropriation of funds of BCRA.
The payment of the IMF debt in 2005 involved a far more drastic intrusion into
BCRA independence. This was the use, at the behest of the Republic, of
BCRA's power to issue pesos, and then the application of these pesos to
purchase U.S. dollars. Obviously the accumulation of U.S. dollars was
intentionally designed to rise above the level of reserves necessary for coverage

-30-

of the monetary base, so that the Republic could take those dollars for the payment of the IMF debt.

As indicated by what has just been discussed, the court is convinced that the availability of $8.4 billion or $9.5 billion in unrestricted reserves to pay the IMF was not some abundance that grew up in the course of BCRA managing its own affairs. It is surely no coincidence that as of the end of 2005, the amount of the unrestricted reserves was what was needed to pay the IMF.

Shortly after the payment to the IMF, BCRA's governor and the Republic's minister of the economy held a joint press conference at which they announced that the Republic planned to continue to use BCRA's unrestricted reserves to pay the Republic's debts to other international organizations. In August 2006, in conjunction with this effort, the Republic announced that BCRA must by the end of the year secure and maintain its U.S. dollar reserves at $30 billion. This announcement was made in spite of Chapter I, Article 3 of the BCRA charter, which declares that in "the preparation and implementation of any monetary and financial policy, BCRA shall not be subject to any order or instruction given by the National Executive Power."

Executive Decree 1394/2008, issued on September 2, 2008, ordered the repayment of Argentina's $6.7 billion debt to Paris Club members using unrestricted reserves from BCRA. Executive Decree 1472/2008 stated that BCRA reserves would be repaid with a Republic security, presumably

similar to the note BCRA received in exchange for the IMF payment. The decree also explicitly stated that the payment to the Paris Club members would be exempted from the BCRA charter's limitations on loans to the Republic.

More recently, on December 14, 2009, President Cristina Kirchner authorized the creation of the so-called Bicentennial Fund for Debt Reduction and Stability (the "Bicentennial Fund"). Pursuant to Emergency Decree No. 2010/2009, the Bicentennial Fund would consist of nearly $6.6 billion to be transferred from BCRA's reserves to the National Treasury and used for the repayment of debts owed by the Republic and due in 2010.

Unlike prior occasions, this proposal of the president met with some resistance. Those opposed included Martin Redrado, then BCRA Governor, and several members of the Argentine Congress who filed a request to stay the decree that was later granted by an Argentine federal judge.

President Kirchner demanded Redrado's resignation on January 6, 2010. Redrado refused, and the following day he was dismissed by way of Emergency Decree 18/2010, issued by the president. Miguel Angel Pesce, a senior bank official, was then appointed to the post of interim Governor. Redrado challenged his ouster and an Argentine federal judge stayed the decree dismissing him. The administration immediately appealed that decision. At the same time BCRA's Board of Directors effectively stripped Redrado of his authority. On January 29, 2010, Redrado capitulated, tendering his resignation.

-32-

On February 3, 2010, President Kirchner appointed as the new BCRA Governor Mercedes Marco del Pont, an "administration loyalist" according to the Wall Street Journal (Mar. 2, 2010). Since her appointment, Marco del Pont has expressed a commitment to working with the government, perhaps at the expense of BCRA independence, commenting that "I believe in the operating autonomy of the central bank but I don't think it can be independent from the whole of the nation's economic policies." Dow Jones Factiva (Feb. 4, 2010). Dow Jones also noted that the "near-unanimous reaction among private-sector economists is that central bank independence will be restricted even further."

Rather than trust the fate of the Bicentennial Fund to the courts or the unsympathetic newly elected Congress, President Kirchner on March 1, 2010 "revoked" Decree No. 2010/2009 and simultaneously issued a different set of decrees authorizing exactly the same use of the same amount of BCRA reserves as previously contemplated. This move to circumvent Congress and the judiciary appears to have succeeded. The entire $6.6 billion in BCRA reserves was apparently transferred into Argentine Treasury accounts on March 1, 2010. Bloomberg (Mar. 1, 2010).

### Inflation and Sterilization

The Republic and BCRA contend that BCRA had, all through this period, a consistent policy of "sterilization." Their argument is that when pesos were issued by BCRA to purchase U.S. dollars, if this led to an excess of pesos

-33-

in the Argentine economy, such excess would be withdrawn by having BCRA sell securities that would be purchased with pesos. It is contended that this kept Argentina from suffering a high rate of inflation. It is said that during the relevant period inflation averaged 7%. The contention appears to be that things could have been worse.

The fact apparently is that things were indeed worse. Plaintiffs contend that inflation exceeded 11% in 2005 and reached 25% in 2008. At a meeting of economists and financial analysts in Washington on November 3, 2005, the head economist of Bank of America stated that the "inflationary outbreak" in Argentina is due to "a lack of independence" of BCRA from the Republic. A Wall Street Journal article of February 20, 2007, entitled "Economics for Dummies," stated that President Nestor Kirchner had recently "sacked" an official at the Argentine National Statistics and Census Institute ("INDEC") for refusing to alter the methodology used to calculate inflation. The June 12, 2008 issue of The Economist contained an article entitled "Hocus-Pocus: Argentina's Way With Sums," which stated that since January 2007 the official inflation rate had been doctored to remain in a single digit, while the true figure had soared above 20%. The article went on to state that it had been hoped that the new president, Cristina Kirchner, who succeeded her husband in December 2007, would restore the Republic's "computational credibility." The article noted that "rather than stopping the meddling that took place

-34-

during Nestor Kirchner's administration, the new [inflation] index merely
formalizes it."

BCRA issued its own inflation statistics, including a projection for
2008 of an inflation range of 7% to 11%. This was precisely what INDEC was
projecting, leading to an Argentine press comment to the effect that Redrado,
the Governor of BCRA, was completely aligned with the position coming from
administration officials. It was, of course, inflation figures emanating from
INDEC which were the subject of a barrage of critical commentary, including
questioning by the International Monetary Fund.

Transfers Out of the United States

Historically, BCRA has had substantial accounts both at the
FRBNY and at private banks located in the United States. As of month-end
September 2001, BCRA held $14.4 billion of its reserves in the United States.
Of this, $4.2 billion was on deposit at the FRBNY in the form of cash and U.S.
government securities. $4.6 billion was on deposit at various commercial
banks. $5.6 billion was on deposit at Deutsche Bank in New York City under a
particular program administered by that German bank. By month-end
December 2001 (the time of the bond default), BCRA had reduced its reserves
held in the United States to $4.5 billion. $3.5 billion was on deposit at the
FRBNY in cash and U.S. government securities. About $1 billion was on
deposit at commercial banks. The special program with Deutsche Bank had
been terminated. Amounts withdrawn from the United States were to some

-35-

extent moved to the Bank for International Settlements ("BIS"), and were also moved to Argentina in connection with the financial crisis there. As to the reasons for the large withdrawals from the United States, according to BCRA, they had to do with ensuring liquidity and obtaining more favorable returns on investment. BCRA has also stated that one reason was to avert the possibility of "wrongful attachment" in the United States.

The amounts that BCRA maintained in the United States stayed approximately at the December 2001 level through 2002. However, in 2003 BCRA decided that it would no longer invest in U.S. government securities, and these were allowed to expire or were otherwise liquidated. As of December 2002, BCRA had $2.4 billion in U.S. government securities and $901 million in cash, all on deposit at the FRBNY. By December 2003, there were no U.S. government securities on deposit at the FRBNY, only a cash deposit of about $500 million.

In its description of its funds held in the United States at various times, BCRA states that there was a balance of about $1 billion in commercial banks as of December 2001. In this description, there is no mention made of deposits at commercial banks after this, and it will be assumed that at some point reasonably soon after December 2001, the use of commercial banks was discontinued, so that BCRA's exclusive depository in the United States was the FRBNY.

To return to the deposits at the FRBNY during 2004, the running

-36-

balance amounted to $1 billion or sometimes more, and included modest amounts of U.S. government securities.

In 2005, BCRA again reduced its business at the FRBNY, and thereafter maintained running balances of only about $200 million.

Use of Federal Reserve Account

As already described, BCRA had approximately $105 million on deposit at the FRBNY as of December 30, 2005, when the original orders of attachment and restraint were entered.

The parties have provided a detailed description of transactions in that account on December 30, 2005 and during the three-month period commencing October 3 and ending December 30. This description is largely in the form of a stipulation.

The stipulation describes in detail the kinds of transactions that resulted in deposits in (credits to) the FRBNY account of BCRA, and withdrawals from (debits to) that account. These transactions will be summarized later in this opinion. However, Appendix A to the stipulation contains figures showing the running balances in the BCRA account at the FRBNY, which balances existed after all the detailed transactions were credited and debited. Figures are given for each business day from October 3 through December 30, 2005. A principal feature of the business BCRA did with the FRBNY was that each night funds still in the account would be allocated in three ways. A relatively small amount would be allocated to a required

-37-

minimum deposit, which would earn no interest. A much larger amount would be allocated to the so-called Federal Repurchase Pool ("Repo Pool") and invested in that pool overnight. A third amount would be allocated to the "Fed Funds Pool," also for overnight investment. The Repo Pool and Fed Funds Pool operated as follows. As of 2:30 p.m. BCRA would make the allocation of a portion of its funds at the FRBNY to the Repo Pool. This was an amount that BCRA believed would not be required for transactions during the rest of the day. Participation in the Repo Pool was available only to foreign central banks and "international official institutions." A repurchase agreement is a contract under which a party buys a U.S. treasury or federally sponsored agency security for immediate delivery and simultaneously agrees to sell the security back, usually on the next business day at a price higher than the buy price. The difference is the return on the transaction.

Funds which BCRA did not allocate to the Repo Pool as of 2:30 p.m., and which remained on deposit at the end of the day, could be invested in the Fed Funds Pool. Participation in the Fed Funds Pool was also available only to foreign central banks and international official institutions. Money in the Fed Funds Pool was loaned overnight to one or more large United States banks. BCRA's share of the overnight interest was its return.

At the beginning of each day, at least until December 16, the opening balance in the BCRA account would consist of (1) the overnight minimum balance, which was still in the account without change; (2) the

-38-

amount which had been invested in the Repo Pool plus the return; and (3) the amount which had been invested in the Fed Funds Pool plus the return. During the day there would be credits and debits relating to the various types of transactions in BCRA's account. There could also be transfers from BCRA's account at BIS to augment the BCRA account at the FRBNY. There were also frequently substantial transfers out of the FRBNY account to BCRA's account at BIS. But even after taking into account the various credits and debits from the transactions in the account and the substantial transfers to BIS, BCRA carried sizeable running balances at the FRBNY, which it invested overnight through the Repo Pool and the Fed Funds Pool. For instance, on October 3 BCRA invested $259,200,000 through the Fed Repo Pool and $56 million through the Fed Funds Pool. For the period October 3 through December 15 (when the pattern changed) the average amount invested through the Fed Repo Pool was $120,633,333 per business day. For the same period the average invested through the Fed Funds Pool was $15,941,176 per business day.

For the period October 3 through December 15 the total amount transferred from BIS to the BCRA account at the FRBNY was $240 million and the total amount transferred from the FRBNY account to the BIS account was $2.1 billion.

Beginning on December 16 the handling of the account changed. BCRA essentially stopped carrying substantial running balances and essentially stopped investing any overnight amounts through the Fed Repo Pool

-39-

and the Fed Funds Pool. It would appear that BCRA was carrying on its various kinds of transactions through the FRBNY account, but essentially clearing that account each day. The device for this was to have substantial daily transfers from the BCRA account at BIS and substantial transfers out of the FRBNY account and back into the BIS account during the day, so that essentially very little was left at the end of the day in addition to the required minimum overnight balances of a few hundred thousand dollars.

BCRA explains the change that occurred beginning December 16 as having two causes. One was to assist in assembling funds for the payment to the IMF. The second explanation made by BCRA was concern about the possibility of "wrongful attachment," that might occur when it was learned that BCRA funds were to be used to pay the Republic's debt to the IMF.

The significance of what has been described will be discussed later in this opinion. It is necessary now to give the details of the kinds of transactions for which BCRA used its account at the FRBNY.

1) Argentine banks are required to maintain certain cash reserves, called "efectivo minimo," on deposit at BCRA. BCRA used its account at the FRBNY for depositing dollars, which in turn had been deposited with BCRA under the efectivo minimo requirement. When an Argentine bank needed to increase the amount of this deposit, the amount in the BCRA account at the FRBNY would increase. When the Argentine bank was entitled to decrease the amount of dollar reserves, the amount apparently was

withdrawn from the BCRA account at the FRBNY. From October 1 to December 30, 2005, adjustments to the U.S. dollar efectivo minimo obligations of Argentine banks accounted for $3,915,083,249.55 in credits and $2,855,641,933.62 in debits to the FRBNY account.

2)   BCRA's charter allows it to purchase and sell foreign exchange. BCRA used the FRBNY to settle such foreign-exchange transactions with Argentine domestic banks. When BCRA purchased U.S. dollars, the counterparty's New York branch, correspondent, or intermediary transferred U.S. dollars to BCRA's FRBNY account, while BCRA credited the corresponding amount of Argentine pesos to the counterparty's BCRA account in Buenos Aires. Alternatively, when BCRA sold U.S. dollars, BCRA transferred U.S. dollars from its FRBNY account to the counterparty's New York branch, correspondent, or intermediary, and debited the corresponding amount of Argentine pesos from the counterparty's BCRA account in Buenos Aires. From October 1 through December 30, 2005, foreign exchange transactions accounted for $1,857,894,821.95 in credits and $27,500,000 in debits to the FRBNY account.

3)   BCRA also provided U.S. dollar banknotes to Argentine domestic banks. When an Argentine bank requested U.S. paper currency from BCRA, the New York branch or correspondent of the Argentine bank transferred U.S. dollars to BCRA's account at the FRBNY, and BCRA in turn delivered U.S. dollar banknotes from its vault within Argentina to that

Argentine bank.  From October 1 through December 30, 2005, there was one transaction in which BCRA provided U.S. dollar banknotes to an Argentine domestic bank, amounting to a total credit to the FRBNY account of $5,000,000.

4)   BCRA is a member of the Council for Financial and Monetary Affairs of the Latin American Integration Association ("ALADI").  The ALADI Reciprocal Payments and Credits Agreement ("the Agreement") allows payments from international trade transactions between exporters and importers in ALADI member states to be processed through reciprocal lines of credit among the central banks.  BCRA and the other central bank parties to the Agreement maintain bilateral accounts at one another's institutions, and these central banks would settle their U.S. dollar account balances through the FRBNY. Under this arrangement, when BCRA settled its U.S. dollar positions with another central bank, BCRA would instruct the FRBNY to debit its account and credit the corresponding amount to the other central bank's FRBNY account. Likewise, if another central bank were settling a U.S. dollar account debit with BCRA, a credit would be recorded in BCRA's FRBNY account.  From October 1 through December 30, 2005, the FRBNY debited $18,100,000 and credited $55,632,308.86 to BCRA's account to settle debit/credit positions in connection with the lines of credit established under the Agreement.

5)   BCRA, as financial agent for Argentina, also executes certain payment instructions of the Republic.  BCRA used the FRBNY account to

-42-

transfer funds on behalf of the Republic to and from certain international organizations, to and from Argentine embassies and missions abroad, and to certain business associates of the Republic, including U.S. law firms. Further, FONPLATA, a South American development entity of which Argentina is a member, transferred funds between an account outside Argentina and its account at BCRA, resulting in both credits and debits to the FRBNY account (with a simultaneous debit/credit in the FONPLATA account at BCRA in Buenos Aires). From October 1 through December 30, 2005, such fund transfers accounted for $6,892,326.75 in credits and $31,421,617.92 in debits to the FRBNY account.

6) Funds in the FRBNY account were also used for transactions in which Argentine domestic banks transferred dollars from their accounts at BCRA to their accounts outside Argentina, resulting in debits to the FRBNY account. From October 1 through December 30, 2005, such transfers accounted for $5,786,716 in debits to the FRBNY account.

7) BCRA also used the FRBNY account to make payments of BCRA expenses incurred in U.S. dollars, including, for example, the purchase of currency paper and BCRA's subscription to the Bloomberg News Service. From October 1 to December 30, 2005, the amount debited from the FRBNY account to pay such expenses totaled $3,258,520.49.

8) Finally, BCRA has long maintained $45 million in a U.S. dollar-denominated one-to-three-month term deposit account at Banco

Latinoamericano de Exportaciones, S.A. ("Bladex"), a Panamanian bank. When each term deposit matured, the FRBNY account was credited with the net interest earned, while the principal was "rolled over," or reinvested at Bladex for another term. From October 1 to December 30, 2005, the FRBNY account was used twice to roll over BCRA's long-term deposit at Bladex, resulting in a total credit of $697,650.

Appendix B to the stipulation contains a detailed account of every transaction in BCRA's account at the FRBNY for December 30, 2005. There was an opening balance of $655,881.14, which had been the minimum required overnight balance, not bearing interest. The sum of $5 million had been invested on December 29 through the Fed Funds Pool, so that December 30 started with that amount plus the return from the investment, equaling a total of $5,000,548.62. The total opening balance in the account at December 30 was $5,656,429.76. During the morning of December 30 BCRA received from Argentine banks six requests to decrease the amount of their U.S. dollar reserves. This related to the efectivo minimo requirement. These requests were for a total of $31,700,273. In order to cover these requests, BCRA arranged for a transfer of $31 million from its account at BIS to the FRBNY account on the morning of December 30. On December 30, BCRA requested the withdrawal of a total of $31.7 million to pay the Argentine banks. However, due to the restraints imposed by this court, these payment requests were not honored.

-44-

Other business occurred in the BCRA account at the FRBNY on December 30. Argentine banks arranged for six transactions to increase their efectivo minimo reserves, with the result that a total of $32.2 million was credited to the BCRA account at the FRBNY. On the same day BCRA engaged in 52 spot purchases of U.S. dollars, resulting in credits of $35 million to the FRBNY account. On December 30, in connection with 20 late-exporter transactions, a total of $1,216,568.06 was deposited into the FRBNY account. On the same day BCRA directed that three transfers be made to the BIS - for $20 million, for $30 million, and for $20 million. However, these transfers were not carried out because of the restraints put in place by the court.

## Legal Conclusions

### Res Judicata

As described earlier, on December 30, 2005 plaintiffs moved for pre-judgment attachments and post-judgment restraining notices, as appropriate to the particular case. The purpose of these motions was to put a hold on certain funds to prevent them from being removed from Argentina and to have them available ultimately for application against the judgment debts. Plaintiffs did not seek, through these motions, to execute against the funds, nor did they seek a turnover of the funds. It should be noted that, under the relevant New York law, a plaintiff can use a restraining notice simply by serving that notice. However, FSIA § 1610© provides that no attachment or execution against the assets of a foreign state or its instrumentalities is permitted

-45-

without court order. Although the restraining notices were not literally executions, plaintiffs obviously believed that they should obtain a court order, rather than merely serving them.

The Part I judge of this court granted the motions, but the regularly assigned judge vacated the attachments and the restraints. In these district court proceedings various issues were presented, which were described earlier in this opinion, but the alter ego issue was not one of them. Plaintiffs did not present, or develop, the contention that BCRA was the alter ego of the Republic.

The district court certified the matter for interlocutory appeal under 28 U.S.C. § 1292(b). The Court of Appeals affirmed the vacating of the attachments and restraints. EM Ltd., 473 F.3d 463. As already described, the Court of Appeals noted the potential relevance of an alter ego theory, but did not consider that the issue was one which was to be resolved on that appeal.

In September 2006, prior to the Court of Appeals opinion, plaintiffs filed an action seeking a declaration that BCRA was the alter ego of the Republic. Plaintiffs also made new motions for attachment and for restraints. These new motions were based upon the alter ego theory. Subsequently the complaint in the new action has been amended to seek not only a declaratory judgment, but a money judgment against BCRA.

The submission of evidence and the legal briefing on the alter ego issue have been far greater in volume and scope than what was presented on

-46-

the December 2005 motions. The alter ego issue is complex and multifaceted, and there has been regular interaction between the court and the parties during the lengthy time that the September 2006 motions have been under submission.

BCRA contends that the new action and new motions, raising the alter ego issue, are barred by the doctrine of res judicata. BCRA argues that the January 2006 order of the District Court, vacating the attachments and restraints (which was affirmed on appeal, and on which the Supreme Court denied certiorari), was the kind of a court ruling - in effect, a "judgment" - to which the law of res judicata applies. Plaintiffs go on to argue that the alter ego claim is something which plaintiffs could have and should have presented in their December 2005 motions, and that, since they did not do so, they are now barred from bringing new motions and bringing a new action based on that claim.

The general principles of res judicata are well known. Res judicata precludes a party, or those in privity with the party, from presenting in subsequent litigation claims that were or could have been raised in a prior action that is finally adjudicated on the merits. Storey v. Cello Holdings, L.L.C., 347 F.3d 370, 381 n.7 (2d Cir. 2003); Fay v. South Colonie Central School District, 802 F.2d 21, 28 (2d Cir. 1986). There is authority to the effect that, if the evidence presented and the facts relied on are essentially the same in the second action as in the first action, the second action is barred even

-47-

though different legal theories are presented or dissimilar or additional relief is requested. Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994).

The standard application of res judicata is where a lawsuit goes to judgment and a second lawsuit is brought. When it comes to applications for provisional remedies during the course of a lawsuit or application for supplementary remedies following judgment, there is very little development of the law as to how res judicata should apply. This may very well be because it is assumed that res judicata is largely inapplicable in these situations. There is almost no case law on the subject. And the court has not been cited to any Restatement or treatise, or other learned discussion on the subject. What little case law there is will now be described.

In Ren-Cris Litho, Inc. v. Vantage Graphics, Inc., 93 Civ. 7377 (KMW) (S.D.N.Y. June 19, 1996), Judge Wood dealt with the following situation. The plaintiff sued defendant Modern and other defendants in New York state court and obtained a judgment against Modern. Modern failed to pay the judgment. A new action was brought under N.Y. C.P.L.R. §§ 5225(b) and 5227 against other defendants, claiming that they were transferees of Modern's assets. Judge Wood spoke of this as a new "action" not as a motion or some other kind of proceeding, and indeed it was a separate new action. The purpose of this action was to recover on the judgment against parties other than Modern. The state court dismissed the new action on statute of limitations grounds and the Appellate Division affirmed. Thereafter, the

-48-

plaintiff moved to New Jersey, thus creating diversity of citizenship between plaintiff and the defendants in the second New York action. The plaintiff commenced a federal action in the Southern District of New York against these defendants, and asserted a corporate "veil-piercing" theory, which allegedly made them responsible to pay the judgment. It was apparently assumed that res judicata would bar the new action asserting the veil-piercing theory unless there had been a "formal barrier" to asserting it in the second state court action. Judge Wood found that there was no such formal barrier, and granted summary judgment dismissing the federal action.

The plaintiff appealed. The Second Circuit Court of Appeals affirmed in a summary order. The list of "Decisions Without Published Opinions" at 107 F.3d 4 shows the affirmance, dated February 24, 1997. The Court of Appeals chose not to issue a decision which could be used as a precedent on the subject dealt with. Second Circuit Rule 32.1.1 provides that a summary order filed prior to January 1, 2007 is not to be cited except in the same case or a related case. It should be noted that Judge Wood's opinion is not published in any form, although it is contained in the district court file.

Eckhaus v. Blauner, 1997 WL 362166 (S.D.N.Y. June 26, 1997) is another case where a plaintiff obtained a judgment in New York state court, followed by supplementary proceedings to recover on the judgment. Then there was a federal court action against other parties claiming that they were liable on the judgment, based on theories of fraudulent conveyance and corporate

-49-

veil-piercing.  These defendants asserted res judicata as a defense to the federal

action.  Judge Haight stated:

> There is authority for the proposition that
> supplemental proceedings may lay the
> foundation for application of res judicata.

The only authority cited by the judge was the Ren-Cris case.  Judge Haight

went on to rule that the defendants had not made a factual showing justifying

the application of res judicata.

B.N.E. Swedbank v. Banker, 791 F.Supp. 1002 (S.D.N.Y. 1992),

was a federal suit in the Southern District of New York involving claims on

various theories, including breach of contract and fraud.  The plaintiff filed a

separate action in the federal court in Connecticut to obtain an attachment on

defendant Banker's home, to secure the potential judgment in the Southern

District action.  The court in Connecticut held that there could be no

attachment because there was no probable cause to sustain the claims against

Banker.  Banker and the other defendants in the Southern District action

moved in that court for summary judgment, relying mainly on the theory that

the ruling in Connecticut operated as collateral estoppel to bar the claims

made against them in the Southern District action.  Judge Sweet held that

collateral estoppel could apply, but that in fact it only operated to bar a fraud

claim.

BCRA relies on Federal Deposit Insurance Corporation v.

Shearson-American Express, Inc., 996 F.2d 493 (1st Cir. 1993).  All that needs

-50-

to be said about this case is that it dealt with the res judicata effect of a bankruptcy court order. It is true that the district court had entered an order of attachment against a certain party's assets in order to enforce a judgment. Then the bankruptcy court entered an order approving the disbursement of funds in compliance with the attachment. It was this bankruptcy court order which was given res judicata effect.

It is now necessary for this court to come to its conclusion regarding whether res judicata applies to bar the alter ego claims in the new action and in the new motions. The court rules that res judicata does not apply.

The motions for attachments and restraints made in December 2005 were part of an ongoing process related to their particular actions. These motions had no independent status as actions for lawsuits. They did not lead to independent judgments. They were nothing more nor less than motions, and they were not motions which led to any final disposition in the cases to which they were related.

The alter ego claims, which were presented in the new action and the new motions of September 2006 obviously had some common elements with the issues that were presented by the December 2005 motions. However, it is now known that both the legal and factual issues involved in the alter ego claims go far beyond the legal and factual issues posed by the December 2005 motions. Plaintiffs wisely did not attempt to pose the alter ego claims in their

-51-

December 2005 motions.  For one thing, plaintiffs were acting on the basis of notice of two weeks or less to prevent BCRA funds from being removed from the United States pursuant to the new plan to use BCRA dollar reserves for payment of the IMF debt.  The arguments which plaintiffs used at that time were not successful, although $100 million has remained on deposit at the FRBNY pending the further proceedings.  The Court of Appeals expressly noted the possible viability of the alter ego theory.

Plaintiffs did not have a realistic opportunity to present their alter ego claims in the December 2005 motions.  A res judicata bar should not be applied.  This is particularly true in the context of this extraordinarily difficult litigation.  The Republic of Argentina refuses to pay the judgment debts.  There are no assets of the Republic readily available for attachment (to secure future judgments) or for execution (to obtain payment of judgments already entered).  This has forced plaintiffs to resort to the most arduous litigation process, which has occupied the parties, the District Court, and the Court of Appeals for the past 8 years, with no end in sight.  This is not the fault of plaintiffs.

The authorities relied on by BCRA are not on point.  Ren-Cris did not involve ancillary motions made in connection with the main litigation.  In that case there had been an action in the state court resulting in a judgment, and a new action, a turnover proceeding under N.Y. C.P.L.R. § 5225(b).  The Practice Commentaries in McKinney's state that a special proceeding under § 5225(b) is plenary, and culminates in a judgment.  David D. Siegel, Practice

Commentaries, N.Y. C.P.L.R. § 5225, at 266 (McKinney 1997). In the <u>Eckhaus</u> case Judge Haight simply made a comment based on <u>Ren-Cris</u>, but did not actually apply <u>res judicata</u>. <u>Swedbank</u> involved a basic action in the Southern District of New York, and a separate action in Connecticut to obtain an attachment under Connecticut law. It did not involve an attachment motion made in the Southern District case. In any event, the issue was the extent to which collateral estoppel applied, because of certain matters actually litigated in the Connecticut case.

BCRA urges that the court treat the December 2005 motions, at least in part, as if they were "special proceedings" under New York procedural law. It is true that certain kinds of applications regarding attachments are special proceedings under Article 4 of the C.P.L.R. <u>See</u> N.Y. C.P.L.R. §§ 6214(d) and 6221. However, these do not have to do with the basic motions to grant or vacate attachments of the kind involved in the present case. <u>See</u> N.Y. C.P.L.R. §§ 6201 and 6223. Also there is no special proceeding provided in connection with restraining notices. <u>See</u> N.Y. C.P.L.R. § 5222. In any event, federal procedures, while they refer to the remedies provided by state law (Fed. R. Civ. P. 69), do not incorporate every detail of state procedural law.

Thus, in a federal action, attachment proceedings during the lawsuit and supplementary proceedings after judgment generally are motions which are ancillary or auxiliary to a main action. They are carried out under the supervision of the judge in connection with that main action. Obviously, as

part of proper administration of a case, a judge will not permit repetitious motions. The judge will not permit undue burdens to be placed upon third-party garnishees. However, this is simply a matter of reasonable case administration. And, in the present case, since BCRA is so closely bound up with the Republic of Argentina, it is hardly an unfair burden to require BCRA to respond to the new alter ego claims, and BCRA has done so.

The court holds that the new action and new motions of September 2006 are not barred by res judicata.

It is appropriate to note the following. The Court of Appeals in its January 5, 2007 opinion obviously made certain findings and conclusions on the contested issues presented to it at that time. None of the findings and conclusions now made by this court in respect to the September 2006 motions contradict any of the findings and conclusions in the Court of Appeals opinion. The alter ego theory is being presented now, whereas it was not presented at the earlier stage. Not only is a different overall theory presented, but the detailed propositions supporting that theory are different from those that were presented earlier. A comparison of the Court of Appeals opinion with the current opinion makes that readily clear.

The Alter Ego Issue

Foreign Sovereign Immunities Act
Basic Provisions

The relevant provisions of the FSIA deal with both post-judgment and pre-judgment remedies. 28 U.S.C. § 1610(a) is about remedies following

-54-

judgment. It provides that the property in the United States "of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution," upon a judgment entered by a United States court, if the foreign state has waived its immunity from attachment or execution. Section 1610(d) relates to pre-judgment attachments. It provides that the "property of a foreign state . . . , used for a commercial activity in the United States, shall not be immune from attachment prior to the entry of judgment," if the foreign state has waived its immunity as to such attachment.

Section 1610(d) deals with agencies or instrumentalities of a foreign state. It provides that any property in the United States "of an agency or instrumentality of a foreign state engaged in commercial activity in the United States" shall not be immune from attachment or execution if the agency or instrumentality has waived its immunity from attachment or execution.

It is also provided in section 1611 that, notwithstanding the provisions of section 1610, "the property of a foreign state shall be immune from attachment and from execution, if . . . the property is that of a foreign central bank or monetary authority held for its own account," unless such bank or authority or its parent foreign government has explicitly waived its immunity from attachment or execution.

Section 1603 is the definitions section. A "foreign state" is defined in § 1603(a) as including a political subdivision of a foreign state "or an agency

or instrumentality of a foreign state." An "agency or instrumentality of a

foreign state" is defined in § 1603(b) as any entity which is a "separate legal

person," corporate or otherwise, and is "an organ of a foreign state" or an entity

in which the state owns at least a majority interest. "Commercial activity" is

defined in § 1603(d) as follows:

> (d) A "commercial activity" means either a
> regular course of commercial conduct or a
> particular commercial transaction or act.
> The commercial character of an activity
> shall be determined by reference to the
> nature of the course of conduct or
> particular transaction or act, rather than by
> reference to its purpose.

Although § 1603 defines a "foreign state" to include an agency or

instrumentality, the provisions of § 1610 dealing with attachment and

execution differentiate a "foreign state" on the one hand, from an "agency or

instrumentality" on the other hand. The reference to "foreign state" in

§ 1610(a) must be interpreted to mean those aspects of the foreign state other

than an agency or instrumentality, because there is the separate provision in

§ 1610(b) dealing with an agency or instrumentality. Under the latter section,

if the property belongs to an agency or instrumentality, there must be a

separate waiver of immunity as to such agency or instrumentality. And, of

course, there is § 1611, which requires a specific waiver of immunity with

respect to property of a foreign central bank held for its own account.

### Issues In The Present Case

In the present case the Republic of Argentina has made a waiver of immunity within the meaning of § 1610(a)(1). However, there has been no waiver of immunity with respect to BCRA either by the bank itself or by the Republic on BCRA's behalf. BCRA and the Republic assert that BCRA is an instrumentality within the meaning of § 1610(b) and, of course, that it is a central bank within the meaning of § 1611, and that the funds restrained at the FRBNY are funds "held for its own account," within the meaning of § 1611. Thus, according to BCRA and the Republic, the $100 million at the FRBNY cannot be validly attached or executed upon.

Plaintiffs, on the other hand, contend that the Republic so thoroughly controls BCRA, or, to be more precise, so thoroughly controlled BCRA in late 2005 when the process was served, that BCRA was the alter ego of the Republic, and was not a separate agency or instrumentality, within the meaning of § 1610(b). Plaintiffs further contend that the funds of BCRA at issue, the restrained $100 million, were not funds held by BCRA "for its own account" within the meaning of § 1611, but were in reality funds of the Republic. Plaintiffs conclude that the $100 million is subject to being attached and executed upon to satisfy judgment debts of the Republic.

In dealing with issues such as those involved in the present case, courts look to First National City Bank v. Banco Para El Comercio Exterior De Cuba, 462 U.S. 611 (1983), for the guiding principles. This case is commonly

referred to as the Bancec case. There the Court dealt with the relationship between the Cuban state and a government-connected bank. The issue was whether, in litigation between Bancec and Citibank, the latter could hold the Cuban bank liable for amounts owed by the Cuban government to Citibank. The issue was whether the "normally separate juridical status of a government instrumentality is to be disregarded." Id. at 633. Although there were extensive references in the Bancec decision to the FSIA, the Court concluded that, strictly speaking, the FSIA did not control. Id. at 621. The Court stated that "the principles governing this case are common to both international law and federal common law." Id. at 623. However, the Court was "guided by the policies articulated by Congress in enacting the FSIA." Id. at 621.

In ruling on the issues presented, the Court started by recognizing that there is a presumption that an instrumentality established by a foreign government is to be accorded separate legal status. Id. at 628. However, that presumption can be overcome, and the Court held that the presumption was in fact overcome in that case. The Court noted that the parties had "repeatedly referred to the phrases that have tended to dominate discussion about the independent status of separately constituted juridical entities" including debating, among other things, whether Bancec was an "alter ego" of the Cuban government. The Court went on to quote an eminent legal authority to the effect that metaphors in law are to be "narrowly watched." Id. at 623. In its subsequent discussion and holding, the Court avoided any literal discussion of

-58-

"alter ego" and spoke in other terms. The Court laid down a much-quoted

summary of the law applicable to the issues before it. The Court started by

referring to Chief Justice Marshall's statement that an incorporated entity "is

not to be regarded as legally separate from its owners in all circumstances."

The Court went on to state in the Bancec opinion:

> Thus, where a corporate entity is so
> extensively controlled by its owner that a
> relationship of principal and agent is
> created, we have held that one may be held
> liable for the actions of the other. See NLRB
> v. Deena Artware, Inc., 361 U.S. 398, 401-
> 404 (1960). In addition, our cases have
> long recognized "the broader equitable
> principle that the doctrine of corporate
> entity, recognized generally and for most
> purposes, will not be regarded when to do
> so would work fraud or injustice." Taylor v.
> Standard Gas Co., 306 U.S. 307, 322
> (1939). See Pepper v. Litton, 308 U.S. 295,
> 310 (1939).

Id. at 629.

It is necessary to recognize that the reference by the Supreme

Court to "agent" is a reference to something different from "agency" as used in

the FSIA. As described earlier, there is a distinction in the FSIA between the

treatment of an "agency or instrumentality of a foreign state" and the foreign

state itself with respect to attachments and executions. But when the

Supreme Court speaks of an entity being an "agent" of the owner, the Court is

explaining something that would erase the legal distinction between the two so

-59-

that the agent could be liable for the debts of the owner, or, in the context of

the case, could make the entity liable for the debts of the foreign state.

Letelier v. The Republic of Chile, 748 F.2d 790 (2d Cir. 1984), was

decided by the Second Circuit shortly after the Bancec decision. On facts

sharply different from those in the present case, the Circuit decided that the

assets of Chile's national airline were not subject to execution to satisfy a

judgment against Chile. Certain statements of the Court in Letelier should be

noted. The Court stated:

> . . . both Bancec and the FSIA legislative
> history caution against too easily
> overcoming the presumption of
> separateness, . . . .

Id. at 795. The Court summarized the holding in Bancec. The following is the

pertinent part of that summary:

> Thus, Bancec rests primarily on two
> propositions. . . . The broader message is
> that foreign states cannot avoid their
> obligations by engaging in abuses of
> corporate form. The Bancec Court held that
> a foreign state instrumentality is answerable
> just as its sovereign parent would be if the
> foreign state has abused the corporate form,
> or where recognizing the instrumentality's
> separate status works a fraud or an
> injustice.

Id. at 794. Various other cases have been decided about whether a

government-related entity can be held liable for the debts of the government.

Each decision obviously depends on the particular facts. No case involves facts

like the ones in the present case, and a discussion of these other cases would

-60-

not be of any great use.  The task now before the court is to take the governing principles and apply them to the facts as found by the court.

The Republic did not manage the day-to-day operations of BCRA. It did not manage the routine transactions regarding Argentine pesos and foreign currency.  Intervention in these details was not of interest to the Republic.

But there were certain larger, non-regular monetary operations which BCRA carried out at the behest of the Republic in order to serve the Republic's (not BCRA's) political and economic purposes.  There is evidence that, beginning in late 2004, the Republic directed BCRA to issue increased amounts of pesos to purchase U.S. dollars, thus lowering the value of the peso in a manner favoring certain portions of the electorate.  The court does not rely to any great degree on this circumstance, because the details are not clear from the record.

What is of great significance for present purposes is the Republic's use of resources of BCRA in 2005 to pay the debt owed to the IMF.  During the year 2005, at the express direction of the Republic, BCRA purchased U.S. dollars in large amounts.  Foreign currency holdings by BCRA are denominated "reserves" because apparently their primary purpose is to provide a kind of backing for the Argentine peso currency.  In any event, BCRA, clearly upon orders from the Republic, added substantially to its U.S. dollar reserves in the year 2005.  It has been admitted by BCRA that when BCRA acquires

-61-

international currency reserves, it does this by issuing pesos to purchase the international currencies. Thus, in 2005 BCRA issued pesos to purchase U.S. dollars and build up its balance of U.S. dollar reserves. The purpose of this was to enable the Republic to make an early (and unnecessary) payment to the International Monetary Fund to clear the indebtedness to that entity.

As earlier described, it is not clear from the record the exact amount of BCRA's U.S. dollar reserves which was used - whether it was $8.4 billion or $9.5 billion. However, whatever the amount was, it was deemed by the Republic to be over and above what was necessary to cover the Argentine monetary base. Pursuant to the executive decrees and congressional approval, described earlier in this opinion, the amount of $8.4 billion or $9.5 billion was made available by BCRA out of its funds to pay the debt of the Republic to the IMF. All that the Republic gave to BCRA in return was a ten-year note, which BCRA undoubtedly has no power at all to enforce in the event of default. What this means is that BCRA did the Republic's bidding in two important respects. First, BCRA issued the pesos in sufficient amounts to purchase billions of U.S. dollars. Second, BCRA took the $8.4 billion or $9.5 billion and paid the Republic's debt to the IMF.

This demonstrated that the Republic could draw on the resources of BCRA at will. The Republic ignored the mandate of BCRA's charter, which provided that BCRA would not be subject to any order or instruction of the National Executive in connection with the implementation of monetary and

-62-

financial policy. The management of BCRA posed no obstacles to the
Republic's use of the resources of BCRA exactly as the Republic wished. The
Republic's control in this regard was complete. The court concludes that the
presumption of separateness is overcome, and that BCRA was the servant or
the agent of the Republic as to its funds, within the meaning of the Bancec
case. As of the end of 2005, when the attachments and restraints in this case
were issued, the funds of BCRA were in effect the funds of the Republic. This
was not because of some formal change of title. It was the result of the kind of
control referred to in the Bancec case.

      The use of BCRA resources to pay the IMF was not a one-time
thing. A pattern has developed. In 2006 the Republic started to have BCRA
replenish the U.S. dollar reserves which had been depleted by the IMF
payment. The purpose was to accumulate funds to pay debts which the
Republic wished to pay. In 2008 the Republic ordered BCRA to pay $6.7 billion
to the so-called Paris Club members to retire certain debts.

      The pattern of using billions of BCRA's dollar reserves at the will of
the Republic continues almost to the present day. The latest occasion is the
establishment of the Bicentennial Fund, to take $6.6 billion from BCRA and
place it in the Treasury for payment of debts owed by the Republic. This time,
unlike earlier occasions, there was opposition. Martin Redrado, the Governor
of BCRA, who had previously been compliant with the Republic's appropriation
of BCRA funds, now objected. But the treatment of Redrado provides a vivid

-63-

illustration of the lack of independence of BCRA. Redrado was removed. Also, any possible obstacles in the Argentine Congress or judiciary were circumvented by President Kirchner in a new decree issued on March 1, 2010.

The recent events shed considerable light on what occurred in late 2005, and show that the appropriation of BCRA funds at that time was an exercise of control by the Republic over BCRA which was entirely inconsistent with any idea of central bank independence.

The Bancec case states that the separateness of a corporate entity will not be regarded "when to do so would work fraud or injustice." The circumstances of the present case are clearly those of fraud and injustice. The assurances in the bonds guaranteeing legal channels to judgments which "may be enforced" in the event of defaults, were illusory. To be sure, the Republic has consented to be sued in the federal court in New York, and has by and large presented no barriers to the entry of judgments. However, such judgments are mere scraps of paper if they are not paid and cannot be enforced. Whereas there is a path to the judgments, there is nothing approaching an accessible path to payment enforcement. The Republic maintains no assets in this jurisdiction to recover against. By the terms of the bonds, there appears to be a very broad waiver of sovereign immunity, even as to attachment prior to judgment, attachment in aid of execution of judgment, and actual execution of judgment. However, this waiver is said to be "to the fullest extent permitted by the laws of such jurisdiction." What the bonds do

-64-

not say is that the law of this jurisdiction - the Foreign Sovereign Immunities Act - imposes severe restrictions upon the ability of a creditor of the Republic to obtain an attachment or execution. But, in any event, it does little good to bestow rights of attachment and execution when there is going to be no property to attach or execute against.

In the view of the court, all these circumstances mean that the bonds materially misrepresented the rights of bondholders in the event of a default, and particularly what the bondholders would actually be able to achieve in enforcing their rights.

The court must also take into account the bad faith of the Republic following the default. No one questions the fact that the circumstances of late 2001 were severe enough to cause the Republic to default on its bond obligations. However, in all that has been said in the ensuing eight years of litigation, there has been no suggestion that the Republic's finances through this whole time were such that the Republic could not afford to pay its judgment debts. Indeed, the record shows that during certain of these years the Republic ran a surplus.

The Republic did carry out an exchange offer involving a few cents on the dollar. But the Republic has gone so far as to provide, by legislation, that it will not pay, or settle, the judgments coming out of the litigation in the federal court in New York. Thus the Republic has not acted honestly and in good faith to pay the debts which the Republic has the ability to pay.

-65-

Moreover, the Republic is saddling the federal court system in the United States with years of difficult litigation, all because of the Republic's adamant refusal to honor the obligations it has incurred pursuant to law.

Since the Republic will not pay and since the Republic has no readily available assets in this jurisdiction, plaintiffs can, of course, simply give up, meaning that their judgments are worthless. Or they can do what they have done, and that is to seek to recover from assets belonging to government-related entities. In the view of the court, to the extent that they have taken the latter course, they have done so reasonably, although largely unsuccessfully.

The court concludes that the use by the Republic of the resources and funds of BCRA, as described, has contributed to fraud and injustice perpetrated by the Republic on the bondholders, particularly on those who are seeking to vindicate their legal rights in the federal court. The Republic has used BCRA to pay billions of dollars to get rid of debts which the Republic wished to be rid of. At the same time the Republic refuses to pay the bond indebtedness which it does not wish to pay, and will not honor its obligations to pay the judgments duly entered in the court. It follows that there is the kind of fraud and injustice, referred to in the Bancec case, which justifies disregarding the formal separateness of the Republic and BCRA and treating the funds in the hands of BCRA as of December 2005 as the funds of the Republic. This refers specifically to the $100 million on deposit at the FRBNY.

Conclusions Regarding FSIA

Based on the ruling just made, the court must now give effect to the relevant provisions of the Foreign Sovereign Immunities Act. Since there are judgments in all of the relevant bond actions (03 Civ. 2507, 03 Civ. 8845, 05 Civ. 2434, and 06 Civ. 6466) the section of the FSIA dealing with post-judgment remedies is applicable to those actions. This is § 1610(a). Since no judgment has been entered in the action seeking declaratory and monetary relief against both the Republic and BCRA (06 Civ. 7792), the provision in the FSIA about pre-judgment attachments is applicable. This is § 1610(d).

In either case the remedies can be afforded only if the property subject to the process was "used for a commercial activity in the United States," and if the Republic has waived its immunity from the process.

There is no question about the fact that the Republic has made the requisite waivers of immunity as to its property. The court has now defined this property to include the $100 million. Nevertheless, the court cannot restrain or attach this property unless it was used for a commercial activity in the United States. See 473 F.3d at 480-81.

The definition of "commercial activity" is found in § 1603(d), and was quoted earlier in this opinion. The last sentence of the definition reads:

> The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

The Supreme Court expounded on this definition in <u>Republic of</u>

<u>Argentina v. Weltover, Inc.</u>, 504 U.S. 607 (1992).  The court stated:

> . . . we conclude that when a foreign
> government acts, not as a regulator of a
> market, but in the manner of a private
> player within it, the foreign sovereign's
> actions are "commercial" within the
> meaning of the FSIA.  Moreover, because
> the Act provides that the commercial
> character of an act is to be determined by
> reference to its "nature" rather than its
> "purpose," 28 U.S.C. § 1603(d), the question
> is not whether the foreign government is
> acting with a profit motive or instead with
> the aim of fulfilling uniquely sovereign
> objectives.  Rather, the issue is whether the
> particular actions that the foreign state
> performs (whatever the motive behind them)
> are the *type* of actions by which a private
> party engages in "trade and traffic or
> commerce,"  . . . .    Thus, a foreign
> government's issuance of regulations
> limiting foreign currency exchange is a
> sovereign activity, because such
> authoritative control of commerce cannot be
> exercised by a private party; whereas a
> contract to buy army boots or even bullets
> is a "commercial" activity, because private
> companies can similarly use sales contracts
> to acquire goods, . . . .

504 U.S. at 614-15.

BCRA had a bank account at the FRBNY.  It made deposits in and

withdrawals from that bank account.  The funds on deposit in that account

were used by BCRA for a variety of purposes, as described in detail earlier in

this opinion.  BCRA earned interest on this account.

At the time of the service of the attachments and restraints on December 30, 2005, there was a balance in the account of approximately $105 million. This arose from the following transactions. On December 30, BCRA arranged for a transfer of $31 million from BIS to the FRBNY account in order to pay certain Argentine banks, which had requested to reduce the amount of their U.S. dollar reserves relating to the <u>efectivo minimo</u> requirement. On the same day BCRA deposited $32.2 million in the FRBNY because certain Argentine banks were increasing their <u>efectivo minimo</u> reserves. Still on the same day BCRA made 52 spot purchases of U.S. dollars, resulting in credits to its FRBNY dollar balance in the amount of $35 million. Finally, on that day approximately $1.2 million was deposited into the account as a result of 20 late exporter transactions. These deposits, together with the opening balance of about $5 million, equaled the $105 million that was attached and restrained.

The $105 million was on deposit at the FRBNY, and was therefore used in basically the same way that funds on deposit at the FRBNY had been used over time. It is true that the balances in the account in late December were smaller than the balances that had been carried earlier. But the nature of the activity was essentially the same on December 30, 2005 as it had been. This activity was to maintain a bank account with deposits and withdrawals, with the ability to earn a certain amount of income on balances. The actions in the account were "the <u>type</u> of actions by which a private party engages in 'trade and traffic or commerce.' " <u>Weltover</u>, 504 U.S. at 614. Since the <u>type of</u>

-69-

activity was of the commercial type, it does not matter what purpose BCRA was using the funds for.  This is just as true as what the Supreme Court said about a sales contract to acquire goods, which might be to buy army boots or bullets, but the type of activity was still commercial activity.

The court holds that the $105 million was property used for commercial activity in the United States within the meaning of 28 U.S.C. §§ 1610(a) and (d).

It is necessary now to deal with the argument of BCRA and the Republic that, regardless of what the court has held up to this point, there still could be no valid attachment or restraint because of the FSIA provision in 28 U.S.C. § 1611.  This section states that, notwithstanding the provisions of § 1610, the property of a foreign state shall be immune from attachment and from execution if "the property is that of a foreign central bank or monetary authority held for its own account," unless such bank or authority or its parent foreign government has explicitly waived immunity.  It is true that the account at the FRBNY was in the name of BCRA, and there was no specific waiver of immunity as to this account by BCRA or the Republic.

However, if there are weighty and sufficient reasons to conclude that the funds in the account were in reality the funds of the Republic, as this court has held, it would be entirely anomalous to hold that the funds belonged to BCRA and were "held for its own account," within the meaning of § 1611. The court will not so hold, but concludes that the $105 million was in fact not

-70-

the property of BCRA held for its own account, but was the property of the Republic.

The court concludes that the $105 million was subject to attachment and restraint on the basis of the principles announced in the Bancec decision, and that the provisions of the FSIA, when properly applied, permitted such attachments and restraints.

The Federal Reserve Bank of New York has filed an amicus curiae brief opposing the attachments and restraints. Essentially, the FRBNY argues that allowing the process against the $100 million currently maintained at the FRBNY will inhibit central banks from using the FRBNY and that this is contrary to the national interest. The Federal Reserve specifically urges that allowing the process will drive BCRA away from the Federal Reserve and that this is contrary to the national interest.

The court has seriously considered the Federal Reserve's position and fully recognizes that the Federal Reserve is surely a most important institution in this country, and that its relationships with central banks in other countries is of importance to the United States. However, there are other important institutions. One of these is the court system. What is going on between the Republic of Argentina and the federal court system is an exercise of sheer willful defiance of the obligations of the Republic to honor the judgments of a federal court. Of course, the immunities provided for in the FSIA must be given effect by the court. But the basic, overriding obligation of

-71-

the Republic is to honor and to pay judgments lawfully entered against it by the federal courts, to the extent that it is able to do so. The Republic's prominently declared position is to refuse this course, and the Republic has thus enmeshed the court in years of wasteful litigation with no end in sight.

As to BCRA, the record shows that it has been the servant of the Republic in enabling the Republic to pay off billions of dollars of debt which, for political or diplomatic reasons, the Republic has desired to pay, leaving the plaintiff bondholders to their difficult judicial struggle.

Surely the circumstances of the Republic and BCRA are anomalous and do not represent a pattern which will interfere with the legitimate activities of other nations and other central banks. In any event, the court does not believe that there is any legitimate policy to be served in failing to enforce the rules of law against the Republic and BCRA.

### Conclusion

Plaintiffs' motions for attachment and restraints, as defined earlier in this opinion, are granted.

Settle order.

SO ORDERED.

Dated: New York, New York
       April 7, 2010

Thomas P. Griesa
U.S.D.J.