DEBEVOISE & PLIMPTON LLP
  David W. Rivkin
  John B. Missing
  Suzanne M. Grosso
919 Third Avenue
New York, New York 10022
Tel. (212) 909-6000
  *Attorneys for Plaintiff EM Ltd.*

DECHERT LLP
  Robert A. Cohen
  Dennis H. Hranitzky
  Eric C. Kirsch
1095 Avenue of the Americas
New York, New York 10036
Tel. (212) 698-3500
  *Attorneys for Plaintiff NML Capital, Ltd.*

GIBSON, DUNN & CRUTCHER LLP
  Theodore B. Olson
  Matthew D. McGill
1050 Connecticut Avenue, NW
Washington, D.C. 20036
Tel. (202) 955-8500
  *Attorneys for Plaintiff NML Capital, Ltd.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------- x

EM LTD. and NML CAPITAL, LTD., :
:
        Plaintiffs, :
:                            No. 06-CV-7792
v. :
:
BANCO CENTRAL DE LA :
REPÚBLICA ARGENTINA and :       **THIRD AMENDED**
THE REPUBLIC OF ARGENTINA, :    **COMPLAINT**
:
        Defendants. :

--------------------------------------------------- x

Plaintiff EM Ltd. ("EM"), through its attorneys Debevoise & Plimpton LLP, and Plaintiff

NML Capital, Ltd. ("NML"), through its attorneys Dechert LLP and Gibson, Dunn & Crutcher

LLP (collectively, the "Plaintiffs"), bring this action for a declaratory judgment against

Defendant Banco Central de la República Argentina (the "Central Bank") and Defendant The

Republic of Argentina ("Argentina" or the "Republic") (collectively, the "Defendants"), and for

money judgments against the Central Bank, as an alter ego of Argentina, and allege as follows:

## PRELIMINARY STATEMENT

1.      This is an action for a declaratory judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 to determine and resolve questions of actual controversy involving the relationship between the Central Bank and Argentina.  In addition, Plaintiffs seek money judgments adjudging the Central Bank, as Argentina's alter ego, jointly and severally liable to satisfy the judgments that have been awarded, or will be awarded, to EM and NML against Argentina based on the Republic's default on its external sovereign debt.

2.      EM has a final, non-appealable judgment against Argentina which, with interest as of August 31, 2012, totals $812,546,554.60 million.  NML has five final, non-appealable judgments against Argentina which, with interest as of August 31, 2012, total $1,678,609,873.96, as well as six other actions pending in this Court against Argentina in which judgments have yet to be entered.  NML has been granted summary judgment in all six pre-judgment cases.  When final judgments have been entered in all eleven of NML's actions, NML estimates they will, together with interest, total close to $2.6 billion.  Both EM's and NML's actions are based on Argentina's default on its external sovereign debt in late 2001.

3.      As a result of Argentina's concerted efforts to avoid paying its creditors, including its systematic removal of assets from the United States so that its creditors cannot reach them, EM and NML have been unable to collect or secure assets to pay their billions of dollars of judgments and claims against Argentina.

4.      Over the past eleven years, the Argentine government utilized billions of dollars of reserves nominally held by the Central Bank to repay the Republic's own debts, replaced six Central Bank Governors when they dared to disagree with the Executive Branch on matters involving central banking independence and/or the implementation of central banking policy, legislated to itself tight control over the Central Bank, and took over the Central Bank's function

as regulator of monetary policy to promote the political objectives of the Executive Branch.  In taking these actions, Argentina is exploiting the $47 billion in foreign-currency reserves that the Central Bank continues nominally to hold.  *El pago del cupón se lleva otro 4% de las reservas del BCRA*, La Nacion (Dec. 15, 2011); *Argentina's Stocks, Bonds Extend Gains Ahead Of Long Weekend*, Dow Jones (Dec. 23, 2011).  Argentina so extensively controls the Central Bank that a principal-agent relationship exists between them, thereby rendering the Central Bank an alter ego of Argentina.

5.     It would be manifestly unjust to give effect to the legal fiction that the Central Bank and Argentina are juridically separate entities because Argentina admittedly exploits that fiction in its ongoing wrongful efforts to evade paying the Republic's creditors, including Plaintiffs.  EM and NML are entitled to declaratory judgments expressly adjudging the Central Bank to be an alter ego of Argentina.  Consequently, the assets of the Central Bank ought to be treated as Argentina's own and, like any other commercial assets of Argentina, made available to satisfy Plaintiffs' judgments and expected judgments.  Furthermore, money judgments should be entered against the Central Bank expressly adjudging it jointly and severally liable for EM's and NML's separate judgments, and NML's anticipated separate judgments, against Argentina.

6.     Plaintiffs file this Third Amended Complaint on consent to set forth facts that have arisen since the Second Amended Complaint was filed.  The currently existing (and voluminous) documentary evidence supporting Plaintiffs' allegations is referenced throughout the Third Amended Complaint.  Some of that evidence was served on Defendants as exhibits to Plaintiffs' Complaint, First Amended Complaint, and Second Amended Complaint, as well as exhibits to motions seeking provisional relief filed by Plaintiffs on September 28, 2006.  Plaintiffs are prepared to provide any and all of the evidence referenced herein for immediate

inspection upon request by the Court or the Defendants.  Plaintiffs also expect that discovery will reveal additional documentary and testimonial evidence supporting the allegations in this Third Amended Complaint.

## THE PARTIES

7.     Plaintiff EM is a limited liability corporation organized under Cayman Islands law with its registered office at Queensgate House, 113 South Church Street, George Town, Grand Cayman, Cayman Islands.

8.     Plaintiff NML is a limited liability corporation organized under Cayman Islands law with its registered office at Huntlaw Corporate Services, The Huntlaw Building, 75 Fort Street, PO Box 1350,  Grand Cayman, Cayman Islands.

9.     Defendant Argentina is a foreign state as defined under 28 U.S.C. § 1603(a).

10.     Defendant the Central Bank, both as an agency or instrumentality of Argentina and as an alter ego of Argentina, is a foreign state as defined under 28 U.S.C. § 1603(a).  The Central Bank is headquartered at Reconquista 266, C1003ABF, Buenos Aires, Argentina, but it maintains assets outside of Argentina, including in the Southern District of New York.

## JURISDICTION AND VENUE

11.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1605(a)(1) because Argentina has consented to the jurisdiction of this Court and waived any claim of immunity with respect to this action – including but not limited to sovereign immunity – pursuant to Section 22 of an October 19, 1994 Fiscal Agency Agreement (the "FAA"), and the terms and conditions of the bonds purchased by Plaintiffs.  In the FAA, which governs both EM's and NML's bonds, Argentina "irrevocably waive[d] and agree[d] not to plead any immunity from the jurisdiction of any . . . court to which it might otherwise be entitled" in

connection with any action to enforce a judgment based on Plaintiffs' bonds.  The terms and conditions of these bonds extend this waiver to any action to enforce such a judgment against any of Argentina's "revenues, assets or properties."  This waiver can be imputed to the Central Bank as an alter ego of Argentina.

12.     This Court also has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1330(a) and 1605(a)(2) because EM's and NML's claims are based both upon commercial activities that Argentina undertakes in the United States, and upon activities that the Central Bank undertakes in the United States as fiscal agent for and as an alter ego of Argentina.

13.     This Court has personal jurisdiction over both Argentina and the Central Bank pursuant to 28 U.S.C. § 1330(b), which extends personal jurisdiction over a foreign state that is not immune from suit and which has been properly served with process pursuant to 28 U.S.C. § 1608(a).

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(1) because a substantial number of the events and omissions that gave rise to this action, including the entry of separate judgments (and anticipated judgments) against Argentina in favor of EM and NML, occurred in this District, and the Central Bank maintains assets in this District against which Plaintiffs hope to enforce their judgments and anticipated judgments.

## FACTUAL ALLEGATIONS

## I.     PLAINTIFFS' JUDGMENTS AND ANTICIPATED JUDGMENTS AGAINST ARGENTINA

15.     At a hearing on October 31, 2003, this Court ruled that the prerequisites set forth in the Foreign Sovereign Immunities Act, 28 U.S.C. § 1610(c), for execution in aid of a judgment against a foreign state had been met, and that judgment creditors could seek execution after January 29, 2004.  Argentina has never challenged this ruling.

A.    **EM**

16.    Since December 2001, Argentina has been in default on a global debt security (referred to here for simplicity as a "bond") in which EM beneficially owned an interest.  On April 10, 2003, EM filed an action against Argentina in this Court seeking to recover hundreds of millions of dollars in principal and accrued interest that Argentina owes to it on this bond.

17.    On September 12, 2003, this Court granted EM's motion for summary judgment, holding that EM had an "unconditional legal right to collect on the bond" as a result of Argentina's default.  *EM Ltd. v. Republic of Argentina*, No. 03 Civ. 2507, 2003 WL 22120745, at *2 (S.D.N.Y. Sept. 12, 2003).  The Court entered an amended final judgment in the amount of $724,801,662.56 in favor of EM on October 27, 2003 (the "EM Judgment"), which became final and non-appealable on November 30, 2004, after the Court of Appeals affirmed the EM Judgment on August 31, 2004, and Argentina did not seek further review.  *See EM Ltd. v. Republic of Argentina*, 382 F.3d 291 (2d Cir. 2004).

18.    Post-judgment interest accrues on the EM Judgment, pursuant to 28 U.S.C. § 1961, at the rate of 1.3%.  As of August 31, 2012, the amount of the EM Judgment including interest owed by Argentina is $812,546,554.60.

B.    **NML**

19.    Since December 2001, Argentina has been in default on certain Argentine securities beneficially owned by NML, including NML's beneficial interests in certain global bonds and certain Floating Rate Accrual Notes which matured on April 10, 2005 (collectively referred to here for simplicity as the "bonds").  NML is the plaintiff in eleven actions pending before this Court seeking to recover, in aggregate, approximately $2.6 billion dollars in principal and accrued interest that Argentina owes to it on these bonds:  *NML Capital, Ltd. v. Republic of Argentina,* 03 Civ. 8845 (TPG) ("NML-1"); *NML Capital, Ltd. v. Republic of Argentina,* 05 Civ.

2434 (TPG) ("NML-2"); *NML Capital, Ltd. v. Republic of Argentina,* 06 Civ. 6466 (TPG) ("NML-3"); *NML Capital, Ltd. v. Republic of Argentina,* 07 Civ. 1910 (TPG) ("NML-4"); *NML Capital, Ltd. v. Republic of Argentina,* 07 Civ. 2690 (TPG) ("NML-5"); *NML Capital, Ltd. v. Republic of Argentina,* 07 Civ. 6563 (TPG) ("NML-6"); *NML Capital, Ltd. v. Republic of Argentina,* 08 Civ. 2541 (TPG) ("NML-7"); *NML Capital, Ltd. v. Republic of Argentina,* 08 Civ. 3302 (TPG) ("NML-8"); *NML Capital, Ltd. v. Republic of Argentina,* 08 Civ. 6978 (TPG) ("NML-9"); *NML Capital, Ltd. v. Republic of Argentina,* 09 Civ. 1707 (TPG) ("NML-10"); and *NML Capital, Ltd. v. Republic of Argentina,* 09 Civ. 1708 (TPG) ("NML-11").

20.     Final judgment for $284,184,632.20 was entered for NML in NML-1 on December 18, 2006 (the "NML-1 Judgment"). Post-judgment interest accrues on the NML-1 Judgment, pursuant to 28 U.S.C. § 1961, at the rate of 4.95%. As of August 31, 2012, the amount of the NML-1 Judgment including interest owed by Argentina is $374,448,111.66.

21.     Final judgment for $311,177,898.00 was entered for NML in NML-2 on June 1, 2009, as amended on June 16, 2009 and October 26, 2011 (the "NML-2 Judgment"). Post-judgment interest accrues on the NML-2 Judgment, pursuant to 28 U.S.C. § 1961, at the rate of 0.49%. As of August 31, 2012, the amount of the NML-2 Judgment including interest owed by Argentina is $316,160,428.03.

22.     Final judgment for $533,378,361.00 was entered for NML in NML-3 on June 1, 2009, as amended on June 16, 2009 (the "NML-3 Judgment"). Post-judgment interest accrues on the NML-3 Judgment, pursuant to 28 U.S.C. § 1961, at the rate of 0.49%. As of August 31, 2012, the amount of the NML-3 Judgment including interest owed by Argentina is $541,918,728.80.

23.     Summary judgment for $71,098,000.00 in principal, with interest yet to be calculated, was granted to NML in NML-4 on April 10, 2008.  NML calculates that the amount of prejudgment interest owed by Argentina in NML-4 as of August 31, 2012, is $145,759,163.55.

24.     Final judgment for $148,781,936.00 was entered for NML in NML-5 on June 1, 2009, as amended on June 16, 2009 (the "NML-5 Judgment").  Post-judgment interest accrues on the NML-5 Judgment, pursuant to 28 U.S.C. § 1961, at the rate of 0.49%.  As of August 31, 2012, the amount of the NML-5 Judgment including interest owed by Argentina is $151,164,208.22.

25.     Summary judgment for $300,000 in principal, with interest yet to be calculated, was granted to NML in NML-6 on April 10, 2008.  NML calculates that the amount of prejudgment interest owed by Argentina in NML-6 as of August 31, 2012, is $588,881.00.

26.     Summary judgment for $16,719,628.00 in principal, with interest yet to be calculated, was granted to NML in NML-7 on March 4, 2009.  NML calculates that the amount of prejudgment interest owed by Argentina in NML-7 as of August 31, 2012, is $42,484,846.84.

27.     Final judgment for $290,270,631.00 was entered for NML in NML-8 on June 1, 2009, as amended on June 16, 2009 (the "NML-8 Judgment").  Post-judgment interest accrues on the NML-8 Judgment, pursuant to 28 U.S.C. § 1961, at the rate of 0.49%.  As of August 31, 2012, the amount of the NML-8 Judgment including interest owed by Argentina is $294,918,397.26.

28.     Summary judgment for $81,080,000.00 in principal, with interest yet to be calculated, was granted to NML in NML-9 on September 28, 2011.  NML calculates that the

amount of prejudgment interest owed by Argentina in NML-9 as of August 31, 2012, is $150,840,552.45.

29.     Summary judgment for $30,000.00 in principal, with interest yet to be calculated, was granted to NML in NML-10 on September 28, 2011.  NML calculates that the amount of prejudgment interest owed by Argentina in NML-10 as of August 31, 2012, is $431,723.92.

30.     Summary judgment for $140,889,549.00 in principal, with interest yet to be calculated, was granted to NML in NML-11 on September 28, 2011.  NML calculates that the amount of prejudgment interest owed by Argentina in NML-11 as of August 31, 2012, is $310,541,278.20.

## II.     THE CENTRAL BANK IS ARGENTINA'S ALTER EGO

31.     An instrumentality of a foreign state is considered to be the alter ego of its parent when the state controls the instrumentality so extensively that a principal-agent relationship is created between them, or when giving effect to the nominal separateness of the instrumentality would work a fraud or injustice.  In this case, Argentina has completely controlled the Central Bank at least since 2001, and continues to do so today.  Moreover, Argentina has admittedly exploited the legal fiction of the Central Bank's independence unjustly and fraudulently to avoid paying the Republic's creditors, including EM and NML.

32.     Argentina's dominance over the Central Bank is demonstrated in myriad ways, four of which are summarized below and described in detail in ¶¶ 33-113:

- **Argentina owns the Central Bank and, by law, can control nearly all of its activities.**  Under the charter governing the Central Bank, which was initially set forth in Law 24.144 (the "Central Bank Charter"), the Argentine government owns the Central Bank and all profits it generates, and has the legal power to control all but a few of the Central Bank's functions.  In other words, the Central Bank has extremely limited "*legal* independence."  In recent years, Argentina has severely cabined these few remaining areas of the Central Bank's nominal

autonomy and made even the putative legal independence of the Central Bank a fiction as a matter of Argentine law.

- **Argentina can use, has used, and to this day continues to use the Central Bank's assets at will.**   In December 2005, at the insistence of late former President Néstor Kirchner, the Argentine Congress made billions of dollars of Central Bank reserves available to repay certain of the Republic's debts.  Almost simultaneously, President Kirchner issued a presidential decree commanding the Central Bank to make an early repayment of nearly $10 billion to the International Monetary Fund ("IMF") in January 2006 – notwithstanding that this payment violated the Central Bank Charter.  The Argentine government has since used Central Bank reserves routinely to pay off the Republic's other debts, including to commercial creditors like Plaintiffs.  In March 2012, the Argentine Congress enacted current President Cristina Fernández de Kirchner's proposed legislation making it significantly easier for Argentina to use Central Bank reserves to satisfy the Republic's debts.

- **Argentina controls the day-to-day activities of the Central Bank by replacing any Central Bank official who refuses to do its bidding.**      The Argentine government is able to puppeteer the Central Bank by threat of replacing its chief official, the Central Bank Governor.  For more than a decade, and in violation of the Argentine Constitution, that position has been appointed on an interim basis through a process that side-steps the Argentine Congress – thereby arming the government with power to replace any Governor by presidential decree. Argentina has had an astounding *seven* Central Bank Governors since 2001 (with three in office for less than a year), notwithstanding that the position purportedly holds a 6-year term.   Many of those former Governors have expressly acknowledged that their early departures resulted from efforts to assert some degree of Central Bank independence.

- **The Argentine government dictates monetary policy and controls how it is implemented by the Central Bank.**  In the area of developing and implementing monetary policy – the most critical of the Central Bank's few nominally independent functions – the Argentine government has utterly dominated the Central Bank for most of the past decade.  Since late 2004, former President Kirchner and President Fernández de Kirchner have forced the Central Bank to pursue highly inflationary policies to serve the government's own political aims in violation of the Central Bank's mandate under its Charter first and foremost to protect the value of the currency.  President Fernández de Kirchner continues the Argentine government's domination of the Central Bank. Through the Executive Branch's interference, Argentina has taken over the day-to-day Central Bank activities of buying and selling currency and securities in open market operations, and it has commandeered the responsibility of determining the level of reserves that the Central Bank shall maintain.

A.     **Argentina Owns The Central Bank And,
By Law, Can Control Nearly All Of Its Activities**

33.     According to Article 1 of its Charter, "[t]he Central Bank . . . is a self-administered institution of the National State governed by the provisions of [its Charter] and other related legal rules."  The Argentine government owns the Central Bank and all profits it generates.  Central Bank Charter, Art. 1 & 38.  When the Complaint was filed, the Central Bank Charter provided that the Argentine government could control virtually everything the Central Bank did, subject to two limitations.  *First,* the Central Bank could only lend money to the government under limited circumstances, and subject to clear restrictions on the amount and term of the loan.  *Id.*, Art. 19(a) & 20.  *Second*, the Central Bank was required to "primarily and essentially maintain the value of legal tender," and in performing this function, to "not be subject to any order or instruction given by the National Executive Power."  *Id.*, Art. 3.  Since the Complaint was filed, even these two limitations – which Argentina routinely directed the Central Bank to violate – have been amended to the point that they have been rendered meaningless.

34.     In the past thirteen years, the Argentine government enacted numerous laws that have either amended the Central Bank Charter to serve the government's own policies, enabled the government to exert more control over the Central Bank, or both.  The effect of these laws was:  *(1)* to increase the amount of money that the Central Bank can itself loan to the government and to expand the circumstances under which such loans can be made; *(2)* to direct the Central Bank otherwise to make money available for the government's use; *(3)* to increase the already considerable control the government has over the selection and removal of Central Bank officials; and/or *(4)* to expand the market for higher risk government bonds, thereby allowing the government to borrow more money.  To illustrate:

- **Executive Decree 1373/1999**, enacted on November 24, 1999, changed the mechanism by which the Governor, Vice-Governor, Directors and Trustees of the

Central Bank are appointed, granting the Argentine President the authority to fill these posts "in commission" without seeking confirmation by the Argentine Senate.  The Executive Branch has used this power to control Central Bank officials by depriving them of a clear 6-year term and mandate from the Senate.

- **Executive Decree 439/2001**, enacted on April 17, 2001, granted Argentina's banks, which are regulated by the Central Bank, the ability to use Argentine government bonds to meet their reserve requirements, thereby increasing the captive market for these high-risk government bonds.  Decree 439/2001 also made it easier for the Central Bank to advance funds to the government by removing certain pre-existing limitations on such advances.

- **Law 25.561**, enacted on January 6, 2002, *(1)* dismantled Argentina's convertibility currency system, *(2)* transferred extraordinary powers that allow Argentina's President, in effect, to rule by decree, and *(3)* enabled the Argentine government to seize for its own use billions of dollars in reserves that, under the prior convertibility regime, the Central Bank was legally required to maintain.

- **Law 25.562**, enacted on February 6, 2002, amended the Central Bank Charter to implement further the dismantling of Argentina's convertibility currency system, and to allow the Central Bank to "loan" the Argentine government even more money.

- **Executive Decree 401/2002**, enacted February 28, 2002, like Decree 439/2001, expanded the market for Argentine government bonds by increasing the ability of Argentine financial institutions, which are regulated by the Central Bank, to comply with their reserve requirements by holding high-risk Argentine sovereign debt.

- **Law 25.780**, enacted August 27, 2003, again increased the amount of money the Central Bank was authorized to "loan" the Argentine government.

- **Decrees 1599/2005 and 1601/2005**, enacted on December 15, 2005, required the Central Bank to use its reserves to pay debts owed by the Republic to the IMF.

- **Decree 1394/2008**, enacted on September 2, 2008, required that $6.7 billion of Central Bank reserves be used to pay debts owed by the Republic to the Paris Club.

- **Law 26.422**, enacted on November 5, 2008, modified the Central Bank Charter to again increase the amount of money the Central Bank may "loan" the Argentine government, and provided that such loans could be used for payment of the Republic's liabilities denominated in foreign currency.

- **Executive Decree No. 296/2010**, enacted on March 1, 2010, provided that the Argentine government could use the Central Bank's so-called "freely available reserves" to repay debts of the Republic to international financial institutions.

- **Executive Decree No. 297/2010**, also enacted March 1, 2010, applied Decree No. 296/2010 by mandating the use of $2.187 billion of the Central Bank's reserves to pay debts of the Republic maturing in 2010 that were owed to international financial institutions, with the Central Bank receiving a non-transferrable Argentine government note in return.

- **Executive Decree No. 298/2010**, also enacted March 1, 2010, created the Argentine Fund for the Reduction of Indebtedness (the "Debt Reduction Fund") to pay private bondholders. It was initially funded with $4.382 billion of the Central Bank's reserves and is managed by the Ministry of Economy. In exchange for its reserves, the Central Bank received non-transferrable Argentine treasury notes that pay an interest rate equal to the London Interbank Offered Rate ("Libor") minus 1% – i.e. at effectively zero percent interest.

- **Executive Decree No. 2054/2010**, enacted on December 22, 2010, mandated that $7.504 billion of Central Bank reserves be transferred to the Debt Reduction Fund to pay private holders on bonds maturing in 2011, with the Central Bank receiving non-transferrable Argentine government notes in return.

- **Executive Decree No. 276/2011**, enacted on March 3, 2011, mandated that $2.174 billion of Central Bank reserves be used to pay debts owed by the Republic to international financial institutions maturing in 2011, in exchange for a 10-year non-transferable Argentine government note that accrued interest at a rate of Libor minus 1% – i.e. at effectively zero percent interest.

- **Law 26.728**, enacted on December 27, 2011, increased the available resources of the Bond Payment Fund to $5.674 billion, funded by the Central Bank's reserves and managed by the Ministry of Economy.

- **Law 26.739**, enacted on March 22, 2012, amended the Central Bank Charter to redefine its purpose – which now includes both promoting monetary and financial stability and promoting employment and economic development with social equity. By eliminating the requirement that the Central Bank's primary mission be to control inflation, this amendment cut back dramatically on the little remaining pretense of legal independence the Central Bank enjoyed. Law 26.739 also amended the Central Bank Charter to increase, once again, the amount of money the Central Bank may loan the Argentine government and the maximum time-period for its reimbursement.

- **Resolution No. 131/2012**, passed by the Ministry of Economy on April 26, 2012, requires the Central Bank to "loan" $5.674 billion of freely available reserves to the Argentine government, in exchange for a 10-year non-transferable Argentine government note that accrued interest at a rate of Libor minus 1%. – i.e. at effectively zero percent interest.

- **Executive Decree No. 928/2012**, enacted on June 21, 2012, mandated that 2.179 billion of Central Bank reserves be used to pay debts maturing in 2012 that were

owed to international financial institutions, in exchange for 10-year non-transferable Argentine-government notes that accrued interest at a rate of Libor minus 1% – i.e. at effectively zero percent interest.

35.     The laws, decrees, and resolutions described in Paragraph 34 demonstrate that the Central Bank has no independence from the Argentine government.  The Argentine government simply changes the law whenever there is a nominal legal barrier to the Central Bank serving the government's political whims.   Indeed, the central focus of these laws is to effectuate the Argentine government's desire to use the Central Bank's reserves to fund its profligate spending habits and selectively pay favored creditors of the Republic, as detailed below.

> **B.     Argentina Can Use, Has Used, And To This Day Continues To Use The Central Bank's Assets At Will**

36.     The Argentine government's total disregard for the Central Bank's financial autonomy and its unfettered utilization of the Central Bank's assets unequivocally prove the Argentine government's complete appropriation and assimilation of the Central Bank.  In the words of one Argentine official, "[Argentina's] reserves ***belong*** to the Government, not to Central Bank."  *Reserves top US$25 billion: Increase of 5.524 billion so far this year*, CLARÍN (Aug. 2, 2005).  The government has used Central Bank reserves for itself repeatedly for over a decade – and continues to do so at record pace.  As of July 2012, the government's use of Central Bank reserves reached a decade high.  *Baten récord los préstamos del Banco Central al Tesoro*, ÁMBITO FINANCIERO (July 16, 2012).

> **IMF Repayment**

37.     On December 15, 2005, former President Kirchner announced his intention to use billions of dollars of Central Bank reserves to make an early and complete repayment of Argentina's $9.8 billion dollar debt to the IMF.  This was accomplished – without the approval

of the Central Bank – through two new presidential decrees that were later rubber-stamped by the Argentine Congress.

38.     The first Decree, Decree 1599/2005, declared that the amount of Central Bank reserves ostensibly necessary to back up 100% of the monetary base would be referred to as "restricted" reserves, with only reserves exceeding this amount to be referred to as "unrestricted" reserves.  Decree 1599/2005.  At the time, Argentina's total reserves equaled US $26.8 billion, and the amount ostensibly needed to support the monetary base was deemed to be US $18.4 billion – which left US $8.4 billion (or approximately one-third of total reserves) as "unrestricted" reserves.  The first Decree additionally instructed that, "[a]s long as the monetary effect is neutral, the unrestricted reserves may be used for payment of obligations undertaken with international monetary authorities." *Id*.

39.     The second Decree, Decree 1601/2005, confirmed that "the current level of international reserves amply exceeds the margins necessary to maintain appropriate monetary and exchange policies" and provided that "it is necessary and appropriate to order [implementation of] the mechanisms for payment of the pending debt to the INTERNATIONAL MONETARY FUND."  Decree 1601/2005.  Accordingly, the second Decree "instructed" the Argentine Ministry of Economy and Production to "take the pertinent steps" to repay the Republic's debt to the IMF using "unrestricted" reserves.  *Id*.

40.     On December 29, 2005, the Argentine Ministry of Economy and Production issued Resolution No. 49, directing the Central Bank to repay Argentina's debt to the IMF and instructing "the SECRETARIAT OF THE TREASURY and the SECRETARIAT OF FINANCE, both reporting to this Ministry, . . . to implement an exchange of liabilities held by the NATIONAL GOVERNMENT with the CENTRAL BANK . . . as compensation for the

transactions conducted with the [IMF]." Resolution 49. Resolution No. 49 accomplished this "exchange of liabilities" by directing the issuance of a ten-year term "[n]on-transferable note" to the Central Bank. *Id.*

41. As a result, over $8 billion of "unrestricted" reserves – roughly a third of the Central Bank's total reserves at the time – were used to repay on January 3, 2006 the IMF's $9.8 billion loan, even though that debt was owed by the Republic, and not the Central Bank. *See Yesterday Argentina stopped being a creditor of the Monetary Fund*; LA NACIÓN.COM (January 4, 2006). Argentina was roundly criticized at the time for running "roughshod over the central bank's legal independence." *Kirchner and Lula: different ways to give the Fund the kiss off; Argentina, Brazil and the IMF*, THE ECONOMIST (Dec. 24, 2005).

42. Argentina's extraordinary actions in commandeering Central Bank assets to make an early repayment in full of the Republic's debt to the IMF were not only "roughshod," they were in direct derogation of at least two Articles of the Central Bank Charter.

43. *First*, under Article 3 of the Central Bank Charter then in force, the Central Bank ought not have been "subject to any order or instruction given by the National Executive Power" concerning "the preparation and implementation of any monetary and financial policy" (*see* ¶ 33 above). Central Bank Charter, Art. 3. The management of foreign currency reserves, and specifically the selling and buying of foreign currency, is an integral part of any nation's monetary policy. It is the method used by countries to protect the value of their own currency. By dictating that reserves also be used to service foreign debt – a function that necessarily leads to an aggressive accumulation of reserves (and can lead to inflation) – the Executive Branch interfered with the Central Bank's ability to prepare and implement monetary policy. *Id.* Indeed, the Executive Branch disrupted the Central Bank's primary role of safeguarding the

value of Argentina's currency, and dictated how the Central Bank should use one of the most important levers of implementing monetary policy. *See id.* (the Central Bank "shall primarily and essentially maintain the value of legal tender").

44.     *Second*, Article 19(a) of the Central Bank Charter prohibits the Bank from lending funds to the Republic except as provided under Article 20 (*see* ¶ 33 above).   Central Bank Charter, Article 19(a).     The non-transferable, non-negotiable (and almost certainly unenforceable) "note" given by Argentina to the Central Bank in exchange for the use of "unrestricted" reserves to repay the IMF had a term of 10 years.   Thus, on its face, the "note" violated the Article 20 requirement that any Central Bank loan to the Republic must be repaid within 12 months.   Moreover, the "note" appeared to be a sham employed by Argentina to create the illusion that the Central Bank received something in exchange for the "unrestricted" reserves because, among other reasons, Argentina is rumored to have **defaulted** on the **very first interest payment** ($200 million) on the "note" when it came due on July 3, 2006.   *A guarded rumor under lock and key: Economy Ministry failed to repay debt to the Central Bank?*, CLARÍN (Aug. 12, 2006).   According to the Argentine press, "[t]he issue is not so much the amount in question – about 200 million dollars – but rather how the decisions of the political power weigh upon an entity that preserves very little of the independence that it is supposed to have pursuant to law." *Id.*

45.     After Argentina made its early and complete repayment of $9.8 billion to the IMF on January 3, 2006, it continued to accumulate billions of dollars more in "unrestricted" reserves. *See Half the Reserves Paid to the Fund Already Recovered*, LA NACIÓN (May 6, 2006); *Reserves Grow 25 Percent over the Year,* LA NACIÓN (May 6, 2006).   Yet that accumulation was reportedly not being deposited into the Central Bank's foreign exchange accounts, but rather was

being deposited into an account held in the name of Argentina for other uses to be dictated by the Executive Branch. *See Argentina Raises Money for Upcoming Debt Payment,* GLOBAL INSIGHT (July 27, 2006) ("[T]he Central Bank has been increasing its daily purchases in the foreign exchange market, while trying to avoid excessive pressure over the exchange rate. Consequently, purchases are not being made to recompose its foreign reserves but rather for the Treasury.").

## Paris Club Repayment

46.     Less than three years later, Argentina once again commandeered, by presidential decree, billions of dollars from the Central Bank through the issuance on September 2, 2008 of Decree 1394/2008 – this time to repay Argentina's debt to the Paris Club, which is an informal group of creditor governments. *Government to pay Paris Club debt with reserves*, CLARÍN (Sept. 3, 2008).  Decree 1394/2008 refers to Decree 1599/2005 which, as described in ¶ 39 above, designated (by Executive fiat) those Central Bank reserves in excess of the amount necessary to support the Argentine monetary base as "unrestricted" reserves available for the payment of debt obligations with international monetary organizations. *See* Decree 1394/2008.  After noting that "the current level of reserves comfortably surpasses the margins necessary for sustaining the monetary and exchange rate policies," Decree 1394/2008 ordered the repayment of Argentina's $6.7 billion debt to Paris Club members using the so-called "unrestricted" reserves.  *See Paris Club: new payment proposal drafted,* ÁMBITO FINANCIERO (Sept. 5, 2008).

47.     The decision to repay Argentina's debts to Paris Club members using Central Bank reserves was made by President Fernández de Kirchner and her husband without even **consulting** the Central Bank.   *The Ways of the Presidential Couple: the K Way,* PERFIL (Sept. 14, 2008); *see also The similarities with 2005,* LA NACIÓN (Sept. 7, 2008) ("[T]he decision was

made by the governing couple and the only ones who were informed were current Cabinet Chief Sergio Massa, Legal and Technical Secretary Carlos Zannini, and Minister of Economy, Carlos Fernandez."); *A decision that leaves a legal question mark,* LA NACIÓN (Sept. 3, 2008) ("Reports indicate that while the measure announced by Cristina Kirchner yesterday was being adopted, the chairman of the Central Bank was absent from the decision-making table.").  This was but one more demonstration of Argentina's complete control over the Central Bank, of the Central Bank's lack of a separate legal and financial existence, and of Argentina's willingness to use Central Bank assets to pay off the Republic's debt when doing so suits the Executive Branch's purposes.  *See Satisfying the creditors,* THE ECONOMIST (Sept. 4, 2008) ("Ms Fernández has rustled up the cash [to pay the Paris Club] by helping herself to 15% of the central bank's foreign-currency reserves … highlighting the bank's tenuous independence"); *Argentina, In A Jam, Is Forced To Rethink "Holdout" Debt,* DOW JONES (Sept. 11, 2008) (according to a Lehman economist the payment "erases altogether any doubt over the independence of the central bank and the property of the reserves.").

48.     That the Central Bank Charter contains in Article 20 an explicit limitation on lending to the Argentine government was of no concern to President Cristina Fernández de Kirchner (*see* ¶¶ 33, 45 above).  Instead, she simply issued Presidential Decree No. 1472/2008, which provided that *(a)* the Central Bank reserves used to pay the Paris Club would be repaid with a government security, presumably similar to the note the Central Bank received for the IMF payment, and *(b)* the payment to Paris Club would be exempted from the Central Bank Charter's limitation on loans to the government.  Decree 1472/2008.  The Argentine press has described Decree 1472/2008 as a "decision to subjugate the Central Bank's autonomy" and as demonstrating that in the Kirchners' "autocratic model the Central Bank is another agency of the

Executive Branch." *The reserves, once again in the government's sights,* LA NACIÓN (Sept. 22, 2008).

49.     Tellingly, despite the issuance of Decree 1472/2008, President Cristina Fernández de Kirchner's unilateral decision to use Central Bank reserves to repay Argentina's debt to Paris Club members still failed in at least two ways to comport even with the minimal limitations previously imposed by her husband on the use of Central Bank reserves to repay Argentina's debts.

50.     *First*, in Decree 1599/2005, former President Néstor Kirchner proclaimed the so-called "unrestricted" reserves available for the repayment of Argentina's debt obligations with international monetary organizations (*see* ¶ 39 above).  But the Paris Club, unlike the IMF, is not an international monetary organization.  The Paris Club does not have any legal status at all; it is an informal group of creditor nations that coordinate efforts to reschedule debt due to them by developing countries.  *See Paris Club: new payment proposal drafted,* AMBITO (Sept. 5, 2008) ("But clearly, the Paris Club isn't one [an international monetary organization].").

51.     *Second*, whereas the Central Bank was technically the debtor to the IMF (although both Argentina and the Central Bank publicly acknowledged that such debt in fact belonged to Argentina, and not the Central Bank), the Argentine Treasury is the debtor to the Paris Club members.  The Central Bank does not have any relationship, nominal or otherwise, to the Paris Club.  *See An error in the decree authorizing payment to the Paris Club gives license to million-dollar lawsuits,* CRONISTA (Sept. 4, 2008) ("[T]he debtor to the Paris Club is the Treasury.").

**Bicentennial Fund**

52.     On December 14, 2009, President Fernández de Kirchner authorized the so-called Bicentennial Fund for Debt Reduction and Stability ("Bicentennial Fund") by Emergency Decree No. 2010/2009.  Emergency Decree No. 2010/2009.  The Bicentennial Fund was to be used for the repayment of certain debts due in 2010 that were owed by the Argentine government to private-sector creditors.  *Argentina Takes Steps to Lower Risk Perception*, DOW JONES INT'L NEWS (Dec. 14, 2009).  The fund was to be created by a transfer of nearly US $6.6 billion from the Central Bank reserves to the Argentine Treasury that effectively constituted a loan with zero interest.  *Argentine Zero Interest Loan Proves Irresistible*, BLOOMBERG (Dec. 20, 2009).

53.     Implementation of the Bicentennial Fund was met with resistance in Argentina outside the Executive Branch.  The Central Bank's then-Governor, Martín Redrado, delayed implementation of Decree No. 2010/2009 before he was forced to resign by President Fernández de Kirchner (*see* ¶¶ 89-91 below).  Redrado reportedly hesitated, in part, out of concern that any transfer of the Central Bank's reserves into the Bicentennial Fund would make "funds held by the Central Bank abroad vulnerable to claims [for attachment and restraint] by [Argentina's] creditors."  *Socialism for Foes, Capitalism for Friends; Argentina Under the Kirchners*, ECONOMIST (Feb. 27, 2010); *Government Already Alerted to Funds Seizure*, LA NACIÓN (Jan. 13, 2010).

54.     Members of the Argentine Congress also questioned whether Decree No. 2010/2009 violated the Central Bank Charter, and argued that a transfer of Central Bank reserves into the Bicentennial Fund would evidence the Central Bank's lack of independence.  *Argentine Opposition Fights Kirchner's Debt Plan*, WALL ST. J. (Dec. 30, 2009).  Alfonso Prat-Gay, who had served as Governor of the Central Bank from 2002 to 2004 before becoming a

member of the Argentine Congress, believed Decree No. 2010/2009 was illegal – because the Central Bank should be an independent institution and not have its reserves appropriated at the Executive Branch's will.  *See Harsh Criticism by the Opposition to the Use of BCRA Funds*, LA NACIÓN (Dec. 15, 2009) ("[Prat-Gay] warned that the measure adopted by the Government was illegal, because the BCRA 'is an independent entity and the Government cannot appropriate its reserves.'").

55.    Other observers harshly criticized the Bicentennial Fund as violating the independence ostensibly required by the Central Bank Charter, because President Fernández de Kirchner had acted without the required Congressional approval.  *See, e.g.*, *The Reserves Belong to Cristina,* ÁMBITO FINANCIERO (Dec. 16, 2009) (explaining that central bank reserves belong to the central bank and "cannot be transferred . . . to any fund whatsoever");  *The Government Frees Up Resources to Raise Cash and Maintain Spending*, CLARÍN (Dec. 15, 2009) ("A collateral effect of the decision [to create the fund] is that it further blurs the lines between the Central Bank and the State."); *Argentina to Tap Reserves for Debt Payment Fund*, REUTERS (Dec. 14, 2009) (according to Goldman Sachs senior economist, use of Central Bank reserves for debt repayment is "clearly negative from an institutional standpoint" because "it weakens the central bank and provides the government with extra rope to extend a notoriously profligate spending stance that is often shaped according to political criteria"); *Argentina Govt's Move to Woo Investors Becomes a Headache*, DOW JONES INT'L NEWS (Dec. 21, 2009) ("Latest speculation suggests the Treasury may now . . . take reserves as and when they're needed.").

56.    Several Argentine lawmakers filed a request to stay implementation of the Bicentennial Fund, and they sought a declaration that Decree No. 2010/2009 was an unconstitutional exercise of power absent legislative approval.  *Argentine Opposition Fights*

*Kirchner's Debt Plan*, WALL ST. J. (Dec. 30, 2009).  The request was granted on January 8, 2010; the Executive Branch appealed.  On January 22, 2010, while the Argentine federal courts were in recess, an interim appellate court upheld the stay pending approval of the Bicentennial Fund by the Argentine Congress.  National Court of Federal Administrative Appeals, *Pinedo et al.–Inc. Med. (8-1-2010) v. Executive Branch—Decree 2010/09*, No. 142/2010 (Jan. 22, 2010) (Arg.).

57.     President Fernández de Kirchner was unwilling to leave the Bicentennial Fund's fate in the hands of a newly unsympathetic Congress following the elections.  On February 5, 2010, after the regular term of the federal courts recommenced, the Executive Branch filed an extraordinary appeal and sought both an immediate lifting of the stay, and that the case be forwarded to the Supreme Court.  *BCRA:  The Government Asks the Court to Free the Reserves*, LA NACIÓN (Feb. 5, 2010).  On February 24, 2010, the appellate court refused to lift the stay, but granted the request to forward the case to the Argentine Supreme Court for further review. *Argentine Court Upholds Freeze on Reserves Plan*, REUTERS (Feb. 24, 2010).  The Supreme Court was not expected to issue a decision contradicting whatever Congress decided.  *Argentine Debt Plan Blocked*, FIN. TIMES (Feb. 25, 2010).

58.     On March 1, 2010, at the opening of the new Congressional session, President Fernández de Kirchner announced that she had "revoked" (by presidential decree) Decree No. 2010/2009 relating to the Bicentennial Fund because of "judicial overstepping" in a "strictly political" issue.  Decree No. 296/2010, *Official Gazette of the Argentine Republic*, No. 31,853 (Mar. 1, 2010)); *At Congress Opening Session, "I revoked the 2010 Bicentennial Fund decree," CFK Announces*, BUENOS AIRES HERALD (Mar. 1, 2010).

59.     Simultaneously, President Fernández de Kirchner announced her issuance of a different set of decrees authorizing the use of approximately $6.6 billion in Central Bank reserves to repay creditors of the Argentine government – the same amount and use of Central Bank reserves previously contemplated by "revoked" Emergency Decree No. 2010/2009. Emergency Decree No. 298/2010 authorized the use of approximately US $4.4 billion of Central Bank reserves to repay debts coming due in 2010 to Argentina's private creditors by creating the Debt Reduction Fund.  The Debt Reduction Fund specifically contemplated repayment of the Boden 2012 bonds, the Bonar V bonds, as well as other maturities with private bondholders. Decree No. 297/2010, by contrast, authorized the use of approximately US $2.2 billion of Central Bank reserves to repay Argentina's multilateral lenders where such transfer of reserves would have a neutral monetary effect.  Decree No. 297/2010, Decree No. 298/2010, Resolution No. 104/2010, Resolution No. 105/2010, *Official Gazette of the Argentine Republic*, No. 31,853 (Mar. 1, 2010); Press Release, Presidency of the Argentine Republic, Cristina Fernández Opens New Regular Session of the Congress of Argentina (Mar. 1, 2010).

60.     That same day (March 1), US $6.6 billion in Central Bank reserves was transferred into accounts held in the name of the Argentine Treasury at the Central Bank in Argentina.  *Argentine Central Bank Sends $6.6 Billion in Funds to Treasury*, BLOOMBERG (Mar. 1, 2010); *Argentina President Changes Tack to Tap Reserves*, FIN. TIMES (Mar. 2, 2010).

61.     The Executive Branch micro-engineered the events of March 1, 2010 to circumvent both legislative and judicial review of the Bicentennial Fund.  *See "The President's Speech Was a Mockery to Both the People and Parliament," Lawmaker*, BUENOS AIRES HERALD (Mar. 1, 2010) (former Central Bank Governor Alfonso Prat-Gay described these events "as a 'disrespect for the judicial and the legislative branches'"); *accord A Crazy Day at the Central*

*Bank*, CRÍTICA DE ARGENTINA (Jan. 23, 2010); *New Twist in Argentine Currency Fight*, WALL ST. J. (Jan. 26, 2010).  For example:

- The Kirchners reportedly met on Sunday, February 28, with Central Bank Governor, Mercedes Marcó del Pont, and Argentina's Economy Minister, Amado Boudou, to provide detailed instructions for the following morning.  They planned a transfer of Central Bank reserves timed almost simultaneously with President Fernández de Kirchner's speech to Congress on March 1, in order to surprise the opposition and minimize the risks of any interference.  *Maniobras Secretas para Eludir Buitres y Congreso*, ÁMBITO FINANCIERO (Mar. 2, 2010); *Toman Reservas del BCRA con Otro DNU*, LA NACIÓN (Mar. 2, 2010); *El BCRA ya separó el dinero para pagar*, LA NACIÓN (Mar. 2, 2010).

- Marcó del Pont agreed with the Kirchners' plan and clarified that she would need to obtain on Monday morning the consent of Central Bank legal advisors.  Accordingly, neither Marcó del Pont nor Boudou accompanied President Fernández de Kirchner to Congress.  At the Kirchners' direction, Boudou stayed behind at the Ministry of Economy, and Marcó del Pont – together with Argentina's Finance Secretary – remained at the Central Bank to ensure a smooth execution of the agreed plan.  *El Gobierno Capturó Los U\$S 6.569 Millones de las Reservas con Dos Nuevos Decretos*, EL CRONISTA (Mar. 2, 2010); *Economía Festeja la Resurrección del Fondo para Pagar con Reservas*, LA NACIÓN (Mar. 2, 2010).

- The new decrees were signed by President Fernández de Kirchner's Cabinet on Monday morning, shortly before her speech.  While she spoke, the Central Bank Board met and (with the exception of two members linked to former Governor Martín Redrado) also endorsed the new decrees.  The process of transferring US \$6.6 billion of Central Bank reserves then began during President Fernández de Kirchner's speech.  Accordingly, the Argentine Congress were not told either that the new decrees were ready to be printed officially or that the reserves already had been transferred until after her speech was concluded.  *Una Jugada Armada en Secreto para Soprender a la Justicia y a la Oposición*, EL CRONISTA (Mar. 2, 2010); *Con Dos Votos en Disidencia, el BCRA hizo el giro al Tesoro*, ÁMBITO FINANCIERO (Mar. 2, 2010); *La Oposición Resiste en la Justicia*, LA NACIÓN (Mar. 2, 2010).

62.  In early May 2010, a bill was introduced by President Fernández de Kirchner's Congressional supporters to ratify the transfer of reserves.  That legislation was passed by the Argentine Senate on May 5, 2010, which was the only requirement necessary for ratification.

*Argentine Senate Approves Use of Reserves to Pay Debt*, REUTERS (May 6, 2010); *Senate OKs Use of Reserves to Pay Debt*, LA NACIÓN (May 6, 2010).

### Debt Reduction Fund and Other Uses of<br>Central Bank Reserves Under Mercedes Marcó del Pont

#### 1.   The Debt Reduction Fund

63.   Current Central Bank Governor Mercedes Marcó del Pont has repeatedly agreed to transfer Central Bank reserves to the Treasury and has defended the use of Central Bank reserves to pay debt since her appointment in May 2010 (*see* ¶¶ 71, 93-96 below).  Immediately thereafter, the Argentine government used US$1.833 billion in Central Bank reserves to repay the country's outstanding debt.  *E.g, Government Used $1.83 Billion for Debt Payment, said Cristina*, EL CRONISTA (May 4, 2010); *Argentine Senate Approves Use of Reserves to Pay Debt*, REUTERS NEWS (May 6, 2010).  Only a few months later, in early August 2010, Argentina used US $2.2 billion in Central Bank reserves to pay a coupon due on the Boden 2012 bond. *Argentina Coupon Payment May Ease Path to Debt Sale*, REUTERS (Aug. 3, 2010).  By the end of 2010, the Argentine government had used $4.3 billion in Central Bank reserves.  *Payment Made with Reserves and No Chaos Ensues*, PÁGINA 12 (Nov. 9, 2010).

64.   In January 2011, pursuant to Decree 2054/2010 issued on December 22, 2010, approximately $7.5 billion in Central Bank reserves were transferred to the Debt Reduction Fund.  Decree 2054/2010, Art. 22; *Argentina Central Bank Approves $7.5B Loan To Pay Foreign Debt*, DOW JONES (Jan. 11, 2011); *By Decree, Government Extends 2010 Budget and Allocates $7.5 Billion from Central Bank for Debt Payment*, ÁMBITO FINANCIERO (Dec. 29, 2010).  In return, the Ministry of Economy issued a Treasury Bond worth US$7.504 billion. Resolution 1/2011.

65.     In March 2011, the Ministry of Economy borrowed $2.2 billion in Central Bank reserves to pay debt obligations to the World Bank and IADB, pursuant to Decree 276/2011. Decree 276/2011 is separate from the Debt Reduction Fund (which was created by Decree 298/2010 and funded by Decree 2054/2010). Decree 276/2011 creates a separate fund, which seeks to cancel debt arising from maturities from multilateral credit organizations, as opposed to private debtholders. Decree 276/2011; *UPDATE: Argentina Taps Central Bank Reserves Again to Pay Creditors*, DOW JONES (Mar. 4, 2011); *$2.174 Billion Debt Paid with Dollars from Central Bank*, CLARÍN (Mar. 5, 2011); *Argentina's Economy Ministry Borrows $2.12B from Central Bank*, DOW JONES (Mar. 18, 2011); Argentine State Public Debt, Nat'l Bureau of Public Debt (March 31, 2011). The Minister of Economy passed Resolution 64/2011 issuing a Treasury Bond for US$2.121 billion. *See* Resolution 64/2011.

66.     Also in March 2011, $1.5 billion in Central Bank reserves were used to make principal and interest payments on Bonar V bonds, which were issued in 2006, had a 5-year term, and reached maturity in March of 2011. *See Reserves Used to Pay Debt*, CLARÍN (Mar. 29, 2011). In August 2011, $2.2 billion in Central Bank reserves were used to pay the Boden 2012 bonds. *Central Bank Reserves Drop by $1.4 Billion Due to Boden 12 Payment*, EL CRONISTA (Aug. 4, 2011). Both payments were expressly referred to in the decree that created the Debt Reduction Fund. *See* Decree 298/2010.

## 2.     Other Uses

67.     As of March 2012, the Central Bank had approximately $47 billion in total reserves – but had run out of so called "unrestricted" reserves. This was problematic for President Fernández de Kirchner, because Argentina's 2012 budget earmarked up to $5.7 billion in "unrestricted" reserves to repay private creditors. *See Central Bank Assets, Full of Bonds*,

CLARÍN (Mar. 10, 2012).  To dodge the problem, she decided to eliminate all remaining nominal limits on the Central Bank's (and therefore the government's) ability to cut back on what constitutes "unrestricted" reserves – thereby freeing up still more money for the government's use.

68.     Law 26.739, which was promulgated in Decree 462/2012, accomplished this. Law 26.739; Decree 462/2012; *Argentina Wants to Tap More Central Bank Reserves*, REUTERS (Mar. 1, 2012); *Gov't Enacts Central Bank's Charter Reform*, Buenos Aires Herald (Mar. 28, 2012).  The new legislation eliminated the Convertibility Law's requirement that the Central Bank maintain reserves in an amount equal to the monetary base and redefined the Central Bank's mission to include promoting monetary stability, financial stability, employment, and economic development with social equity.  This had the effect of further tightening the Argentine government's control, allowing it to use as much of the Central Bank's reserves as it wishes to pay the Republic's debts.  *Argentina Set To Free Up Bank Reserves*, FIN. TIMES (Mar. 6, 2012).

69.     The new legislation also allows Argentina to repay bilateral loans using the Central Bank's reserves.  According to Marcó del Pont, this will allow Argentina to avoid making "brutal fiscal cuts" or seeking debt on the costly global market.  *Argentina Says Can Rebuild Reserves Used to Pay Debt*, REUTERS (Mar. 6, 2012).

70.     Additionally, the new legislation amended Article 20 of the Central Bank Charter to authorize the Central Bank to temporarily transfer to the Treasury additional temporary transfers equal to 10 percent of the cash resources that the Argentine government has obtained in the last twelve months (*see* ¶ 33 above).  *See Amplían el límite para que el Banco Central asista al Tesoro*, La Nación (Mar. 9, 2012).

71.    The new legislation has been widely criticized as evidencing the Argentine government's domination of its Central Bank.  *See Piggy Bank, Rootling around for Cash*, THE ECONOMIST (Mar. 31, 2012) ("[T]he [central] bank has lost the last shred of its legal independence and become the piggy bank of President Cristina Fernández's government"); *Kirchner Grabs the Central Bank*, WALL ST. J. (April 2, 2012) ("Argentina's Franken-state stormed the central bank last month, destroying the last vestiges of independence.").  According to former Central Bank Governor Martín Redrado:   "With no definition of ["unrestricted"] reserves, it will be up to the [Central Bank] board to decide the amount of reserves needed.  The central bank will be at the end of the phone to do the Treasury's bidding.  They've opened a parallel treasury that is subject to no kind of control."  *Argentina Set to Free up Bank Reserves*, REUTERS (Mar. 6, 2012).   Opposition lawmaker Federico Pinedo called the bill "one of democracy's most sinister laws[; t]he Government is just looking for a blank check in order to finance itself with the Central Bank's reserves."  *Pinedo calls bill to amend Central Bank Charter 'sinister,'* BUENOS AIRES HERALD (Mar. 11, 2012).   Abel Viglione, an economist at think-tank Fiel, opined that this is another thinly-disguised asset grab that "subordinates monetary policy to fiscal policy."  *Argentina set to free up bank reserves*, FIN. TIMES (Mar. 6, 2012).  In addition, in August 2012, a federal prosecutor opened a criminal fraud investigation into President Fernández de Kirchner and Marcó del Pont for violating the law with their extensive use of the Central Bank's reserves to pay Argentina's debts and restrictions on dollar sales. *See, e.g.*, Eliana Raszewski, Argentine Prosecutor Probes Fernandez on Controls, Clarin Says, BLOOMBERG (Aug. 28, 2012); Argentine Leader Could Face Criminal Fraud Probe, ASSOCIATED PRESS (Aug. 29, 2012).

72.     On April 26, 2012 the Economy Ministry announced that, pursuant to a Resolution dated April 20, Argentina had issued a Treasury bill of up to $5.7 billion to be bought in several installments by the Central Bank using its reserves.  Resolution 131/2012.  That amount, which (not coincidentally) is identical to the amount earmarked in the country's 2012 budget, would be used by Argentina to repay its debts.  *Argentina issued note of up to $5.7 billion to Central Bank*, BLOOMBERG (April 26, 2012).

73.     On July 6, 2012, it was announced that the Argentine government planned to use $4.2 billion in Central Bank reserves to repay the country's debt during the third quarter of 2012.  *Argentina to Use $4.2 Bln in Central Bank Reserves to Pay Debt*, WALL ST. J. (July 6, 2012); *More Reserves for Debt Payment*, ÁMBITO FINANCIERO (July 6, 2012).  Included among the planned repayments was a $2.2 billion final installment on the Boden 2012 bond due August 3, 2012.  *Puesta en escena hoy del Gobierno:  celebran el pago final del Boden 2012*, CRONISTA (Aug. 3, 2012).

74.     President Fernández de Kirchner has even begun to use Central Bank reserves to fund government projects.  For example, in October 2010, President Fernández de Kirchner introduced loans to encourage small businesses to invest in Argentina and assist local production. These loans seek to keep dollars in the country and limit the outflow of dollars that has troubled Argentina in the past.  To incentivize small businesses to participate, these loans carry a negative interest rate.  Most importantly, these loans are funded by Central Bank reserves.  *Free Pesos Leave Fernandez With Shunned Loans: Argentina Credit*, Bloomberg (Aug. 1, 2012).  In essence, the government has directed the Central Bank to make loans available and to assume all related costs.  *See* Central Bank Communication "B" 9911 (Sept. 24, 2010).

75.     As a result of the Argentine government's extensive use of the Central Bank's reserves to pay its debts and fund the fiscal deficit, the Argentine government now owes the Central Bank, in dollars and pesos, approximately $55 billion.  These debts constitute more than half of the Central Bank's assets – most of the balance of which are comprised of the Central Bank's $47 billion in reserves.  And as a result of the March 2012 amendments to the Central Bank Charter, the Central Bank is directly funding the Argentine government's deficit through "temporary advances."  *Argentina Central Bank to Continue Lending to Federal Government*, WALL ST. J. (August 17, 2012) (reporting that Marcó del Pont stated that the Central Bank "will provide funding equivalent to 10% of what the government collects in total tax revenue").  As comments made by the Central Bank's governor to the Argentine Chamber of Deputies in March 2012 make clear, all of this is the result of the Argentine government's decision that it is better fiscal policy to fund itself and its fiscal deficit using the Central Bank's reserves than to issue new debt at the yields that the markets would demand from Argentina:

> In all this, beyond the issue of sovereignty, there is a basic question of what is rational from an economic point of view.  If the international reserves were yielding the Central Bank 12%, we would probably doubt whether the best alternative is to use the reserves.  Now then; comparing the yield that the Central Bank's deposits are getting in other international organizations, it is clearly evident what cost is involved in issuing external debt, and what the cost is of using the reserves.  If we analyze the yield on the BODEN 2015 bond, we will notice that it is around 10%.

Testimony of Mercedes Marcó del Pont, Joint Meeting of the Committees of Finance, Budget and Treasury, and General Legislation of the National Chamber of Deputies, March 7, 2012.

### C.     Argentina Controls The Day-To-Day Activities Of The Central Bank By Replacing Any Bank Official Who Refuses To Do Its Bidding

76.     One of the most effective means for a government to exert control over its central bank is by sending a clear message that any bank official who refuses to implement the

government's wishes or attempts to assert the bank's independence, can – and will – be replaced with another official who will follow the government's instructions.  Consequently, there is a broad consensus among central banking experts that high turnover of central bank officials is a strong indication that the bank is controlled by the parent state.  Alex Cukierman, Steven Webb & Bilin Neyapti, *Measuring the Independence of Central Banks and Its Effect on Policy Outcomes*, THE WORLD BANK ECONOMIC REV. Vol. 6, No. 3 at 363-67 (1992).

77.    Argentina is infamous for the high turnover rate of its Central Bank Governor (the Central Bank's chief official).  For the last 80 years, Governor turnover has been among the highest – if not the highest – of any central bank in the world.  The average tenure for a Governor since 1935 has been eighteen months (compared to over five years, on average, for central banks in developed countries).  *Id.* at 365; *accord* List of Central Bank presidents and tenures at http://www.bcra.gov.ar.

78.    This pattern has continued under Argentina's current political leadership.  Argentina has had a remarkable seven Central Bank Governors since 2001:  Pedro Pou, Roque Maccarone, Mario Blejer, Aldo Pignanelli, Alfonso Prat-Gay, Martín Redrado, and Mercedes Marcó del Pont.  Governors Maccarone, Blejer and Pignanelli were each in office for less than a year.  Pursuant to the Central Bank Charter, the Governor is appointed for 6-year terms with the possibility of re-appointment.  Charter, Art.7.

79.    The departures of all but Marcó del Pont (who remains the Central Bank Governor) were preceded by disagreements with the Argentine government over the country's monetary policy (which, under the Central Bank Charter, must be made and implemented free of government interference (*see* ¶ 33 above)) and/or the Central Bank's independence from the government generally.  In each case, the Argentine government's view prevailed over that of the

Central Bank's chief official.  The experiences of former Governors Blejer, Pignanelli, Prat-Gay, and Redrado are particularly illustrative.

### April 2001 – September 2004

80.     Pedro Pou served as Central Bank Governor from August 5, 1996 to April 25, 2001.  Roque Maccarone served from April 25, 2001 to January 18, 2002.  Mario Blejer served from January 28, 2002 to June 25, 2002. Aldo Pignanelli served from June 25, 2002 to December 11, 2002.  Alfonso Prat-Gay served from December 11, 2002 to September 23, 2004.

81.     Former Governor Mario Blejer identified the Argentine government's increasing encroachment on the Central Bank's independence as the reason for his departure from the Central Bank in 2002 after only four months.  *See Minister to Meet IMF over Aid Talks Problems: Argentina*, FINANCIAL TIMES (June 26, 2002) ("In his resignation letter, Mr. Blejer had complained about growing infringements on central bank independence by the economy ministry.  Now analysts say that much of the structure of the central bank has been filled by political appointees who respond to various parts of the executive branch.").  Two weeks after his resignation, Blejer told an interviewer that he and then Argentine Economy Minister Roberto Lavagna clashed over the Central Bank's independence.  *Interview: Mario Blejer*, CENTRAL BANKING (Jan. 2003).  Blejer "thought it was important to preserve central bank independence," while Lavagna "had a different conception." *Id*. at 28.

82.     Former Governor Mario Blejer was replaced with Aldo Pignanelli.  The Financial Times noted that, with Pignanelli's appointment, the Economy Ministry "gained more control over the notionally-independent central bank by getting its candidate appointed to the board of directors and taking over its press office." *Minister to Meet IMF over Aid Talks Problems: Argentina*, FINANCIAL TIMES (June 26, 2002).  Apparently, that was not yet enough control over

the Central Bank, and Pignanelli was replaced after only five months.  Differences between

Pignanelli and the Argentine Economy Ministry leading to his resignation were reportedly "the

result of a culture based on the mistaken belief that the Central Bank can be constantly subjected

to political winds of fortune and even at the Treasury's service." *Editorial I: The New President

of the BCRA,* LA NACIÓN (Dec. 12, 2002).  As Argentina's daily newspaper La Nación added:

> The fruit of this culture is that in a little more than eighteen months
> the [Central Bank] has had five presidents, when the term of that
> autonomous entity's head is six years.  The contrast with countries
> such as the United States – where there have only been five
> Federal Reserve chairmen in the last fifty years – is obvious. …
> [The] final success [of Pignanelli's replacement] won't depend so
> much on his person and the technical ability of those who will
> doubtless accompany him, but rather on the political leadership
> exhibiting its willingness to respect the [Central Bank's]
> autonomy, in order to avoid political short-circuits and ensure that
> the set term for that important entity's president is respected.  *Id*.

83.     Former Governor Aldo Pignanelli was replaced by Alfonso Prat-Gay, who served

the final twenty months of the six-year term collectively held by the four former Central Bank

Governors preceding him.   Although Prat-Gay was widely acclaimed as a central banking

superstar, former President Kirchner refused to reappoint him and in September 2004 replaced

him by presidential decree with Martín Redrado.  *See* Executive Decree 1236/2004 (replacing

Prat-Gay with Martin Redrado).  The international financial community was shocked by this turn

of events.  By all independent accounts, Prat-Gay had done a superb job during his brief tenure,

and significantly, he was the first person to be awarded Euromoney's prestigious "central bank

Governor of the year" award after leaving office.   Euromoney stated that Prat-Gay "built a

credible central bank from almost nothing" and was "Argentina's most internationally respected

policymaker."  *Argentina ditches its respected central bank governor on eve of crucial bond*

exchange; Alfonso Prat-Gay is central bank governor of the year, EUROMONEY INSTITUTIONAL INVESTOR (Sept. 1, 2004).

84.    The only credible explanation for former President Kirchner's decision not to reappoint former Governor Prat-Gay is that he was "widely known to oppose central tenets of [the Kirchner] administration's economic philosophy."  *Id.*; *see also* Alejandro Alonso, *Dispute Over Policies Sparks Change in Argentina CenBnk Chief*, THE MAIN WIRE (Sept. 17, 2004) ("Prat-Gay had repeatedly clashed with the administration … on the government's handling of the debt restructuring, the Central Bank's role in influencing the foreign exchange rate as well as the use to be made of the country's increasing foreign reserves").

85.    The Argentine press reported that, in addition to clashing with former President Kirchner over debt restructuring and the use of reserves, former Governor Prat-Gay had made two requests that were unpalatable to the Executive Branch.  *First*, Prat-Gay asked that, if he were to continue as Governor, his appointment be ratified by the Argentine Senate so that he could have a full six-year term and a mandate from the Senate.  *Second*, Prat-Gay asked that he have some input over who would be appointed to the Central Bank directorships.  Former President Kirchner refused, reportedly because he wanted Prat-Gay to serve without a defined term or mandate, and because he wanted full control over director appointments.  *Kirchner Changes Central Bank to Avoid Rifts in Debt Negotiations,* PÁGINA/12  (Sept. 18, 2004).  In resigning, Prat-Gay explained "basically the president and I have different views of what the role of the central bank should be."  *Argentina ditches its respected central bank governor on eve of crucial bond exchange; Alfonso Prat-Gay is central bank governor of the year*, EUROMONEY INSTITUTIONAL INVESTOR (September 1, 2004).  That difference, according to Euromoney, was "about the degree of independence that a central bank should have."  *Id.*

## September 2004 – January 2010

86.     Former Governor Prat-Gay was replaced by Martín Redrado, who was initially described as "a man most analysts consider unlikely to assert much in the way of independence" – as one government official opined, "Redrado is Kirchner." *Id.*; *A payment to the Fund was the spark that started the fire*, PÁGINA 12 (September 19, 2004); *see also Profits and losses*, PÁGINA/12 (Sept. 18, 2004) ("[T]he technical conditions and lineage of the pawns used in power games count for little.  The only thing that matters is their willingness to play the required role at the opportune moment.").  According to a Latin America analyst at Credit Suisse First Boston, the replacement of Prat-Gay with Redrado "'solidifie[d] the prospect that the Central Bank will remain under the control of the ministry of economy and Kirchner.. . . . Prat-Gay got fired because he was trying to be independent.'"  *Argentina ditches its respected central bank governor on eve of crucial bond exchange; Alfonso Prat-Gay is central bank governor of the year*, EUROMONEY INSTITUTIONAL INVESTOR (Sept. 1, 2004).

87.     For over five years, the Kirchner administrations did not find it necessary to fire Redrado, because he implemented their wishes dutifully.  For example, when the U.S. financial crisis hit in October 2008, former President Kirchner simply called Redrado to give him explicit instructions on how the Central Bank should respond on a day-to-day level.  As the Argentine press described just one day:

> [The] telephone of Martín Redrado . . . never stopped receiving messages by order of Néstor Kirchner.  The former President … spoke at least three times with the Head of Cabinet, Sergio Massa.  Automatically, the official called Redrado, who instantly offered 1 billion dollars to depressurize the meteoric rise of the dollar.  Just an hour had passed since the start of operations.

*Kirchner Gave the Order to Intervene*, LA NACIÓN (Oct. 30, 2008).

88.     Redrado's relationship with the Kirchner administrations dramatically changed in December 2010 when, pending advice from the Central Bank's legal counsel, he resisted the immediate transfer of nearly US $6.6 billion in Central Bank reserves to the Bicentennial Fund as directed by Emergency Decree 2010/2009 (*see* ¶ 54 above).   On January 6, 2010, President Fernández de Kirchner publicly demanded Redrado's immediate resignation.   The demand stemmed from her view that decisions regarding use of Central Bank reserves rest with the Executive Branch, rather than the Central Bank.   *See Argentina Seeks Central Bank Ouster Over Debt Plan*, BLOOMBERG (Jan. 6, 2010) (quoting Cabinet Chief Aníbal Fernández as saying that the decision to use Central Bank reserves to repay sovereign debt "'is a decision of the president [of Argentina], who is the one in charge of evaluating the pace of economic activity and determining economic policies based on that,'" and that "'these policies aren't discussed at the [C]entral [B]ank because it's the president [of Argentina] who makes decisions'"); *The Reserves, or Your Job*, ECONOMIST (Jan. 7, 2010) (quoting Cabinet Chief Aníbal Fernández as saying "'[i]t wasn't Redrado who accumulated the reserves … [i]t was [the Kirchners'] government.   In this country, it's not the [G]overnor of the Central Bank that makes the decisions.'"); *Argentina 'Kills' Bank Independence, Moody's Economy.com Says*, BLOOMBERG (Jan. 6, 2010) (quoting Moody's analyst Juan Pablo Fuentes that the firing of Redrado "underscores the lack of importance the government attributes to the central bank's independence").

89.     When Redrado did not submit his resignation and maintained that he could not be fired without the participation of the Argentine Congress, President Fernández de Kirchner fired him by emergency decree on January 7, 2010.   Executive Decree 18/2010; *see also Central Banker Steps Down, Vows Legal Action*, AGENCE FRANCE PRESSE (Jan. 8, 2010) ("Martin Redrado has agreed to step down but "will not resign" and will take his case to court, his

spokesman said only hours after President Cristina Kirchner issued a decree sacking Redrado for refusing to authorize a payment toward the national debt."). An Argentine federal judge ordered Redrado's reinstatement on January 8, 2010. *Court Reinstates Fired Central-Bank Chief*, WALL ST. J (Jan. 9, 2010). The Executive Branch immediately appealed and, at the same time, the Central Bank Board effectively stripped Redrado of his authority – with President Fernández de Kirchner labeling him a "squatter" at the Central Bank. *Battle for Control at Argentina's Central Bank*, FIN. TIMES (Jan. 25, 2010); *Argentine Gov't Appeals Rulings on Central Bank*, REUTERS (Jan. 9, 2010); *BCRA Board of Directors Takes Another Step to Corner Redrado*, LA NACIÓN (Jan. 15, 2010).

90.     On January 29, 2010, Redrado finally capitulated and tendered his resignation. *Argentina Bars Central Banker—Latest Bid to Oust Redrado Follows Ban on Using Reserves to Pay Debt*, WALL STREET. J. (Jan. 26, 2010); *The End of the Redrado Era: A Timeline*, EUROMONEY MAGAZINE (March 4, 2010). In a press conference that day, Redrado accused President Fernández de Kirchner of "tr[ying] to destroy the [C]entral [B]ank." *Argentine Central Bank President Quits Over Reserves*, BLOOMBERG (Jan. 30, 2010). Redrado has subsequently explained that "'I had to leave the bank because I wasn't very obedient.'" *Fernandez Says Investors to Do Well in Argentine Swap*, BLOOMBERG (Apr. 16, 2010).

## January 2010 – Present

91.     President Fernández de Kirchner had tapped Miguel Angel Pesce, a senior Central Bank official who publicly expressed support for the Bicentennial Fund, to act as the Central Bank's interim Governor after she fired Redrado. *See The Central Bank Vice-President Puts More Pressure on Redrado*, ÁMBITO FINANCIERO (Jan. 7, 2010) (quoting Pesce as stating that "'[t]he only thing that can be done is comply'" with the decree creating the Bicentennial Fund

"because that decision by the Chief Executive has the 'force of law'").  Pesce moved quickly to try to implement the Bicentennial Fund.  *Pesce Arrived Early and Authorized the Account, But Did Not Manage to Transfer Funds*, CLARÍN (Jan. 9, 2010).   He additionally ordered that Argentine banks conduct their foreign currency transactions through the Central Bank's account at the Bank for International Settlements in Basel, Switzerland (the "BIS"), rather than through the Central Bank's account at the Federal Reserve Bank of New York.  *Arrangements Made for Carrying Out Foreign Exchange Operations in Switzerland in Order to Avoid the Seizing of Accounts*, LA NACIÓN (Jan. 8, 2010).   This was consistent with the Central Bank's policy – unique among central banks – of keeping virtually all of its liquid reserves at the BIS (at virtually no return of interest) to seek to exploit the immunities against attachment and execution that it offers.

92.    On February 3, 2010, President Fernández de Kirchner appointed Mercedes Marcó del Pont as Central Bank Governor.   Decree 1378/2010.   Marcó del Pont, then president of state-owned Banco de la Nación Argentina, was described as a "[Kirchner] administration loyalist."   *Kirchner Directs Foreign Reserves Into Debt Payments*, WALL ST. J. (Mar. 2, 2010). Observers believed that Marcó del Pont would accede to the whims of the Executive Branch. *See Argentina Bank Won't Be Independent, Goldman Says*, BLOOMBERG (Feb. 4, 2010) (quoting Goldman Sachs economist as saying "'[t]he new president is very closely aligned with the government and won't have an independent voice'"); *Socialism for Foes, Capitalism for Friends; Argentina Under the Kirchners*, ECONOMIST (Feb. 27, 2010) (reporting that "[e]ventually the president got her way and Mr. Redrado was replaced with a more pliant figure").

93.     At the time of her appointment, Marcó del Pont's record reflected that she did not support Central Bank independence.  While a member of the Argentine Congress, Marcó del Pont had sponsored a bill in 2007 that "sought to redefine the role of the [C]entral [B]ank so that it would work more closely with the government on enacting economic policy."  *Argentine Bank President Is Formally Dismissed*, N.Y. TIMES (Feb. 4, 2010).  The bill specifically would have amended the Central Bank Charter to change its primary mission from "preserv[ing] the value of the currency" to include "keeping a high level of activity" and maximizing the use of "human resources and materials available."   Charter Act No. 24,144, Central Bank of the Argentine Republic; Charter of the Central Bank of the Republic of Argentina. Law 24,144 and Amendments Thereto:  Amendment to Article 3 (Mission and Functions, File No. 1218-D-2007, Parliamentary Process 022 (30/03/2007), sponsored by Mercedes Marcó del Pont, et al.)).

94.     True to her record, Marcó del Pont quickly collaborated with Argentina's Minister of Economy, Amado Boudou, officially to shift even more authority for monetary policy away from the Central Bank and to the Economy Ministry.  *Argentina Govt Seizes Moment to Make Changes at Central Bank*, DOW JONES INT'L NEWS (Feb. 4, 2010).  The shift was accomplished in part by the formation, pursuant to Decree No. 272/2010, of an "Economic Council" consisting of the Central Bank and the Economy Ministry.   Decree No. 272/2010.   Certain decisions regarding monetary policy would be made by that Council (rather than the Central Bank), and the Central Bank would play a greater role in managing the state's economic affairs.  *Economy and the BCRA Agreed to Maintain the Dollar and Synchronize the Rhythm of Public Spending*, EL CRONISTA (Feb. 19, 2010).

95.     In March 2012, Marcó del Pont enthusiastically supported President Fernández de Kirchner's proposed legislation to amend the Central Bank Charter and the nation's

Convertibility Law – thereby ensuring the Argentine government unfettered access to Central Bank reserves (*see* ¶¶ 68-74 above).  *Argentina Says Can Rebuild Reserves Used to Pay*, REUTERS (Mar. 7, 2012); *Argentina's Marcó Del Pont Defends Central Bank Reform*, DOW JONES (Mar. 3, 2012).  Argentina's unlimited access to the Central Bank's reserves is all but unique compared to typical relationships between governments and their central banks.

96.  Despite Marcó del Pont's acquiescence, President Fernández de Kirchner has continued to keep Marcó del Pont's appointment – like the appointments of her predecessors – "in commission."  As a result, Marcó del Pont can be removed at any time at the president's whim.  *Marcó del Pont, una presidenta a tiro de decreto*, LA NACIÓN (Mar. 13, 2012).  The status of Marcó del Pont's appointment violates Article 99(19) of the Argentine Constitution, which requires that such appointments (a) be made only when the Senate is in recess, and (b) expire at the end of the next legislative session if not confirmed. Argentine Constitution Art. 99(10); *accord Controversial Changes to Central Bank Regulations*, LA NACIÓN (Nov. 30, 1999); *Appointment to the Board by Decree*, CLARÍN (Nov. 30, 1999).

**D.  The Argentine Government Dictates Monetary Policy
And Controls How It Is Implemented By The Central Bank**

97.  During the administrations of former President Kirchner and President Fernández de Kirchner, the Executive Branch has forced the Central Bank to implement whatever monetary policies it deemed to be politically expedient.  At times, this meant accumulating dollars and issuing pesos to artificially depress the price of Argentine exports – causing massive inflation and forcing the Central Bank to violate what then was a core provision in its Charter: that it preserve the value of the peso.  At other times, the Executive Branch has reversed course and ordered the Cental Bank to ***sell*** dollars – causing an appreciation of the peso – in order to punish its political opponents.  And at still other times, the Executive Branch has ordered the Central

Bank to try to achieve a politically optimal valuation of the peso just before an election cycle to manufacture short-term economic vitality.  Although the Executive Branch has sought to conceal this economic mismanagement by manipulating statistics, independent economists agree that the result has been massive inflation – something an independent Central Bank would have been duty-bound to act to prevent.  The Executive Branch's comandeering of monetary policy further demonstrates that the Central Bank is nothing more than an agent of the Republic.

### 1.   Accumulating Dollars and Depreciating the Peso

98.    The primary duty of an independent central bank is to maintain the value of the national currency.  Until March 2012, this duty was enshrined as the Central Bank's sole objective in its Charter:  "[The Central Bank] shall primarily and essentially maintain the value of legal tender."  Former Central Bank Charter, Art. 3.  Importantly, this duty was supposed to be fulfilled by the Central Bank without interference or pressure from the government.  *Id.* ("As regards the preparation and implementation of any monetary and financial policy, BCRA shall not be subject to any order or instruction given by the National Executive Power.").  But in direct violation of this restriction, Argentina controlled the Central Bank's formulation and day-to-day implementation of monetary policy.   In March 2012, Argentina removed these nominal restrictions to legally authorize its interference.  The result has been soaring inflation since late 2004.  As a further result, a consensus has developed over the past several years that Argentina "manifestly does not have the rigid Central Bank independence of much of the world."  *The economy this year*, BUENOS AIRES HERALD (Sept. 28, 2008).

99.    Beginning in late 2004, acting on the orders of former President Kirchner, the Central Bank began purchasing dollars on a daily basis – and, as a consequence, releasing more pesos into the Argentine economy.  *See* Daniel Fernandez Canedo, *Focus: Dollar creates*

*pressure peak and interest rates rise fast and strong*, CLARÍN (June 23, 2005) ("[The] Central Bank is following the President's wishes to the letter.  So, day by day, [the] Central Bank is buying more dollars, to which end it is issuing more pesos.").  Former President Kirchner initially forced the Central Bank to adopt this policy for purely political reasons.  Specifically, he wanted the Central Bank to continue accumulating reserves (thereby increasing the amount of pesos in circulation) in order to keep down the value of the Argentine peso relative to the U.S. dollar.  *ARGENTINA: Still growing but inflation a worry*, LATIN AMERICA ECONOMY & BUSINESS (July 26, 2005) (observing that "government's refusal to let the peso appreciate against the dollar … has kept Argentine exports competitive").  This strategy would increase worldwide demand for Argentine goods – and presumably bolster the popularity of the Kirchners and their allies among various agricultural and industrial export sectors in the run-up to congressional elections held in October 2005.

100.    After the October 2005 elections, the Argentine government continued to pressure the Central Bank to accumulate dollars for another political reason – to finance the government's debts.  *See Argentine c-bank makes record dollar purchase in 2006*, LA NACIÓN (July 6, 2006) ("Argentina must cancel a debt of some $3.0 bln (2.35 bln euro) at the beginning of next month, which is the reason BCRA [is buying] U.S. dollars at present"); *Argentina: bearish thoughts on the peso*, EUROMONEY INSTITUTIONAL INVESTOR (Feb. 6, 2006) ("Now, however, BCRA is continuing to purchase dollars, following the government's prepayment of U.S. $10bn to the IMF, in order to replenish stocks"); *Economy ministry asks Central Bank for nearly ARP 5 billion*, LA NACIÓN (Dec. 28, 2007) ("To ring in the New Year with no unwelcome surprises and pay liabilities in the next few days, the Ministry of Economy decided to ask the Central Bank to

come to the rescue, requesting nearly ARP 5 billion in temporary advances that will be arranged today before the close of the voluntary debt markets.").

101.    One particularly glaring example of how completely the Argentine government has usurped the Central Bank's responsibility for monetary policymaking is former President Kirchner's announcement in mid-2006 that it was for *him* to quantify the precise level of reserves to be maintained by the Central Bank.   He exercised this self-given authority by dictating that the Central Bank's reserves must reach US$30 billion by the end of that year.  *See* Martin Boerr, *At this rate, the Central Bank's surplus will only last a year*, INFOBAE PROFESIONAL (Aug. 14, 2006) ("The experts . . . made it clear that the accumulation of reserves is not so much a policy of the Argentine Central Bank as an idée fixe of President Néstor Kirchner."); *US$634 million pay-out*, AMBITO FINANCIERO (Aug. 14, 2006) ("The idea is for [Argentina] to have US$30 billion in international reserves by the end of [2006], because Néstor Kirchner has made this the target").  Of course, under the version of the Central Bank Charter that was operative at that time, the government was prohibited from even influencing the process whereby the level of reserves held by the Central Bank is determined – let alone establishing a numerical target.

102.    The strategy had the benefit of providing former President Kirchner with a piggy bank of export taxes.   But domestic observers, like the Argentine financial paper Ambito Financiero noted that this strategy was also irrational – because in order to purchase the dollars the Central Bank issued bonds that yielded 11% interest, while the Bank's investment in dollars only yielded 6% interest.  That is, the Central Bank guaranteed that it would lose money by using borrowed money for an investment that yielded roughly half of what the Central Bank was required to pay to borrow the money.  As Ambito Financiero noted:

> Everything seems to indicate that the "accumulation" of foreign currency is an undesired effect of a disorganized monetary policy for which the only purpose is to keep the exchange rate high so as to be able to continue charging export duties to generate the necessary cash to test a hegemonic power project. . . .

*What they don't tell us about the reserves,* AMBITO FINANCIERO (June 7, 2007).

103.    Argentina's reserves continued to grow at a remarkable pace.  By March of 2008, Argentina announced that its reserves exceeded U.S. $50 billion.  *Smiles for Cristina: reserves pass the USD 50 billion mark. The messenger: Redrado*, AMBITO FINANCIERO (March 13, 2008). Argentina's vigorous efforts to increase reserves include having required the Central Bank to borrow dollars from other banks using speculative Argentine government securities as collateral. *See Inflated reserves?*, AMBITO FINANCIERO (June 3, 2008).

### 2.     Selling Dollars and Appreciating the Peso

104.    Shortly after the Central Bank passed the $50 billion mark in accumulated reserves, the Kirchners ordered the Central Bank to begin ***selling*** dollars.  *Fernandez peso gambit may backfire as Argentina slows,* BLOOMBERG (July 7, 2008) (noting that the Central Bank had sold over a 2-month period about US$2.6 billion, breaking a five-year policy of buying dollars).  This Executive Branch directive caused the value of the Argentine peso to rise relative to the U.S. dollar, which in turn caused a decrease in the worldwide demand for Argentine exports.  The temporary shift in monetary policy was motivated at least in part by the desire to ***punish*** Argentina's agricultural sector for its nation-wide strike in opposition to the Kirchners' tax policies.  *Central Bank bets on recovering reserves with cheap dollar,* EL CRONISTA (June 25, 2008) (quoting a source as stating, "Néstor [Kirchner] … even planned to take [the exchange] to $2,20 so that all the defiant sectors would feel the pain");  *They say that Kirchner could drop it to 2,80,* CLARÍN (June 18, 2008) (quoting former President Kirchner as telling industrialists, in an effort to get their support for the government's policies against the

agricultural sector, that "if you don't get behind the government's plan, we can make the dollar fall to $2,80,"and as telling Central Bank officials that "[i]f we need to spend part of the reserves to lower the price of the dollar, we'll do it."); *Fernandez peso gambit may backfire as Argentina slows,* BLOOMBERG (July 7, 2008) (noting that Cristina Fernández de Kirchner was using "the peso as a weapon to quell striking farmers"); *With the dollar low, Kirchner also plans to punish industrialists,* EL CRONISTA (June 6, 2008) ("The 'lesson' of a low dollar, proposed initially to punish the countryside, also aims to discipline the industrial sectors.  In simplified terms, it is Néstor Kirchner's opinion that the rise in the exchange rate is a source of daily satisfaction."). Ironically, the agricultural sector is among those whose electoral support the Kirchners previously curried by ordering the Central Bank to accumulate dollars and fuel an export-driven economy.  *Once a government supporter, rural Argentina now an opponent*, NEW YORK TIMES (July 2, 2008) ("[Cristina Fernández de Kirchner] rode to victory in part because of her support from the countryside … who benefited from her husband's fiscal policies[.]")

105.    The Kirchners continued to utilize Argentina's monetary policy as a tool for silencing the agricultural sector's criticism of their administration.  For example, in early September 2008 they instructed the Central Bank to sell over US$100 million in reserves in order to slow down recent increases in the value of the dollar that were strengthening demand for Argentine exports.  As confirmed by one official with access to the President's office, the decision "was Néstor's order, to teach a lesson to the countryside."  *For Néstor, Nothing Happened*, CRÍTICA DE LA ARGENTINA (Sept. 13, 2008).

### 3.    Maintaining a "Politically Correct" Exchange Rate

106.    Leading up to Argentina's 2009 mid-term elections, President Fernández de Kirchner ordered the Central Bank to use all means necessary to maintain a "politically correct"

exchange rate and thereby avoid the perception that her administration was mismanaging the economy.  In March 2009, for example, she ordered the Central Bank to "take actions . . . to contain the dollar" in an attempt "to prevent the exchange rate of United States currency from becoming a factor that could divert votes."  *US$ 1 Billion Sought from International Organizations to Contain the Dollar*, EL CRONISTA (Mar. 25, 2009)).  Her motivation was transparent; as the Argentine financial press reported at the time, "halting or at least significantly slowing the rise of the Dollar does stem from economic interests, but mainly from political ones."  *Central Bank to Take Action Today to Halt Dollar Rise*, ÁMBITO FINANCIERO (Mar. 25, 2009) (explaining that "[e]xcessive devaluation could mean a hard blow for the Government, especially as the elections draw near"); *see Redrado Floods Market with Dollar Futures that Will Mature During the Elections*, EL CRONISTA (June 4, 2009) (reporting on the President's decision "to tame the domestic [dollar-to-peso] exchange market at all costs, using measures as aggressive as necessary, to ensure an 'ideal' rate of exchange for the dollar ***at election time***." (emphasis added)).  So motivated were the Kirchners – in fact, Néstor Kirchner also was running for a Congressional seat – that the Central Bank had sold in the first six months of 2009 reserves worth approximately US$878 million – or 80% of all dollars sold in during the entire year in 2008.  *Sale of Dollars by Central Bank Now Amounts to 80% of Everything "Sacrificed" in 2008*, EL CRONISTA (June 17, 2009).  Later in 2009 and in 2010, the Executive Branch reversed course again, and the Central Bank resumed purchasing dollars.

### 4.  Concealing Inflation

107.   During those times that it ordered the Central Bank to purchase hundreds of millions of dollars daily, the Executive Branch directed the Central Bank not to "sterilize" those purchases by removing a corresponding amount of pesos from circulation.  The failure to

sterilize is largely responsible for the country's soaring inflation.  *See* Fernando Laborda, *Recipes that proved his failure*, LA NACIÓN (Dec. 1, 2005) ("The root of the problem is the monetary policy of supporting the dollar.  It is the government who is causing inflation, and it then pressures companies to not raise prices. . . .  This drop was not due to a reduction in revenue, but rather to an increase in spending, probably on account of the elections."); *The BCRA pays big to maintain US dollar rate*, LA NACIÓN (Oct. 19, 2005) (noting that the Central Bank continued to buy hundreds of millions of U.S. dollars despite resulting inflation); *Argentina economy: Government rebuffs currency concerns*, THE ECONOMIST (Aug. 12, 2005) ("the dollar purchases by the Central Bank are expanding the money supply and thereby contributing to rising inflation.").

108.    As a result of the Executive Branch's intervention, Argentina's inflation exceeded 11% in 2005.  *The economy grows strong, but inflation becomes again a threat*, CLARÍN (Sept. 22, 2005).  Independent economists then warned in 2006 that, if the policy continued, Argentina could face an inflation rate of 15% during that year and 18% in 2007.  *Warning by international banks that inflation could reach 18% in 2007*, LA NACIÓN (Apr. 5, 2006) (explaining inflationary effect of the "decision not to adopt market mechanisms to lower prices").  This warning proved prescient, as a group of independent economists determined that the average CPI (consumer price index) growth since January 2007 was in fact 15%.  *Analysts calculate actual inflation*, LA NACIÓN (July 15, 2007).  Inflation continued to pose an increasingly significant threat to the Argentine economy, with independent estimates in 2008 calculating inflation to have reached its highest levels – 25% – in several years.  *Cristina in the land of make believe*, THE ECONOMIST (May 1, 2008).  Argentina's inflation rate, as estimated by independent economists, remains

approximately 25% today.  *Argentina Central Bank to Continue Lending to Federal Government*, WALL ST. J. (August 17, 2012).

109.    According to Bank of America's chief economist, Mickey D. Levy, growing inflation in Argentina is the result of "the [Central Bank's] lack of independence from the government."  Hugo Alcado Mon, *They warn of inflation and debt*, LA NACIÓN (Nov. 4, 2005). Standard & Poor's has also questioned the lack of independence of Central Bank's monetary policy from the Argentine government in light of Argentina's escalating inflation.  *Standard & Poor's Criticized the BCRA's Monetary Policy,* LA NACIÓN (Oct. 24, 2005).

110.    It is therefore not surprising that the Executive Branch has resorted to outright manipulation of Argentina's "official" inflation statistics.  It accomplished this sleight of hand primarily by interfering with the activity of Argentina's National Statistics and Census Institute (known as "INDEC") – just as it created the inflation problem by interfering with the Central Bank.  As The Economist observed in 2008:

> Since January 2007, the official inflation rate has been doctored to remain in single digits, while the true figure has soared above 20%. When current President Cristina Fernández de Kirchner succeeded her husband as president last December, it was hoped that she might help restore the government's computational credibility, given that she had promised during her campaign to revamp the national statistics bureau.  Those expectations have now been dashed.  Rather than stopping the meddling that took place during Néstor Kirchner's administration, the new index merely formalises it.

*Hocus-pocus: Argentina's way with sums,* THE ECONOMIST (June 12, 2008); *see also* ("*Economics for Dummies*, WALL ST. J., (Feb. 20, 2007) ("Recently the Peronist government of President Néstor Kirchner sacked an official at its National Statistics and Census Institute for refusing to agree to alter the 'methodology' used to calculate inflation"); *Analysts calculate actual inflation*, LA NACIÓN (July 15, 2007) ("The heavy-handed manipulation of the retail price

index has created a huge gap between what is reported by INDEC and private calculations, which double the official estimate."); *Brazil and Argentina: the tortoise and the hare*, THE ECONOMIST (Mar. 19, 2008) (the government has "resorted to … baldly lying about the inflation rate").

111.    The Executive Branch has a strong incentive to hide Argentina's true inflation rate:  much of the Republic's outstanding debt is structured in the form of bonds whose yields are indexed to inflation.  Thus, by creating the illusion of lower inflation, Argentina can repay those lenders less than what is truly owed.  *IMF close to declaring that INDEC is unreliable,* LA NACIÓN (July 30, 2008); *If the INDEC recovers, USD 3.4 billion in debt will have to be paid,* PERFIL (Aug. 16, 2008).   In fact, according to the former head of INDEC, "'Argentina is in default. What was done with the indexes is a form of concealed default'" and that "a surge of lawsuits could be generated against the State from the holders of bonds adjusted by the CER [Reference Stabilization Rate]."  *Concealed default,*  AMBITO FINANCIERO (Aug. 25, 2008).

112.    The controversy over data manipulation by INDEC became so widespread that the IMF eventually instructed Argentina to use better tools for measuring inflation.  *See IMF questions INDEC:  will say that there are other indicators for inflation*, CLARÍN (Mar. 22, 2008); *IMF close to declaring that INDEC is unreliable,* LA NACIÓN (July 30, 2008) (reporting that the IMF was on the verge of declaring that INDEC's statistics could not be trusted); *Don't lie to me, Argentina*, THE ECONOMIST (Feb. 25, 2012) ("The IMF has 'noted' that Argentina is failing in its obligation to provide it with reliable figures, and made recommendations and set deadlines for it to improve.  However, when Argentina ignores it, the fund merely wrings its hands, laments the 'absence of progress' – and feebly sets a new deadline.").   Earlier this year, The Economist refused to continue publishing INDEC's inflation statistics because political manipulation had

made them too inaccurate to be useful to The Economist's readers. *Id.* ("We are tired of being an unwilling party to what appears to be a deliberate attempt to deceive voters and swindle investors.").

113.    Not surprisingly, the Central Bank was complicit in the Argentine government's manipulation of inflation figures.   The Central Bank's own unrealistically low inflation projection for 2008, between 7%-11%, ***precisely*** matches that of INDEC, leading one Argentine newspaper to comment that "Redrado is completely aligned with the position coming from administration officials."  *Central Bank says inflation won't exceed 11% in 2008,* CLARÍN (Dec. 27, 2007).   When asked about inflation after a speech before the Council of the Americas, President Fernández de Kirchner explicitly invoked the Central Bank's inflation figures to shore up the credibility of INDEC's projections. *See Speech of the President to the Council of the Americas in New York, September 25, 2008,* ("The truth is that the expectations of . . . the Central Bank coincide in the Report, more or less, with the statistics of the INDEC.") *available at* http://www.casarosada.gov.ar/index.php?option=com_content&task=view&id=5034&Itemid=66 (last visited Sept. 29, 2008).  The disparity between the official rate of inflation and the real rate of inflation remains just as wide today, with economists estimating that the real rate of inflation is approximately 25%, rather than just under 10% as reported by INDEC. *Argentina Central Bank to Continue Lending to Federal Government*, WALL ST. J. (August 17, 2012).

## III.    GIVING JUDICIAL RECOGNITION TO THE CENTRAL BANK'S ILLUSORY INDEPENDENCE WOULD INJURE EM AND NML

114.    Recognizing the Central Bank's illusory independence to shield the Central Bank's assets from Argentina's creditors would injure EM and NML by unjustly assisting the

Republic in avoiding the satisfaction of valid judgments that already exist (and that are anticipated to be entered) against it.

115.    As this Court has observed:  "[T]he Republic has thus far used every imaginative way in law and propriety to – and maybe not such propriety, but anyway, they want to block these plaintiffs from ever recovering a dime."  Hearing Transcript (May 30, 2008) at 12:7-14; *id*. at 26:2-23 ("I am not impressed with the morality of the Republic of Argentina in its absolute steadfast refusal to honor its lawful debts.").   Earlier this year, the Court explained that the "overriding problem" in this litigation is "the lawlessness of the Republic," which has turned "the most clear-cut obligations in the debt instruments ... into a dead letter" by refusing to pay those debts.  Hearing Transcript in No. 08 Civ. 6978 (TPG) (Feb. 23, 2012) at 49.

116.    Argentina's dealings with its Central Bank are entirely consistent with the Court's observations regarding the Republic's steadfast refusal to satisfy valid judgments entered against it.  At the same time that Argentina has exercised such extensive control over the Central Bank that a principal-agent relationship exists, Argentina has sought to shield the Central Bank's assets by contending that they technically are not Argentina's property.   That contention is demonstrably false, as evidenced by the examples above describing Argentina's actions both before and after it defaulted on its debt obligations.

117.    The falseness of Argentina's contention that the Central Bank's assets are not Argentina's property is further evidenced – and tacitly acknowledged – by the words of Argentina's former Cabinet Chief, Alberto Fernandez, in describing some of the measures taken by the Republic ***even before its default*** to avoid satisfying its post-default legal obligations to its creditors.  As Fernandez stated:

> Reserves of the Central Bank of the Argentine Republic on deposit
> in New York banks have been withdrawn, funds on deposit in the

> New York branch of Banco Nación have been repatriated, and
> salaries of Argentine officials posted to other countries are being
> deposited in Argentina or paid in the form of cash sent via
> diplomatic pouch, which has immunity.

*The government is protecting itself from attachment*, LA NACIÓN, (Feb. 5, 2004).   In fact,

between mid-2001 and 2003, the Central Bank, acting on the advice of the Argentine

government and its "international counsel," transferred billions of dollars of foreign exchange

reserves out of the United States to the BIS in Switzerland.  There would have been no reason to

shield those reserves from possible attachment unless they in fact belong to Argentina.

118.    Argentina's domination and control over the Central Bank causes its purportedly

separate juridical status to work a fraud and injustice on Plaintiffs.  The Central Bank is at the

heart of all efforts to pay the Republic's debts.  It serves as the Republic's centralized collection

point and repository for the U.S. dollars, which the Republic needs to pay dollar-denominated

debt.  It invests those dollar reserves with the BIS, and then employs those reserves solely at the

Argentine government's discretion and direction to pay only creditors favored by the Republic.

However, when disfavored creditors – such as Plaintiffs – seek to attach or execute upon the

Central Bank's dollar reserves, Argentina seeks to invoke the Central Bank's purportedly

separate status to block those creditors' efforts to be paid out of the same pool of dollars.  This

constitutes a fraud or injustice on Plaintiffs.

## COUNT I

### (For Declaratory Judgments)

119.    EM and NML repeat and reallege each and every allegation of Paragraphs 1

through 118 of this Third Amended Complaint as set forth herein.

120.    A justiciable and actual controversy exists before this Court with respect to

whether the Central Bank is an alter ego of Argentina.  A declaratory judgment resolving this

question is likely *(1)* to prevent future harm to EM and NML resulting from Argentina's abuse of the Central Bank's nominal independence to shield its assets from the Republic's creditors, *(2)* to clarify or settle the legal rights of the parties to this action, and/or *(3)* to terminate a principal source of the insecurity and/or controversy that brought about this action.

121.     An instrumentality like the Central Bank is an alter ego of its parent state when the parent state controls the instrumentality so extensively that a principal-agent relationship exists between them, or where giving effect to the nominal separateness of the instrumentality would work fraud or injustice.

122.     In this case, Argentina undoubtedly controls the Central Bank, as demonstrated by the facts set forth above.  Moreover, the nominal distinction between Argentina and the Central Bank is illusory and only serves to aid Argentina in improperly shielding its assets from creditors like EM and NML.

123.     Accordingly, EM and NML are entitled to a declaratory judgment expressly adjudging the Central Bank to be an alter ego of Argentina.

## COUNT II

**(For Money Judgment Against
The Central Bank In Favor Of EM)**

124.     EM repeats and realleges each and every allegation of paragraphs 1 through 123 of this Third Amended Complaint as set forth herein.

125.     On October 27, 2003, this Court entered the EM Judgment against Argentina for $724,801,662.56.  The EM Judgment became final and non appealable on November 30, 2004. As of August 31, 2012, the amount of the EM Judgment including interest owed by Argentina is $812,546,554.60.

126.     As an alter ego of Argentina, the Central Bank is jointly and severally liable for all of Argentina's obligations.   Accordingly, EM is entitled to a money judgment expressly adjudging the Central Bank jointly and severally liable for the EM Judgment.

## COUNTS III-VII

### (For Money Judgment Against
### The Central Bank In Favor Of NML)

127.     NML repeats and realleges each and every allegation of paragraphs 1 through 123 of this Third Amended Complaint as set forth herein.

128.     On December 18, 2006, this Court entered the NML-1 Judgment against Argentina for $284,184,632.20.   The NML-1 Judgment became final and non-appealable on February 16, 2007.   As of August 31, 2012, the amount of the NML-1 Judgment including interest owed by Argentina is $374,448,111.66.

129.     On June 1, 2009, this Court entered the NML-2 Judgment, as amended on June 16, 2009 and October 26, 2011, against Argentina for $311,177,898.00.   The NML-2 Judgment became final and non-appealable on November 25, 2012.   As of August 31, 2012, the amount of the NML-2 Judgment including interest owed by Argentina is $316,160,428.03.

130.     On June 1, 2009, this Court entered the NML-3 Judgment, as amended on June 16, 2009, against Argentina for $533,378,361.00.   The NML-3 Judgment became final and non-appealable on September 16, 2011.   As of August 31, 2012, the amount of the NML-2 Judgment including interest owed by Argentina is $541,918,728.80.

131.     On June 1, 2009, this Court entered the NML-5 Judgment, as amended on June 16, 2009, against Argentina for $148,781,936.00.   The NML-5 Judgment became final and non-appealable on September 16, 2011.   As of August 31, 2012, the amount of the NML-5 Judgment including interest owed by Argentina is $151,164,208.22.

132.     On June 1, 2009, this Court entered the NML-8 Judgment, as amended on June 16, 2009, against Argentina for $290,270,631.00.  The NML-8 Judgment became final and non-appealable on September 16, 2011.  As of August 31, 2012, the amount of the NML-8 Judgment including interest owed by Argentina is $294,918,397.26.

133.     As an alter ego of Argentina, the Central Bank is jointly and severally liable for all of Argentina's obligations.  Accordingly, NML is entitled to a money judgment expressly adjudging the Central Bank jointly and severally liable for the NML-1, NML-2, NML-3, NML-5, and NML-8 Judgments.

## COUNTS VIII THROUGH XIII

### (For Money Judgments Against The Central Bank In Favor Of NML)

134.     NML repeats and realleges each and every allegation of paragraphs 1 through 123 of this Third Amended Complaint as set forth herein.

135.     NML expects to be awarded separate judgments against Argentina in each NML-4, NML-6, NML-7, NML-9, NML-10, and NML-11.  As of August 31, 2012, the estimated amount of principal and accured interest in these six actions owed by Argentina is $960,763,622.97.

136.     As an alter ego of Argentina, the Central Bank is jointly and severally liable for all of Argentina's obligations.  Accordingly, NML will be entitled to separate money judgments expressly adjudging the Central Bank jointly and severally liable for any judgment awarded against Argentina in each NML-4, NML-6, NML-7, NML-9, NML-10, and NML-11.

WHEREFORE, based on the allegations set forth above and/or additional facts that will be revealed through discovery EM and NML pray for declaratory and money judgments against the Central Bank and Argentina,

a. declaring, pursuant to 28 U.S.C. § 2201, that the Central Bank is an alter ego of Argentina,

b. adjudging the Central Bank jointly and severally liable for the judgments that have been awarded, and that will be awarded, to EM and NML against Argentina based on Argentina's default on its sovereign debt,

c. for interest, costs, fees and other expenses associated with this action, including reasonable attorney fees, and

d. such other legal or equitable relief as this Court deems just and proper.

Dated:   August 31, 2012
          New York, New York

DEBEVOISE & PLIMPTON LLP

By:    /s/ Suzanne M. Grosso
        David W. Rivkin
        (dwrivkin@debevoise.com)
        John B. Missing
        (jmissing@debevoise.com)
        Suzanne M. Grosso
        (smgrosso@debevoise.com)
919 Third Avenue
New York, New York  10022
Tel. (212) 909-6000

*Attorneys for*
*Plaintiff EM Ltd.*

DECHERT LLP

By:    /s/ Dennis H. Hranitzky
        Robert A. Cohen
        (robert.cohen@dechert.com)
        Dennis H. Hranitzky
        (dennis.hranitzky@dechert.com)
        Eric C. Kirsch
        (eric.kirsch@dechert.com)
1095 Avenue of the Americas
New York, New York  10036
Tel. (212) 698-3500

GIBSON, DUNN & CRUTCHER LLP

By:    /s/ Matthew D. McGill
        Theodore B. Olson
        (tolson@gibsondunn.com)
        Matthew D. McGill
        (mmcgill@gibsondunn.com)
1050 Connecticut Avenue, NW
Washington, D.C.  20036
Tel. (202) 955-8500

*Attorneys for*
*Plaintiff NML Capital, Ltd.*

## <u>CERTIFICATE OF SERVICE</u>

I, Bethany A. Davis Noll, hereby certify that on August 31, 2012, I caused copies of the

within Third Amended Complaint  to be served by personal delivery upon the following counsel:

Joseph E. Neuhaus, Esq.
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
      *Counsel for Defendant Banco Central de la República Argentina*

Jonathan Blackman, Esq.
Carmine D. Boccuzzi, Esq.
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
      *Counsel for Defendant the Republic of Argentina*


                                    /s/ Bethany A. Davis Noll
                                      Bethany A. Davis Noll