UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------- X

EM LTD. and NML CAPITAL, LTD.,

               Plaintiffs,

           - against -

BANCO CENTRAL DE LA REPÚBLICA ARGENTINA
and THE REPUBLIC OF ARGENTINA,

              Defendants.

---------------------------------------------------------------------- X

06 Civ. 7792 (TPG)


**MEMORANDUM OF LAW OF THE REPUBLIC OF ARGENTINA IN SUPPORT OF
MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT PURSUANT
TO RULES 12(b)(1) AND 12(b)(6)**


CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000

Attorneys for the Republic of Argentina

Of Counsel:

    Jonathan I. Blackman
    Carmine D. Boccuzzi
    Christopher P. Moore

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................... ii

PRELIMINARY STATEMENT ........................................................................... 1

BACKGROUND .................................................................................................. 3

ARGUMENT ........................................................................................................ 5

I.   THE REPUBLIC IS IMMUNE FROM JURISICTION
     UNDER THE FSIA WITH RESPECT TO THIS ALTER EGO SUIT................. 5

II.  PLAINTIFFS FAIL TO ALLEGE SUFFICIENT FACTS TO
     SUPPORT A FINDING THAT BCRA IS THE REPUBLIC'S ALTER EGO...... 8

     A.  Plaintiffs Fail To Plead Day-To-Day Domination And Control...................... 9

     B.  The Complaint Does Not Allege Sufficient Facts
         To Support A Finding That "Fraud Or Injustice"
         Would Result If The Legal Separateness Of The
         Republic And BCRA Is Respected ................................................. 20

CONCLUSION...................................................................................................... 23

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alejandre v. Telefonica Larga Distancia De Puerto Rico, Inc.*,
183 F.3d 1277 (11th Cir. 1999) .................................................................... 20, 21

*Argentine Republic v. Amerada Hess Shipping Corp.*,
488 U.S. 428 (1989).................................................................................... 5

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..........................................................................8, 9, 11, 12-13

*Banco Central de Reserva del Peru v. Riggs Nat'l Bank of Washington D.C.*,
919 F. Supp. 13 (D.D.C. 1994) .................................................................. 20

*Bayer & Willis Inc. v. Republic of Gambia*,
283 F. Supp. 2d 1 (D.D.C. 2003) ................................................................ 20

*BCI Aircraft Leasing, Inc. v. Republic of Ghana*,
No. 06 C 0130, 2006 WL 2989291 (N.D. Ill. Oct. 13, 2006) ........................... 12

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..........................................................................8, 9, 12-13

*Berces v. Debrecem Tartositoipari Kombinat*,
No. 94 Civ. 3391 (KMW), 1995 U.S. Dist. LEXIS 16300 (S.D.N.Y. Mar. 15, 1995)....... 10

*Craig v. Lake Asbestos of Quebec, Inc.*,
843 F.2d 145 (3d Cir. 1988)....................................................................... 10

*De Castro v. SaniFill, Inc.*,
198 F.3d 282 (1st Cir. 1999)....................................................................... 10

*De Letelier v. Republic of Argentina*,
748 F.2d 790 (2d Cir. 1984)........................................................................ 9, 10

*Dow Jones & Co. v. Int'l Sec. Exch., Inc.*,
451 F.3d 295 (2d Cir. 2006)........................................................................ 11

*EM Ltd. v. Republic of Argentina*,
473 F.3d 463 (2d Cir. 2007)...................................................................1, 16, 17, 22

*EM Ltd. v. Republic of Argentina*,
720 F. Supp. 2d 273 (S.D.N.Y. 2010), *vacated sub nom.*, *NML Capital, Ltd. v. Banco Central De La República Argentina*, 652 F.3d 172 (2d Cir. 2011) ................................... 19

*EM Ltd. v. Republic of Argentina*,
865 F. Supp. 2d 415 (S.D.N.Y. 2012)................................................................ 22

*EM Ltd. v. Republic of Argentina*,
No. 08 Civ. 7974 (TPG), 2010 WL 3910604 (S.D.N.Y. Sept. 30, 2010)........................ 6

*First National City Bank v. Banco Para El Comercio Exterior de Cuba*,
462 U.S. 611 (1983)................................................................................2, 4, 8, 9, 20

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*,
905 F.2d 438 (D.C. Cir. 1990)........................................................................ 12, 14

*Gabay v. Mostazafan Found. Of Iran*,
151 F.R.D. 250 (S.D.N.Y. 1993) ..................................................................... 10, 22

*Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de Stat*,
713 F. Supp. 2d 267 (S.D.N.Y. 2010)................................................................... 10

*Glenny v. Am. Metal Climax, Inc.*,
494 F.2d 651 (10th Cir. 1974) .............................................................................. 8

*Hercaire Int'l, Inc. v. Argentina*,
821 F.2d 559 (11th Cir. 1987) ............................................................................ 20

*Hester Int'l Corp. v. Federal Republic of Nigeria*,
879 F.2d 170 (5th Cir. 1989) .......................................................................... 10, 16

*Kensington Int'l Ltd. v. Itoua*,
505 F.3d 147 (2d Cir. 2007)................................................................................. 7

*Kensington Int'l Ltd. v. Republic of Congo*,
No. 03 Civ. 4578 LAP, 2007 WL 1032269 (S.D.N.Y. Mar. 30, 2007)........................... 16

*Lewis v. Robinson (In re Am. Express Co. S'holder Litig.)*,
39 F.3d 395 (2d Cir. 1994).................................................................................. 11

*LNC Invs., Inc. v. Republic of Nicaragua*,
115 F. Supp. 2d 358 (S.D.N.Y. 2000), *aff'd sub nom.*,
*LNC Invs., Inc. v. Banco Central de Nicaragua*, 228 F.3d 423 (2d Cir. 2000) ................9-10, 12, 14

*Minpeco, S.A. v. Hunt*,
686 F. Supp. 427 (S.D.N.Y. 1988).................................................................10, 16-17, 22

*NML Capital, Ltd. v. Banco Central De La República Argentina*,
652 F.3d 172 (2d Cir. 2011), *cert. denied sub. nom*,
*EM Ltd. v. Republic of Argentina*, 133 S. Ct. 23 (2012)....................................... *passim*

iii

*NML Capital, Ltd. v. Republic of Argentina*,
No. 09 Civ. 7013 (TPG), 2011 WL 524433 (S.D.N.Y. Feb. 15, 2011) ............................ 12, 19

*O'Connor v. Donaldson*,
422 U.S. 563 (1975) ..................................................................................... 19

*Phoenix Canada Oil Co. v. Texaco, Inc.*,
842 F.2d 1466 (3d Cir. 1988) ........................................................................ 14

*Pravin Banker Assocs., Ltd. v. Banco Popular del Peru*,
9 F. Supp. 2d 300 (S.D.N.Y. 1998) ............................................................... 9, 20

*Reers v. Deutsche Bahn AG*,
320 F. Supp. 2d 140 (S.D.N.Y. 2004) ............................................................ 14

*Saudi Arabia v. Nelson*,
507 U.S. 349 (1993) ..................................................................................... 7

*Scheidemann v. Qatar Football Ass'n*,
No. 04 Civ. 3432 (LAP), 2008 WL 144846 (S.D.N.Y. Jan. 15, 2008) ............................ 9

*Schweyer Import-Schnittholz GmbH v. Genesis Capital Fund, L.P.*,
220 F.R.D. 582 (S.D. Iowa 2004) ................................................................... 8

*Seijas v. Republic of Argentina*,
No. 10 Civ. 4300 (TPG), 2011 WL 1137947 (S.D.N.Y. Mar. 28, 2011),
*aff'd*, No. 11-1714-cv, 2012 WL 5259030 (2d Cir. Oct. 25, 2012) ............................ 11-12, 13-14, 19

*Seijas v. Republic of Argentina*,
No. 11-1714-cv, 2012 WL 5259030 (2d Cir. Oct. 25, 2012) ............................ 12, 17

*Transamerica Leasing, Inc. v. La Republica de Venezuela*,
200 F.3d 843 (D.C. Cir. 2000) ..................................................................... 12

*United States v. Bestfoods*,
524 U.S. 51 (1998) ..................................................................................... 14

*Wornick v. Gaffney*,
544 F.3d 486 (2d Cir. 2008) ......................................................................... 22

**Rules and Statutes**

28 U.S.C. § 1604 ......................................................................................... 4, 5

28 U.S.C. § 1605 ......................................................................................... 5

28 U.S.C § 1605(a)(1) .................................................................................. 6

28 U.S.C § 1605(a)(2) .................................................................................. 6

iv

**Other Authorities**

H.R. Rep. No. 94-1487 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604 ............................ 9

M.H. de Kock, *Central Banking* (4th ed. 1974)................................................................. 18

*The Federal Reserve's Response to the Crisis*,
http://federalreserve.gov/monetarypolicy/bst_crisisresponse.htm
(last visited Nov. 27, 2012)............................................................................................... 18

Defendant the Republic of Argentina (the "Republic") submits this memorandum of law in support of its motion to dismiss the third amended complaint filed by plaintiffs EM Ltd. ("EM") and NML Capital, Ltd. ("NML") on August 31, 2012 (the "Complaint" or "TAC") against the Republic and Banco Central de la República Argentina ("BCRA") pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## PRELIMINARY STATEMENT

The Complaint is plaintiffs' latest attempt to hold BCRA, the central bank of Argentina and a wholly-separate instrumentality, liable for their judgments against the Republic.  It follows their two previous attempts – both rejected by the Second Circuit – to lay claim to BCRA reserves at the Federal Reserve Bank of New York (the "FRBNY").  *See NML Capital, Ltd. v. Banco Central De La República Argentina*, 652 F.3d 172, 196-97 (2d Cir. 2011) ("The April 7, 2010 opinion and all associated orders of the District Court are vacated."), *cert. denied sub. nom*, *EM Ltd. v. Republic of Argentina*, 133 S. Ct. 23 (2012); *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 476 (2d Cir. 2007) ("[G]overnment instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such.") (internal quotation marks omitted).  In rejecting plaintiffs' second attempt, the Second Circuit expressly noted the lack of subject matter jurisdiction for plaintiffs' claims to reserves at the FRBNY and remanded to this Court for further proceedings in accordance with its opinion.  *See NML Capital*, 652 F.3d at 196-97.  Consistent with those rulings and the relevant legal standards, this latest Complaint should be dismissed for at least two reasons.[1]

---

[1] The Republic joins in and incorporates the arguments made by BCRA in its Memorandum of Law in Support of its Motion to Dismiss ("BCRA's Brief"), dated November 27, 2012.

*First*, this Court lacks jurisdiction over the Republic with respect to the instant alter ego suit.  The contractual waiver of immunity related to the Republic's bonds covers suits "solely" for the adjudication of *its* liability and the enforcement of resulting judgments against it.  It does not provide a basis for jurisdiction to establish a general alter ego relationship over a third party, as sought in the Complaint.  And in any case, plaintiffs offer no pleading demonstrating the availability of executable BCRA assets in New York against which their judgments can be enforced.  The Court of Appeals has already held that this Court did not have subject matter jurisdiction over plaintiffs' claim to BCRA reserves at the FRBNY (on an alter ego theory), and the Complaint provides no alternative basis for subject matter jurisdiction here.

*Second*, the allegations contained in plaintiffs' Complaint are in any event insufficient to support a finding that BCRA, an instrumentality presumptively separate from the Republic and not liable for its debts, is the alter ego of the Republic under *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*").  It is well-settled that plaintiffs must plead facts demonstrating that the Republic exercised *day-to-day* control over BCRA in order overcome this presumption of separateness; the Complaint lacks sufficient allegations to support such a finding.  This is not surprising, as plaintiffs' theory is not that the Republic dominated the day-to-day operations of BCRA, but that BCRA is not, in the view of plaintiffs, sufficiently "independent" from the Republic.  That is not the *Bancec* standard, and, if accepted by the Court, would lead to absurd results.  As the Second Circuit explained, plaintiffs' "independence" theory "renders BCRA *more* independent than the Federal Reserve System, the central bank of the United States, and *more* independent than the Bank of England, the central bank of the United Kingdom."  *NML Capital*, 652 F.3d at 190 (emphasis in original).  The fact that the Republic is BCRA's parent government and, like all parent governments, has the powers

and rights inherent in any ownership relationship, falls far short of what is necessary to satisfy the *Bancec* standard.  Nor are plaintiffs' theories improved by their allegations that BCRA has, from time to time and in accordance with Argentine law, loaned funds to the Republic to repay international creditors.  Many central banks loan funds to their parent states as well as to their financial systems, and no case has ever held that such loans satisfy *Bancec's* requirements for treating a central bank as the alter ego of its parent state.

The Complaint should be dismissed.

## BACKGROUND

Plaintiffs EM and NML are judgment creditors of the Republic that have obtained final judgments in six separate actions (and summary judgment in another six actions) on bonds purchased at deep discounts both immediately before and long after the Republic's default.  *See* TAC ¶¶ 16-30.  In the underlying actions between plaintiffs and the Republic, the Court exercised subject matter jurisdiction pursuant to the Republic's waiver of sovereign immunity in the Fiscal Agency Agreement (the "FAA") that governs plaintiffs' bonds, which provides that the Republic has waived immunity as to "any suit, action, or proceeding against it . . . with respect to the Securities of this Series or the Fiscal Agency Agreement (a 'Related Proceeding')."  *See* FAA at A-17-A-18 (Ex. P).[2]  The FAA waiver provides further that the Republic waived immunity under the FAA in any suit "brought *solely* for the purpose of enforcing or executing" any judgment obtained in a Related Proceeding.  *See id.* at A-18 (emphasis added) (Ex. P).

BCRA has been the central bank of the Republic since its founding in 1935.  BCRA is not a party to the FAA, and had no involvement in the Republic's 2001 default or in the

---

[2] All exhibits are attached to the accompanying Declaration of Carmine D. Boccuzzi in Support of the Republic's Motion to Dismiss Pursuant to Rules 12(b)(1) and 12(b)(6), dated Nov. 27, 2012.

Republic's non-payment of plaintiffs' judgments.  BCRA's powers and duties are set forth in Law No. 24,144, last amended March 8, 2012 (referred to in the Complaint and here as the "Charter"), which dictates that BCRA is "a self-administered institution of the [Republic]."  *See* Charter Art. 1 (Ex. A).  Accordingly, plaintiffs concede that BCRA is an agency or instrumentality of the Republic, *see, e.g.*, TAC ¶ 10, and therefore is entitled to a presumption of separateness from the Republic, as well as its own sovereign immunity under the FSIA.  *See Bancec*, 462 U.S. at 627; 28 U.S.C. § 1604.

As an independent government entity, BCRA is managed by a board of directors appointed by the National Executive Power with the consent of the Senate, with each director serving a six-year term.  *See* Charter Art. 6, 7 (Ex. A).  The board of directors has numerous powers, including making decisions regarding monetary and exchange markets, determining interest rates, demonetizing bank notes and coins from circulation, providing rules for BCRA organization and management, and preparing and submitting for approval an annual budget.  *See id.* Art. 14, 15 (Ex. A).  BCRA directors must be qualified in monetary, banking, or finance-oriented law, *see id.* Art. 6 (Ex. A), and are neither considered for, nor may they serve as, employees of the national, provincial, or municipal government, *see id.* Art. 8(a) (Ex. A).  These directors in turn appoint BCRA's deputy general managers.  *See id.* Art. 15(b) (Ex. A).  BCRA has the legal authority to purchase and sell property in its own name, establish and maintain bank accounts in its own name, and sue and be sued in a court of law in its own name.  *See id.* Art. 18, 33 (Ex. A).

Pursuant to BCRA's Charter as amended on March 8, 2012, BCRA's purpose includes "promoting monetary stability, financial stability, employment, and economic development with social equality, insofar as its authority allows and within the framework of the policies

established by the national government." *See id.* Art. 3 (Ex. A).  Both in support of and in addition to this function, BCRA is charged with the power and responsibility of monitoring the performance of the financial markets, fostering and strengthening the development of capital markets, implementing an exchange policy in accordance with congressional legislation, and acting as a fiscal agent for the Republic before international monetary entities.  *See id.* Art. 4 (Ex. A).

Plaintiffs contend that BCRA is the alter ego of the Republic because, according to plaintiffs: 1) the Republic has appointed seven BCRA Governors since 1996, TAC ¶¶ 76-96; 2) the Republic "dictates" monetary policy, TAC ¶¶ 97-113; 3) the Republic has enacted various laws that allow BCRA to loan the Republic money, TAC ¶¶ 34-35; and 4) the Republic has used funds borrowed from BCRA to satisfy the Republic's debts to other creditors, TAC ¶¶ 36-75. None of these allegations amounts to the day-to-day control or dominance required to overcome the strong presumption of separateness mandated by *Bancec*.  Instead, the facts alleged in support of these claims, as distinguished from the conclusory assertions littering the Complaint, merely establish that BCRA is a government instrumentality that performs the functions of a traditional central bank.

## ARGUMENT

## I.    THE REPUBLIC IS IMMUNE FROM JURISICTION UNDER THE FSIA WITH RESPECT TO THIS ALTER EGO SUIT

The FSIA provides the sole basis for jurisdiction over a foreign state in United States courts.  *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). Under Section 1604 of that statute, a foreign sovereign is presumptively immune from suit unless one of the enumerated exceptions set forth in Section 1605 apply.  *See* 28 U.S.C. §§ 1604-1605. Plaintiffs allege in their Complaint that the Court has subject matter jurisdiction over this action

under two of these exceptions: 1) that this suit falls under the Republic's waiver of sovereign immunity "in connection with any action to enforce a judgment based on Plaintiffs' bonds," *see* TAC ¶ 11; 28 U.S.C § 1605(a)(1), and 2) that this alter ego suit is based "upon commercial activities that Argentina undertakes in the United States," *see* TAC ¶ 12; 28 U.S.C § 1605(a)(2). Plaintiffs are wrong on both counts.

First, plaintiffs' reliance on the Republic's waiver of its immunity in any suit "brought *solely* for the purpose of enforcing or executing" any judgment against the Republic based upon the bonds is misplaced. *See* FAA at A-17-A-18 (Ex. P) (emphasis added). That provision does not cover suits against third parties for the sweeping declaratory relief sought by plaintiffs here – plaintiffs have not commenced this alter ego suit "solely" to enforce or execute on their related judgments, but in an apparent effort to redefine the legal relationship between the Republic and its central bank. Indeed, plaintiffs seek a declaration from this Court that BCRA is liable for *all* of the Republic's debts – whether they have anything to do with the bonds or not.

Moreover, plaintiffs fail to plead any facts that would link the desired alter ego finding to an enforcement of plaintiffs' judgments. To the extent plaintiffs claim that such a finding would allow them to execute on BCRA's reserves at the FRBNY, the Court of Appeals has already rejected plaintiffs' attempt to do just that, concluding that there was no subject matter jurisdiction over such an execution and remanded the case to this Court "for further proceedings consistent with [its] opinion." *NML Capital, Ltd.*, 652 F.3d at 197. With no basis pleaded for enforcement here, subject matter jurisdiction still does not exist. *See EM Ltd. v. Republic of Argentina*, No. 08 Civ. 7974 (TPG), 2010 WL 3910604, at *4 (S.D.N.Y. Sept. 30, 2010) (recognizing "a most serious question about whether the [alter ego] allegations provide a sufficient jurisdiction basis" once orders attaching assets had been vacated).

In the alternative, plaintiffs contend that their suit is "based both upon commercial activities that Argentina undertakes in the United States, and upon activities that the Central Bank undertakes in the United States as fiscal agent for and as an alter ego of Argentina." *See* TAC ¶ 12.  But to establish "based upon" jurisdiction under the FSIA, plaintiffs not only need to identify specific commercial activity of the Republic in the United States, but also demonstrate that a "'degree of closeness' [] exist[s] between the commercial activity and the gravamen of plaintiff[s'] complaint." *See Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 156 (2d Cir. 2007); *see also Saudi Arabia v. Nelson*, 507 U.S. 349, 357 (1993).

As an initial matter, plaintiffs fail to plead that the Republic undertook a single commercial act in the United States upon which their alter ego claim is based.  Plaintiffs assert that their claim is based upon the Republic's use of BCRA as its "fiscal agent," *see* TAC ¶ 12, but the Complaint is devoid of allegations explaining what actions, if any, BCRA has undertaken in the United States as the Republic's fiscal agent, how a "fiscal agent" equates to an alter ego of the Republic, or why that activity is a basis for plaintiffs' alter ego claim.  *Cf. NML Capital, Ltd.*, 652 F.3d at 192 (noting that BCRA's "acting as the Republic's financial agent and as depository and agent for the Republic before international monetary, banking and financial entities . . . are traditional activities of central banks") (internal quotation marks omitted).  Plaintiffs' remaining allegations are all based on "examples" of the Republic's purported control of BCRA that are claimed to have occurred *outside* of the United States – *e.g.*, the loans from BCRA to the Republic, the replacement of BCRA's Governors, and the formulation of monetary policy.[3] None of this suffices to create jurisdiction here.

---

[3] For the reasons set forth in BCRA's Brief, the Court is also without subject matter jurisdiction to decide this alter ego action as it pertains to BCRA.  In the event the Court accepts, as it should, BCRA's contention that plaintiffs have failed to establish that an exception to immunity under Section 1605 applies to it, the Court should also dismiss plaintiffs' complaint in its entirety pursuant to Federal Rules of

II.   **PLAINTIFFS FAIL TO ALLEGE SUFFICIENT FACTS TO SUPPORT A FINDING THAT BCRA IS THE REPUBLIC'S ALTER EGO**

To survive a motion to dismiss for failure to state a claim for which relief may be granted, plaintiffs' Complaint must provide sufficient "facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). Similarly, a complaint is insufficient to state a claim "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Accordingly, the Court should begin its analysis by identifying any conclusory allegations not entitled to the presumption of truth. *See id.* at 679. Once these allegations are shorn from the Complaint, the Court then should determine whether the remaining factual allegations state a plausible claim for relief. *See id.* at 677-79.

Requiring the pleading of sufficient factual allegations is all the more important here because the presumption of separateness afforded BCRA does not merely evidence a respect for the legal distinction between juridical entities, but also reflects important policies underlying the FSIA. *See Bancec*, 462 U.S. at 627 ("Congress [has] clearly expressed its intention that duly created instrumentalities of a foreign state are to be accorded a presumption of independent

Civil Procedure 12(b)(7) and 19(b). BCRA is a necessary party to this action, and plaintiffs' alter ego suit may not proceed without it. *See Glenny v. Am. Metal Climax, Inc.*, 494 F.2d 651, 654-55 (10th Cir. 1974) (rejecting the use of alter ego theory as a basis for not joining a necessary party or avoiding jurisdictional requirements); *Schweyer Import-Schnittholz GmbH v. Genesis Capital Fund, L.P.*, 220 F.R.D. 582, 591 (S.D. Iowa 2004) (finding that alleged alter ego was necessary party to adjudication of alter ego theory and granting motion to dismiss under Rule 12(b)(7)).

status."); *see also* H.R. Rep. No. 94-1487, at 29-30 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6628-29 ("If U.S. law did not respect the separate juridical identities of different agencies or instrumentalities, it might encourage foreign jurisdictions to disregard the juridical divisions between different U.S. corporations or between a U.S. corporation and its independent subsidiary.").  Accordingly, courts have routinely emphasized that the presumption must be applied with force, and "should not be easily defeated."  *Pravin Banker Assocs., Ltd. v. Banco Popular del Peru*, 9 F. Supp. 2d 300, 305 (S.D.N.Y. 1998); *see also De Letelier v. Republic of Argentina*, 748 F.2d 790, 795 (2d Cir. 1984) ("[B]oth *Bancec* and the FSIA legislative history caution against too easily overcoming the presumption of separateness."); *Scheidemann v. Qatar Football Ass'n*, No. 04 Civ. 3432 (LAP), 2008 WL 144846, at *5 (S.D.N.Y. Jan. 15, 2008) (noting that "veil-piercing is the 'rare exception,' applied only in exceptional circumstances" and granting motions to dismiss).

To overcome this strong presumption, plaintiffs must allege sufficient facts to establish: 1) that the Republic has exercised such a degree of control over BCRA as to transform BCRA into the alter ego of the Republic; or 2) that recognizing the separate legal status of BCRA would work a fraud or injustice.  *See Bancec*, 462 U.S. at 626-27.  Plaintiffs' Complaint fails as a matter of law to meet this standard, because its factual allegations, as distinguished from its conclusory assertions, do not "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 679 (pleadings that "are no more than conclusions[] are not entitled to the assumption of truth").

### A.  Plaintiffs Fail To Plead Day-To-Day Domination And Control

To state a plausible claim for alter ego liability under *Bancec's* first prong, plaintiffs must plead enough facts to establish that the Republic "exercises extensive control over [BCRA's]

daily operations *and* abuses the corporate form." *LNC Invs., Inc. v. Republic of Nicaragua*, 115 F. Supp. 2d 358, 363 (S.D.N.Y. 2000) (emphasis added), *aff'd sub nom.*, *LNC Invs., Inc. v. Banco Central de Nicaragua*, 228 F.3d 423 (2d Cir. 2000); *see also De Letelier*, 748 F.2d at 794 (no abuse of corporate form where Chile and LAN, the Chilean state-owned airline, participated in assassination conspiracy; district court made "no finding that LAN's separate status was established to shield its owners from liability for their torts or that Chile ignored ordinary corporate formalities").  This requirement of day-to-day control is necessary to distinguish entities utterly dominated by their parent from ordinary agencies or instrumentalities that are subject to the control common to any ownership relationship.  *See Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de Stat*, 713 F. Supp. 2d 267, 279 (S.D.N.Y. 2010) (*Bancec* presumption not overcome where plaintiff failed to demonstrate Romanian government's exercise of sufficient day-to-day control, and distinguishing powers incident to majority ownership); *Minpeco, S.A. v. Hunt*, 686 F. Supp. 427, 435 (S.D.N.Y. 1988) (day-to-day control required for alter ego finding rather than mere powers incident to wholly-owning a corporation). Accordingly, numerous decisions, both from this Circuit and elsewhere, have emphasized the need for such daily control when evaluating an alter ego claim under *Bancec*.  *See, e.g.*, *Gen. Star*, 713 F. Supp. 2d at 279; *LNC Invs.*, 115 F. Supp. 2d at 363; *Berces v. Debrecem Tartositoipari Kombinat*, No. 94 Civ. 3391 (KMW), 1995 U.S. Dist. LEXIS 16300, at *13 (S.D.N.Y. Mar. 15, 1995); *Gabay v. Mostazafan Found. Of Iran*, 151 F.R.D. 250, 254 (S.D.N.Y. 1993); *Minpeco*, 686 F. Supp. at 435;  *De Castro v. SaniFill, Inc.*, 198 F.3d 282, 284-85 (1st Cir. 1999); *Craig v. Lake Asbestos of Quebec, Inc.*, 843 F.2d 145, 152 (3d Cir. 1988); *Hester Int'l Corp. v. Federal Republic of Nigeria*, 879 F.2d 170, 181 (5th Cir. 1989).  Plaintiffs have failed to meet this pleading burden here.

*Plaintiffs' allegations regarding the replacement of BCRA's Governors does not establish day-to-day control*.  In support of their contention that the Republic exerted day-to-day control over BCRA, plaintiffs primarily rely on the assertion that the Republic has appointed seven BCRA Governors since 1996.  This was allegedly due to disagreements between the Republic's Executive Branch and the respective BCRA Governor over the country's monetary policy and/or BCRA's "independence."  *See* TAC ¶ 79.  Rather than plead factual allegations, plaintiffs instead principally rely on their own conclusions or the impressions and conclusory assertions of various newspaper reports.[4]  Of course, such opinions and conclusions are entitled to no weight.  *See Iqbal*, 556 U.S. at 679; *Dow Jones & Co. v. Int'l Sec. Exch., Inc.*, 451 F.3d 295, 307-08 (2d Cir. 2006) ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.") (internal quotation marks omitted); *Lewis v. Robinson (In re Am. Express Co. S'holder Litig.)*, 39 F.3d 395, 400 n.3 (2d Cir. 1994) (conclusory allegations "need not be accepted as true for the purposes of ruling on a motion to dismiss").

But even ignoring this deficiency, plaintiffs' alter ego theory fails because the authority to hire and fire does not equate to day-to-day domination.  *See Seijas v. Republic of Argentina*, No. 10 Civ. 4300 (TPG), 2011 WL 1137947, at *12 (S.D.N.Y. Mar. 28, 2011) (this Court

---

[4] *See, e.g.*, TAC ¶ 82 (relying on editorial from *La Nacion*, which concluded that Aldo Pignanelli was replaced as a result of a culture based on the belief "that the Central Bank can be constantly subjected to political winds of fortune"); *id.* ¶ 85 (relying on Euromoney's conclusion that Prat-Gay was not reappointed due to a difference of opinion as to the "degree of independence that a central bank should have"); *id.* ¶ 86 (relying on unnamed analyst for conclusion that "Prat-Gay got fired because he was trying to be independent"); *id.* ¶ 88 (relying on opinion of Moody's analyst that termination of Governor Martin Redrado "underscores the lack of importance the government attributes to the central bank's independence").  Such articles are no different than opinions offered by various politicians and writers in the United States that have questioned the independence of Federal Reserve Chairman Ben Bernanke. *See, e.g.*, David Jackson, *Conservatives: Bernanke Trying to Help Obama*, USA Today, Sept. 16, 2012 (Ex. B).  Plaintiffs of course do not contend that the Federal Reserve is the alter-ego of the United States Government, and thus liable for its debts.

holding "insufficient evidence of day-to-day or excessive control" despite allegations that BNA had ten chairmen in eleven years and that the Republic forced chairmen to resign and appointed political allies), *aff'd*, No. 11-1714-cv, 2012 WL 5259030, at *2 (2d Cir. Oct. 25, 2012) (summary order) (holding allegation, *inter alia*, that Republic appointed and removed bank directors "insufficient to establish the extensive control necessary to sustain an alter ego claim").

It is not only common, but entirely appropriate, for a parent government to have the ability to appoint and remove governing board members, and to exercise that ability. *See, e.g.*, *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 849 (D.C. Cir. 2000) ("If majority stock ownership and appointment of the directors were sufficient, then the presumption of separateness announced in *Bancec* would be an illusion."); *NML Capital, Ltd. v. Republic of Argentina*, No. 09 Civ. 7013 (TPG), 2011 WL 524433, at *6 (S.D.N.Y. Feb. 15, 2011) ("[T]he Republic in effect owns ENARSA and appoints the controlling majority of its board. The law is clear that, in and of itself, this situation does not create an alter ego relationship."); *BCI Aircraft Leasing, Inc. v. Republic of Ghana*, No. 06 C 0130, 2006 WL 2989291, at *8 (N.D. Ill. Oct. 13, 2006) ("The Republic of Ghana removed the airline's Board of Directors and management 'in one fell swoop' and appointed the Government Task Force, a government agency, to serve as both board and management. However, a sovereign does not create an agency relationship by appointing a corporation's Board of Directors."); *see also* *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438 (D.C. Cir. 1990) (collecting cases); *LNC Invs.*, 115 F. Supp. 2d at 365-66 (collecting cases). The power to hire and fire is precisely the type of authority incident to ownership, and therefore does not, and cannot, evidence an alter ego relationship.[5]

---

[5] Plaintiffs also overlook that BCRA is not managed exclusively by its Governor, but rather a ten-member board. *See* Charter Art. 6 (Ex. A); *see also id.* Art. 12 (setting forth board procedures) (Ex. A). The

A critical examination of the Complaint also reveals that the purportedly high turnover rate identified by plaintiffs in fact was clustered around the Republic's historic economic collapse in 2001 and 2002.  During that two year period, five of the seven individuals identified by plaintiffs held the position of Governor, *see* TAC ¶ 80 – as the Court may recall, the Republic also had five different Presidents in early 2002 as a result of the social and political turmoil associated with the Republic's worst economic crisis in modern history.  *See* Larry Rohter, *Bank Holiday And Creditors Add to Crisis In Argentina*, N.Y. Times, Apr. 22, 2002 (Ex. N).  A purportedly high rate of turnover within government agencies during the height of an economic crisis proves nothing.  Notably, during the past ten years (*i.e.*, since December 2002), BCRA has had only three Governors, one of which, Alfonso Prat-Gay, served out his term and was simply not reappointed, *see* TAC ¶ 83, and a second of which, Mercedes Marco del Pont, remains Governor, *see* TAC ¶ 79.

*Plaintiffs' have failed to allege sufficient facts regarding the Republic's purported control over monetary policy to establish alter ego liability.*  Plaintiffs next contend that BCRA is the Republic's alter ego because the Republic purportedly "dictates monetary policy."  *See* TAC ¶ 32.  But of course, the rights and powers inherent in being a parent government include having a say over major policy decisions, which in the case of a central bank, include monetary policy.  *See Seijas*, 2011 WL 1137947, at *12 (noting that bank was required to carry out certain

---

board of directors has numerous powers, including making decisions regarding monetary and exchange markets, determining interest rates, demonetizing bank notes and coins from circulation, providing rules for BCRA organization and management, and preparing and submitting for approval an annual budget. *See id.* Art. 14-15.  Plaintiffs offer no allegations with regard to these board members, and thus their claim that BCRA as a whole is excessively controlled by the Republic as a result of the replacement of BCRA's Governors is simply implausible.  *See Twombly*, 550 U.S. at 570 (requiring complaints to allege enough facts to state a claim to relief "that is plausible on its face); *see also Iqbal*, 556 U.S. at 679 ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," dismissal is appropriate).

government policies, but recognizing that "instrumentalities of states regularly carry out the states' policies without becoming an alter ego of the state."); *LNC Invs.*, 115 F. Supp. 2d at 364 ("general supervisory role over the Central Bank's operations" did not support alter ego finding); *Foremost-McKesson*, 905 F.2d at 440 ("[M]ere involvement by the state in the affairs of an agency or instrumentality does not answer the question whether the agency or instrumentality is controlled by the state for purposes of FSIA."); *see also United States v. Bestfoods*, 524 U.S. 51, 72 (1998) (holding that a parent can supervise decisions and set policies of subsidiary without forfeiting limited liability); *Phoenix Canada Oil Co. v. Texaco, Inc.*, 842 F.2d 1466, 1476 (3d Cir. 1988) (no alter ego finding where parent approved subsidiary's "large investments and acquisitions or disposals of major assets"); *Reers v. Deutsche Bahn AG*, 320 F. Supp. 2d 140, 158 (S.D.N.Y. 2004) ("[A] parent of a multinational corporate enterprise may make broad policy decisions for its subsidiaries.  Such control is inherent in the parent-subsidiary relationship and does not justify labeling a subsidiary a mere department of the parent.") (internal quotation marks omitted)).  BCRA's charter in fact specifically contemplates coordination between BCRA and the Government.  *See* Charter Art. 29 ("BCRA shall . . . [a]dvise the Ministry of Economy and the National Congress on the exchange system, and establish the relevant general regulations.") (Ex. A); *id.* Art. 12 (Ministry of economy representative may attend Board meetings) (Ex. A).  Even assuming the Republic has, as plaintiffs claim, formulated a policy to buy or sell dollars in order to obtain a desired exchange rate, that does not establish an alter ego relationship.

This conclusion is further supported by the fact that it is common for central banks and their parent governments to coordinate monetary policy, including here in the United States.  *See* John Nugee, *Foreign Exchange Management*, Handbooks in Central Banking no. 19, Centre for

Central Banking Studies; Bank of England, at 12 "([H]owever independent a central bank is, the

ultimate decisions on a country's currency . . . are usually taken by the government.") (Ex. Q);

Treasury Dep't, *Annual Report to Congress on Int'l Economic Exchange Rate Policy*, Nov. 1,

1996 to Oct. 31, 1998, at 10 (describing U.S. monetary authorities' June 1998 intervention in

foreign exchange markets) (Ex. O).  Such relationships can draw criticism from the press and

politicians both in Argentina and in the United States, *see, e.g.*, Michael Grunwald, *Person of the*

*Year 2009: Ben Bernanke*, Time, Dec. 16, 2009, at 2 (highlighting Bernanke's "aggressive steps

to avert doomsday – and his unusually close partnerships with Bush and Obama Treasury

Secretaries Henry Paulson and Timothy Geithner," which "have exposed him and his institution

to criticism from all directions") (Ex. D), but such criticism does not support the conclusion that

a central bank is dominated by its parent state, nor does coordination between a central bank and

its parent government on monetary policy make the central bank the parent's alter ego.[6]

    *Plaintiffs' remaining allegations have no connection to day-to-day control and fail to*

*establish Republic domination*.  Plaintiffs otherwise cite several laws and decrees governing

BCRA's operations that were enacted during and after the Republic's financial crisis, arguing

that such laws establish excessive control by the Republic.  *See* TAC ¶ 34.  Plaintiffs are wrong.

Of the 18 laws cited, 16 concern at least in part the loaning of money from BCRA to the

Republic.[7]  But plaintiffs offer no explanation for how the enactment of laws allowing for the

---

[6] Plaintiffs also offer the conclusion that the Republic controls how BCRA's monetary policy is implemented by having "taken over the day-to-day Central Bank activities of buying and selling currency and securities," *see* TAC ¶ 32, but utterly fail to support this conclusion with any well-pleaded factual allegations.

[7] Nor do the other two laws support plaintiffs' theory.  Executive Decree 1373/1999, according to plaintiffs, grants the Executive the authority to fill posts at BCRA "in commission," and therefore concerns the appointment of BCRA's Governors, which is addressed *supra*.  Executive Decree 401/2002, according to plaintiffs, increased the ability of financial institutions other than BCRA to meet reserve requirements with government bonds.  Plaintiffs do not and cannot explain how this has anything to do

*loaning* of money from a central bank to its government amounts to such extreme control as to overcome the strong presumption of separateness to which BCRA is entitled.  Further, seven of these laws are permissive, *i.e.*, they simply increased the amount BCRA may loan to the Republic or otherwise removed restrictions on BCRA.  These provisions do not further plaintiffs' alter ego claim.  *See Hester Int'l*, 879 F.2d at 178-79 ("Whether latent powers were reserved by the sovereign is irrelevant") (internal quotation marks omitted); *see also EM Ltd. v. Rep. of Argentina*, 473 F.3d 463, 480 (2d Cir. 2007) ("*Bancec* forecloses any argument that all of BCRA's $26.8 billion in reserves are 'attachable interests' of the Republic merely because the Republic hypothetically *could have* ordered (but in the Decrees did not order) BCRA to assign or transfer the FRBNY Funds.") (emphasis in original).

Further, plaintiffs do not dispute that these laws and decrees were duly enacted under Argentine law.  It surely cannot be an abuse of the corporate form to publicly and transparently enact valid legislation or decrees for all to see.[8]  To the contrary, courts that have found an abuse of the corporate form have relied on a parent's secretive and dishonest use of its agency or instrumentality in reaching such a conclusion.  *See, e.g.*, *Kensington Int'l Ltd. v. Republic of Congo*, No. 03 Civ. 4578 (LAP), 2007 WL 1032269, at *9, *11-12 (S.D.N.Y. Mar. 30, 2007) (resting alter ego determination on finding that the Republic of Congo engaged in "charades for the purpose of confounding its creditors;" "comming[ed]" state and instrumentality assets; and "denied access" to records in the course of an audit by the IMF and World Bank); *see also*

---

with BCRA's status, and it certainly has nothing to do with day-to-day control; it is the kind of policy decision commonly made by elected officials.

[8] Plaintiffs appear to take issue with the use of presidential decrees to regulate BCRA rather than congressional law, but this is a red herring.  Plaintiffs do not allege that the decrees are invalid under Argentine law, and for the reasons stated here, they are manifestly insufficient to establish an alter ego relationship.

*Minpeco*, 686 F. Supp. at 432-33 (relying on corporations' law for examples of abuse of corporate form, including using the corporation as a façade for the operations of the dominant stockholder and absence of corporate records).

Plaintiffs also contend that BCRA is the Republic's alter ego because the Republic exercised the authority provided by these laws and borrowed funds from BCRA in order pay debts to international creditors. However, a parent government's borrowing of funds from its instrumentality is insufficient to establish alter ego liability as a matter of law. The Second Circuit recently reached this very conclusion, affirming a decision by this Court and holding that the allegation that the state-owned bank BNA made loans to the Republic in violation of its governing charter, even if accepted as true, is insufficient to establish the necessary extensive control for alter ego liability. *See Seijas*, 2012 WL 5259030, at *2.

This conclusion is consistent with the Court of Appeals' prior holdings in this case. In plaintiffs' initial attempt to execute on reserves of BCRA held at the FRBNY, they contended that because the Republic had used reserves to repay the IMF, the reserves frozen at the FRBNY should be considered property of the Republic. *See EM Ltd.*, 473 F.3d at 474-75. In rejecting this theory, the Second Circuit noted that:

> [P]laintiffs' theory could expose to attachments the assets of a majority of the world's central banks because national governments customarily retain the ability to direct their central banks to take actions with respect to the central banks' foreign exchange reserves . . . . Under plaintiffs' theory, for example, all of the assets of the United States Federal Reserve system would be treated as attachable interests of the United States (absent otherwise-applicable sovereign immunity protections) because the United States has exercised the power to direct the Federal Reserve Banks to transfer their "surplus funds" to the U.S. Treasury for use by the federal government.

*Id.* at 476 n.12. This is of course correct, and is evidenced by both scholarly literature, *see* Nugee, *Foreign Exchange Management*, at 7-8 (noting that "most countries that have borrowed

in foreign currency will aim to use some of their reserves to provide a fund for servicing at least

the part of their debt which is falling due in the near future," and explaining why); M.H. de Kock,

*Central Banking* 34-37, 312-18 (4th ed. 1974), and  real-world examples, including in Brazil,[9]

Colombia,[10] Mexico,[11] Singapore,[12] and the United States itself.[13]  In fact, the United States

Government has weighed in on this specific issue in the context of the Republic's repayment to

the IMF, stating in an amicus brief filed with the Second Circuit that "BCRA's involvement in

the Republic's payment to the IMF was not unusual: central banks commonly perform payment

functions for their governments, including central banks that are relatively independent from

their governments."  Brief for the United States of America as *Amicus Curiae* in Support of

Reversal at 21, *NML Capital, Ltd. v. Republic of Argentina*, No. 10-1487-cv(L) (2d Cir. Nov. 3,

2010) (Ex. C).  The United States further took the position that "the Republic's decision to use

the BCRA to repay its debt to the IMF is not indicative of the type of extensive control that

[9] Brazil's government used international reserves to pay part of its debt in 2006, *see Brazil's foreign reserves rise to $70 Billion*, Reuters, Aug. 18, 2006 (Ex. I), and announced that it would use reserves to increase export financing in 2008.  *See Government to use foreign reserves to increase export financing*, Bus. News Ams., Oct. 6, 2008 (Ex. H).

[10] Columbia's central bank sold reserves to its government in 2005 so that the latter could pay off debt and meet its cash needs.  *See Colombian foreign reserves fall during week*, Reuters, Oct. 3, 2005 (Ex. L); *Colombia Finance Minister Outlines 2006 Financial Plans*, Dow Jones Int'l, Oct. 26, 2005 (Ex. K).

[11] Mexico's government "bought" $2.88 billion of central bank reserves to meet scheduled payments on foreign debt coming due in 2006 and 2007, *see Mexican government buys $2US.88 billion of Central Bank international reserves*, El Universal, July 15, 2005 (Ex. M), and in 2006 used reserves to prepay $7 billion in loans from the World Bank and Inter-American Development Bank, *see UPDATE: Emerging Mkt Debt Falls as Bonds Seek Direction*, Dow Jones Int'l, June 22, 2006 (Ex. J).

[12] Singapore's constitution specifically provides that the government may use central bank reserves for fiscal stimulus.  *See* P.R. Venkat, *FOCUS: January Singapore Budget To Focus On Tax, Projects*, Dow Jones Int'l, Nov. 17, 2008 (Ex. F); *DJ Singapore Govt To Change Rule to Use More From Reserves-Report*, Dow Jones Chinese Fin. Wire, Oct. 21, 2008 (Ex. G).

[13] On June 20, 2011, the Federal Reserve completed its purchase of $600 billion of longer-term treasury securities, an undeniable financing of the United States Government's budget deficit.  *See The Federal Reserve's Response to the Crisis*, http://federalreserve.gov/monetarypolicy/bst_crisisresponse.htm (last visited Nov. 27, 2012).

concerned the Supreme Court in *Bancec*, nor is it evidence of fraud and injustice," *id.* (Ex. C),

relying in part on a statement from the IMF that many countries had repaid the IMF with funds

held by the respective country's central bank, *see id.* (Ex. C).[14]

Plaintiffs can be expected to rely on this Court's prior determination in the attachment

context that BCRA is the alter ego of the Republic.  *See EM Ltd. v. Republic of Argentina*, 720 F.

Supp. 2d 273 (S.D.N.Y. 2010), *vacated sub nom.*, *NML Captial*, 652 F.3d at 197.  This vacatur

of the decision deprives it of precedential authority, including on issues not reached by the

Second Circuit.  *See, e.g.*, *O'Connor v. Donaldson*, 422 U.S. 563, 577 n.12 (1975) ("Of necessity

our decision vacating the judgment of the [lower court] deprives that court's opinion of

precedential effect, leaving this Court's opinion and judgment as the sole law of the case.").

Although the Court of Appeals declined to address BCRA's status, it obviously did not uphold

this Court's alter ego finding.  In any event, this Court's decision correctly noted that "[t]he

Republic did not manage the day-to-day operations of BCRA.  It did not manage the routine

transactions regarding Argentine pesos and foreign currency."  *EM Ltd.*, 720 F. Supp. 2d at 299.

This conclusion, in addition to the arguments set forth here, establishes that plaintiffs have failed

to plead sufficient facts to overcome the presumption of separateness afforded BCRA, and that

BCRA is instead akin to the other agencies or instrumentalities already determined by this Court

not to be the Republic's alter ego.  *See, e.g.*, *Seijas*, 2011 WL 1137947 (BNA); *NML Capital*,

2011 WL 524433 (ENARSA); Order, *Seijas v. Republic of Argentina*, No. 04 Civ. 400 (TPG)

(S.D.N.Y. Aug. 19, 2009) (Aerolíneas Argentinas) (Ex. E).

---

[14] Also noteworthy is plaintiffs' allegation that with regard to the Bicentennial Fund, the Argentine Senate ratified the loaning of money to the fund, and BCRA Governor Marco del Pont approved of the transaction after consulting with BCRA's legal advisors.  *See* TAC ¶ 61.  Thus, despite plaintiffs' effort to portray the Bicentennial Fund as an example of Republic dominance over BCRA, they plead that it was created with approval of the BCRA Governor, BCRA's legal counsel, the Argentine Senate, and the President, and so their argument that it supports an alter ego finding is meritless.

**B. The Complaint Does Not Allege Sufficient Facts To Support A Finding That "Fraud Or Injustice" Would Result If The Legal Separateness Of The Republic And BCRA Is Respected**

Under *Bancec's* second exception, plaintiffs must state a plausible claim that recognizing BCRA's separate status "would work fraud or injustice." 462 U.S. at 629 (internal quotation marks omitted). In order to ensure that the strong presumption of separateness provided by *Bancec* has meaning, courts have narrowly construed this exception and held it to be applicable only in cases of setoff, *see id.*; *Banco Central de Reserva del Peru v. Riggs Nat'l Bank of Washington D.C.*, 919 F. Supp. 13, 16 (D.D.C. 1994), or where the instrumentality "was the vehicle through which the foreign state incurred the liability," *Bayer & Willis Inc. v. Republic of Gambia*, 283 F. Supp. 2d 1, 6 (D.D.C. 2003); *see also Alejandre v. Telefonica Larga Distancia De Puerto Rico, Inc.*, 183 F.3d 1277, 1287 (11th Cir. 1999) (no alter ego liability "[g]iven the absence of any evidence that [the instrumentality] was involved in the violation [of international law]"); *Hercaire Int'l, Inc. v. Argentina*, 821 F.2d 559, 565 (11th Cir. 1987) (no fraud or injustice where state-owned airline "had no connection whatsoever to the underlying transaction which gives rise to Argentina's liability"); *Pravin Banker*, 9 F. Supp. 2d at 305 (no allegation that Peruvian instrumentality "should be exposed to Peru's liability because it was responsible for the underlying conduct giving rise to Peru's liability").

Here, plaintiffs do not, and cannot, allege that BCRA had any involvement in the Republic's issuance of, and eventual suspension of payments on, plaintiffs' bonds. It would therefore be "manifestly unfair to subject" BCRA and its assets to plaintiffs' actions against the Republic. *Hercaire Int'l*, 821 F.2d at 565. Ignoring this dispositive fact, plaintiffs offer three theories for why recognizing BCRA's separate juridical status would work a fraud or injustice, all of which are meritless.

*First*, plaintiffs contend that BCRA should be held accountable for the Republic's debts because plaintiffs have been relatively unsuccessful in executing their judgments (entered against the Republic, not BCRA) to date.  *See* TAC ¶ 115.  However, the law is well-settled that this is insufficient, as the concern about collection is "present in every case in which a plaintiff seeks to hold an instrumentality responsible for the debts of its related government," and "[a]llowing the *Bancec* presumption of separate juridical status to be so easily overcome would effectively render it a nullity."  *Alejandre*, 183 F.3d at 1286-87; *see also* id. at 1286 n.22 (noting that while the "concern about the injustice of preventing plaintiffs from collecting their judgment is understandable," it is "not the type of injustice that concerned the *Bancec* Court").

*Second*, plaintiffs contend that recognizing BCRA's separate juridical status would work a fraud or injustice because an Argentine former Cabinet Chief stated that BCRA had transferred assets from the FRBNY to the Bank for International Settlements (the "BIS") from mid-2001 to 2003 in order to avoid an attachment.  *See* TAC ¶ 117.  According to plaintiffs, this statement was a tacit acknowledgement that BCRA's assets are in fact the Republic's.  *See id.*  Even assuming that this alleged statement in fact accurately states the reason BCRA moved funds from the FRBNY to the BIS, the transfer could not be a fraud or injustice to plaintiffs.  The Republic's default put BCRA at risk that certain of the Republic's creditors (namely, plaintiffs and other aggressive hedge funds) would seek *unlawful* attachments against BCRA assets.  No bank, let alone a central bank, would prudently risk disruption of its operations in such a setting, and there is certainly no obligation that they do so to avoid "injustice" to creditors of a third party such as plaintiffs.  In fact, the risk of disruption became a reality when from 2005 to 2010, $105 million of BCRA reserves held in its account at the FRBNY were frozen, and were released only after two Second Circuit decisions holding that such funds could not be used to satisfy plaintiffs'

judgments against the Republic. *See NML Capital, Ltd. v. Banco Central De La Republica Argentina*, 652 F.3d 172, 197 (2d Cir. 2011); *EM*, 473 F.3d at 469, 486-87. This risk was also shown when other hedge-fund plaintiffs served process on the FRBNY purporting to restrain the funds of Republic bondholders passing through BCRA's account at the FRBNY. The FRBNY "shut down" the account entirely in an attempt to avoid noncompliance, and in doing so "jeopardized the functioning of BCRA." *EM Ltd. v. Republic of Argentina*, 865 F. Supp. 2d 415, 418 (S.D.N.Y. 2012). The transfer of assets identified by plaintiffs was therefore the prudent minimization of risk by a central bank that requires reserves to operate, not an "admission" of liability.

*Third*, and finally, plaintiffs allege that "Argentina's domination and control over the Central Bank" causes a "fraud and injustice on Plaintiffs," because the Republic has used funds borrowed from BCRA to repay other creditors but not plaintiffs. *See* TAC ¶ 118. But this argument simply "begs the question," as BCRA's use of its funds can be considered a fraud or injustice "only if [BCRA] *is* an illusory corporate fiction, which plaintiff[s] [have] yet to establish." *Gabay v. Mostazafan Found. Of Iran*, 151 F.R.D. 250, 254 n.5 (S.D.N.Y. 1993) (emphasis in original); *see also Minpeco*, 686 F. Supp. at 432. Because – as established above – BCRA is in fact a central bank that is separate and apart from the Republic, it owes no obligation to plaintiffs, and its loaning of funds to the Republic to pay other creditors in no way constitutes fraud or injustice to plaintiffs' claims against the Republic. *See, e.g.*, *Wornick v. Gaffney*, 544 F.3d 486, 492 n.3 (2d Cir. 2008) (transfer of non-debtor's property is "by definition" not fraud upon a creditor).

**CONCLUSION**

For the foregoing reasons, the Republic's and BCRA's motions should be granted and the

Complaint should be dismissed with prejudice.

Dated: New York, New York
       November 27, 2012

                              Respectfully submitted,

                              CLEARY GOTTLIEB STEEN & HAMILTON LLP

                              By:     /s/ Carmine D. Boccuzzi      
                                  Jonathan I. Blackman (jblackman@cgsh.com)
                                  Carmine D. Boccuzzi (cboccuzzi@cgsh.com)
                                  Christopher P. Moore (cmoore@cgsh.com)

                              One Liberty Plaza
                              New York, New York 10006
                              (212) 225-2000

                              Attorneys for the Republic of Argentina