UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
: 
EM LTD. and NML CAPITAL, LTD.,                             :
:
     Plaintiffs,                  :
:
   - against –                              :  No. 06 Civ. 7792 (TPG)
:
BANCO CENTRAL DE LA REPÚBLICA                             :  ECF Case
ARGENTINA and THE REPUBLIC OF                              :
ARGENTINA,                                                 :
:
     Defendants.                  :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF BANCO CENTRAL DE LA REPÚBLICA ARGENTINA'S MOTION TO DISMISS

Joseph E. Neuhaus
Michael J. Ushkow
Taly Dvorkis
Zeh S. Ekono
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel.:  (212) 558-4000

*Counsel for Banco Central de la
 República Argentina*

March 18, 2013

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .............................................................................1

ARGUMENT ......................................................................................................6

I.  THE COURT SHOULD EXERCISE ITS DISCRETION UNDER THE DJA TO
    DISMISS THE PENDING COMPLAINT BECAUSE PLAINTIFFS FAILED TO
    SHOW WHY A DECLARATORY JUDGMENT AGAINST BCRA WOULD
    SERVE A USEFUL, RATHER THAN HYPOTHETICAL, PURPOSE............................6

II. BCRA IS IMMUNE FROM JURISDICTION UNDER THE FSIA...................9

    A.  The Court Cannot Impute the Republic's Waiver to BCRA. ..................9

    B.  Plaintiffs Failed to Plead Facts Sufficient to Establish That the Commercial
        Activity Exception to FSIA Immunity from Jurisdiction Applies to BCRA.........13

III. PLAINTIFFS LACK STANDING TO BRING THIS ACTION AGAINST
     BCRA....................................................................................................16

CONCLUSION...................................................................................................16

# **TABLE OF AUTHORITIES**

**Page(s)**

C ASES

*Antares Aircraft, L.P.* v. *Federal Republic of Nigeria,*
   999 F.2d 33 (2d Cir. 1993)..........................................................................................16

*Amusement Indus., Inc.* v. *Midland Avenue Assocs., LLC,*
   820 F. Supp. 2d 510 (S.D.N.Y. 2011)..........................................................................16

*BP Chems. Ltd.* v. *Jiangsu Sopo Corp.,*
   285 F.3d 677 (8th Cir. 2002) .......................................................................................13

*Bryant* v. *New York State Educ. Dep't,*
   692 F.3d 202 (2d Cir. 2012)..........................................................................................16

*Carl Marks & Co., Inc.* v. *Union of Soviet Socialist Republics,*
   665 F. Supp. 323 (S.D.N.Y. 1987),
   *aff'd,* 841 F.2d 26 (2d Cir. 1988).................................................................................16

*Durning* v. *Citibank, N.A.,*
   950 F.2d 1419 (9th Cir. 1991) ......................................................................................12

*EM Ltd.* v. *Republic of Argentina,*
   473 F.3d 463 (2d Cir. 2007).............................................................................. *passim*

*EM Ltd.* v. *Republic of Argentina,*
   865 F. Supp. 2d 415 (S.D.N.Y. 2012)...........................................................................13

*EM Ltd.* v. *Republic of Argentina,*
   720 F. Supp. 2d 273 (S.D.N.Y. 2010),
   *vacated sub nom.*, *NML Capital Ltd.* v. *Republic of Argentina,*
   652 F.3d 172 (2011)..................................................................................................3, 14

*First City, N.A.* v. *Rafidain Bank,*
   150 F.3d 172 (2d Cir. 1998)............................................................................................8

*Hanil Bank* v. *PT. Bank Negara Indon. (Persero),*
   148 F.3d 127 (2d Cir. 1998) .........................................................................................16

*Jenkins* v. *U.S.,*
   386 F.3d 415 (2d Cir. 2004)............................................................................................7

*KBL Corp.* v. *Arnouts,*
   646 F. Supp. 2d 335 (S.D.N.Y. 2009).............................................................................6

## TABLE OF AUTHORITIES
### (*continued*)

**Page(s)**

*Kensington Int'l Ltd.* v. *Itoua*,
  505 F.3d 147 (2d Cir. 2007)..............................................................2, 14, 15

*Kensington Int'l Ltd.* v. *Republic of Congo*,
  No. 03 Civ. 4578, 2007 WL 1032269 (S.D.N.Y. Mar. 30, 2007) ................7, 12, 13

*LNC Invs., Inc.* v. *Republic of Nicaragua*,
  115 F. Supp. 2d 358 (S.D.N.Y. 2000),
  *aff'd sub nom., LNC Invs., Inc.* v. *Banco Central De Nicaragua*,
  228 F.3d 423 (2d Cir. 2000)........................................................................10

*NML Capital Ltd.* v. *Banco Central de la Republica Argentina*,
  652 F.3d 172 (2d Cir. 2011),
  *cert. denied,* 133 S. Ct. 23 (2012) ........................................... *passim*

*O'Connor* v. *Donaldson*,
  422 U.S. 563 (1975)..................................................................................12

*Saudi Arabia* v. *Nelson*,
  507 U.S. 349 (1993) .................................................................................15

*Seijas* v. *Republic of Argentina*,
  No. 11-1714-cv, 2012 WL 5259030 (2d Cir. Oct. 25, 2012) ...........................8, 13

*Sun* v. *Taiwan*,
  201 F.3d 1105 (9th Cir. 2000) ..................................................................13

*U.S. Fid. & Guar. Co.* v. *Braspetro Oil Servs. Co.*,
  199 F.3d 94 (2d Cir. 1999).......................................................................12

*Walters* v. *Indus. & Commer. Bank of China, Ltd.*,
  651 F.3d 280 (2d Cir. 2011).......................................................................7

### STATUTES & RULES

28 U.S.C. § 1605.......................................................................... *passim*

28 U.S.C. § 1609..............................................................................11

28 U.S.C. § 1611.......................................................................... *passim*

Federal Rule of Civil Procedure 12 ....................................................1

## TABLE OF AUTHORITIES
### (*continued*)

**Page(s)**

### OTHER AUTHORITIES

J. Onno de Beaufort Wijnholds & Lars Søndergaard, *Reserve Accumulation: Objective or By-Product?*, EUROPEAN CENTRAL BANK OCCASIONAL PAPER SERIES 73, Sept. 2007 .........................4

Luis Catão & Sandeep Kapur, *Volatility and the Debt-Intolerance Paradox,* 53 IMF STAFF PAPERS 195 (2006) ...................................................................................................................4

Defendant Banco Central de la República Argentina ("BCRA" or the "Central Bank") respectfully submits this reply brief in further support of its motion pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2) and 12(b)(6) to dismiss plaintiffs EM Ltd.'s ("EM") and NML Capital, Ltd.'s ("NML" and, together with EM, "EM/NML") Third Amended Complaint ("TAC" or the "Complaint") (Dkt No. 157).[1]

## PRELIMINARY STATEMENT

Plaintiffs initiated this action over six years ago hoping that an alter ego declaration would enable them to attach, and execute upon, BCRA's assets held in the United States—over $100 million held at the Federal Reserve Bank of New York ("FRBNY"). The Second Circuit has since ruled, however, that BCRA's funds at the FRBNY are immune from attachment, *irrespective of whether BCRA is the alter ego of the Republic*. The Second Circuit vacated the entirety of this Court's prior decision. With no assets to execute upon, seeking an alter ego declaratory judgment has become a purely academic exercise. Indeed, another group of plaintiffs has voluntarily dismissed its complaint seeking the very same relief.[2]

Plaintiffs ignore the fact that a declaratory judgment action—which is always within the discretion of the Court, and not a matter of right—is only appropriate to resolve current litigation or prevent future litigation. Plaintiffs have not alleged that an alter ego declaratory judgment would accomplish either of those things. Rather, they hypothesize that some future discovery dispute may be aided if this Court proceeds with this litigation now. But courts do not embark on a plenary declaratory judgment action, together with any appeals, in order to simplify a hypothetical discovery dispute.

---

[1]    BCRA adopts and incorporates by reference the arguments made in the Republic of Argentina's (the "Republic's") Reply Memorandum, dated March 18, 2013.

[2]    Notice of Voluntary Dismissal, *Aurelius Capital Partners, LP*. v. *Banco Central de la República Argentina*, No. 10 Civ. 3059 (S.D.N.Y. July 26, 2012).

Even if the Court might otherwise wish to entertain plaintiffs' declaratory judgment action, plaintiffs have not established jurisdiction over BCRA. The Second Circuit, in *NML Capital Ltd.* v. *Banco Central de la República Argentina*, 652 F.3d 172, 194-95 (2d Cir. 2011), *cert. denied,* 133 S. Ct. 23 (2012), rejected plaintiffs' theory that a waiver by the Republic automatically applies to BCRA if an alter ego relationship is eventually proven. Plaintiffs' present attempt to reinterpret that opinion is belied by plaintiffs' own petition for certiorari from that decision, which stated that the Second Circuit had fatally undermined their position on the consequences of an alter ego holding in precisely this way.

Likewise, plaintiffs' attempts to find that BCRA engaged in commercial activity in the United States, or other activity in the United States connected to commercial activity elsewhere, stumble on the Second Circuit's requirement that the U.S. activity have a "degree of closeness" and a "significant nexus" to the "gravamen" of the complaint. *Kensington Int'l Ltd.* v. *Itoua*, 505 F.3d 147, 155-56 (2d Cir. 2007). The supposed contacts with the United States advanced by plaintiffs are utterly incidental to the core alter ego allegation that the Republic can use BCRA's funds freely to satisfy other debts.

In considering this motion, the Court should bear in mind that plaintiffs' Complaint is based almost entirely on hearsay newspaper articles and editorials, generally from one side of the sensationalistic Argentine press. Not only will none of these newspaper articles or editorials be admissible in this litigation, but many of the supposed "facts" therein are hotly disputed and are really disagreements over central banking policy choices and the political structure of a foreign country rather than the kinds of hard facts courts rely upon in alter ego cases. Ascertaining the overall relationship between BCRA and the Republic will be an

immense undertaking, involving attempts to obtain massive discovery of highly sensitive

information from a sovereign entity and an enormous expenditure of party and judicial resources.

By way of example, plaintiffs claim that BCRA accumulated or disposed of

reserves at the behest of the President of Argentina and to serve the President's political

purposes, even when that was supposedly not in the Central Bank's economic interest.  This is a

centerpiece of the Complaint.  (TAC ¶¶33-71, 74, 99-106; Pls. Opp. at 5, 7-15, 19-21.)  As a

legal matter, the Second Circuit has already found that such coordination between the national

government and its central bank does not evince an alter ego relationship.  *EM Ltd.* v. *Republic*

*of Argentina*, 473 F.3d 463, 476 n.12 (2d Cir. 2007) ("[N]ational governments customarily retain

the ability to direct their central banks to take actions with respect to the central banks' foreign

exchange reserves.").  Plaintiffs otherwise rely on the pejorative characterization that the

accumulation of reserves was "irrational" (Pls. Opp. at 19-20), but others both inside and outside

the government supported accumulation to further legitimate Central Bank policy objectives.[3]

More fundamentally, numerous other developing countries followed precisely the same policy as

the Central Bank at precisely the same time.[4]

Moreover, the criticism of the "cost" of such a policy is utterly simplistic.  Indeed,

the cost of borrowing local currency in emerging markets is almost always higher than the return

---

[3]     *See, e.g.,* Exhibit 1 to the Declaration of Michael J. Ushkow (Mar. 18, 2013) ("Ushkow Decl."), at 2 (Mario Blejer, former BCRA governor who at the time of the interview was running the Bank of England's Centre for Central Banking Studies, believed that "extra reserves should be used to buffer a country against exogenous shocks"); Ushkow Decl. Ex. 2 (describing policy rationale for accumulating international reserves); *see also EM Ltd.* v. *Republic of Argentina*, 720 F. Supp. 2d 273, 283 (S.D.N.Y. 2010) ("The accumulation of international reserves, including U.S. dollars, is said to be an important factor in achieving price stability."), *vacated sub nom.*, *NML Capital*, 652 F.3d 172.

[4]     *See* Ushkow Decl. Ex. 3, at 103 (a program of rebuilding Brazil's international reserves was announced in 2004 so as to "make it possible to take advantage of liquidity conditions whenever they turned favorable, in order to be able to ensure a neutral impact on exchange market volatility and floating exchange rates"); Ushkow Decl. Ex. 4, at 44, 51 (Mexico's international reserves increased in 2004); *see also* Ushkow Decl. Ex. 5, at 11 (showing increase in reserves for the 20 countries with the largest holdings, including Mexico and Brazil).

on U.S.-dollar deposits, as a consequence of the risk inherent in emerging-market economies.[5]

On plaintiffs' reasoning, it is therefore economically irrational for any developing country to

accumulate dollars and "sterilize" the accumulation through issuances of bonds to remove local

currency from circulation, but in fact this is a widespread central bank practice.[6]

Likewise, plaintiffs allege that from mid-2008 through mid-2009, BCRA shifted

its reserves-accumulation policy to focus on selling U.S.-dollars in exchange for Argentine

pesos, and that such a policy shift was driven by President Fernández de Kirchner's political

motives.  (Pls. Opp. at 20-21.)  But if this case moves forward the record will clearly show that

BCRA's shift in 2008 to a policy of selling U.S.-dollar reserves was a completely ordinary

response of a developing country's central bank to a temporary strengthening of the dollar,[7] a

response that, again, was mirrored by the central banks of other developing countries at precisely

the same time.[8]

Another central theme of the Complaint is plaintiffs' repeated suggestions that the

president of the Republic acted alone, or improperly exercised overwhelming power, over the

Central Bank.  For example, plaintiffs refer throughout their opposition brief to actions being

---

[5]     *See, e.g.*, Luis Catão & Sandeep Kapur, *Volatility and the Debt-Intolerance Paradox,* 53 IMF STAFF PAPERS 195 (2006) (Ushkow Decl. Ex. 6).  *See also* Ushkow Decl. Ex. 5, at 16-17 (South Korea and India hold among the largest pools of international reserves despite high sterilization costs due to country risk).

[6]     *See* J. Onno de Beaufort Wijnholds & Lars Søndergaard, *Reserve Accumulation: Objective or By-Product?*, EUROPEAN CENTRAL BANK OCCASIONAL PAPER SERIES 73, Sept. 2007, at 26 (Ushkow Decl. Ex. 7) ("As a result of the potentially destabilising effects of large foreign exchange inflows, many central banks attempt to sterilise such inflows" by, among other things, selling bonds.).

[7]     As measured by the Federal Reserve, in mid-2008, the value of the dollar against the currencies of major U.S. trading partners reversed a long trend of depreciation and steadily appreciated through March 2009. *See* Ushkow Decl. Ex. 8.  The stronger dollar meant the value of the peso declined.  By selling dollars in exchange for pesos, the Central Bank reduced the supply of pesos in the domestic economy and thereby strengthened its value.

[8]     During the same time period, the central banks of developing countries including Peru, Costa Rica, South Korea, India, Indonesia and the Philippines also sold U.S.-dollars in order to strengthen or maintain the value of their respective currencies.  *See, e.g.*, Ushkow Decl. Exs. 9-14.

taken by "Executive Decree," such as the passage of Law 26.739 in 2012, suggesting that these actions were taken outside the normal legislative process of a democracy.  (Pls. Opp. at 10; *see also id*. at 9-15.)  This is a misleading picture that would make an Argentine civics student guffaw.  Laws passed by the Argentine Congress are typically promulgated by Executive Decree.[9]  That is the culmination of the legislative process, akin to the U.S. President signing a bill and causing it to be published in the statute books.

Plaintiffs also assert that Law 26.739, which broadened the Central Bank's mandate to include safeguarding financial stability and promoting economic growth, has been "uniformly criticized."  (Pls. Opp. at 14-15.)  Plaintiffs cite no evidence for this proposition and overlook substantial support for the law on the ground that it will result in more growth, more equitable income and wealth distribution, improved credit allocation, and increased price stability.[10]  Plaintiffs also claim that the law, which also alters BCRA's lending limits, had "the effect of further tightening the Argentine government's control and allowing it to use whatever amount of BCRA reserves the Executive wishes to pay the Republic's debts."  (*id*. at 14.)  Plaintiffs ignore the fact that it is increasingly common for central banks, including that of the United States, to loan money to their parent governments.[11]

---

[9]    After both houses of Congress vote on a bill, the Executive has three options:  (i) veto the law within 10 days; (ii) remain silent, in which case the law takes effect within 10 days; or, most commonly, (iii) issue within 10 days an Executive Decree that gives effect to the law.  *See* Argentine National Constitution, arts. 78, 80 and 99(3), *available at* http://www.senado.gov.ar/web/interes/constitucion/english.php (last visited Mar. 18, 2013).

[10]    *E.g.,* Ushkow Decl. Exs. 15, 16.  The U.S. Federal Reserve Bank is likewise empowered to promote employment.  *See* Ushkow Decl. Ex. 17 ("The Congress established the statutory objectives for monetary policy—maximum employment, stable prices, and moderate long-term interest rates—in the Federal Reserve Act.").

[11]    Indeed, on December 12, 2012, the Federal Reserve reiterated its policy of purchasing United States Treasury securities, thereby lending money to the United States government, to support economic recovery.  *See* Ushkow Decl. Ex. 18.  Moreover, the Federal Reserve pays over to the Treasury its earnings at the end of the year, including any earnings made from the Treasury's interest payments, and so the Treasury is essentially provided with an interest-free source of financing.  *See* Ushkow Decl. Ex. 19, at 4.  The Bank of England also has

(continued . . . )

In short, plaintiffs seek to have this Court sit in judgment on the political

processes and economic policy choices of another nation—probably the most sensitive exercise

in which federal courts can engage.  To summarize some of the issues that plaintiffs want to

litigate, as described above, is to demonstrate how remote they are from the facts appropriately

considered in an alter ego case, and to show that what plaintiffs actually contemplate is a

graduate seminar on central banking, monetary policy, and Argentine politics.  This Court should

not go down this path where it need not do so, and in particular where doing so would do nothing

to draw this already long dispute to a close.[12]

## ARGUMENT

I.  **THE COURT SHOULD EXERCISE ITS DISCRETION UNDER THE DJA TO DISMISS THE PENDING COMPLAINT BECAUSE PLAINTIFFS FAILED TO SHOW WHY A DECLARATORY JUDGMENT AGAINST BCRA WOULD SERVE A USEFUL, RATHER THAN HYPOTHETICAL, PURPOSE.**

Unable to point to any BCRA assets that are attachable, or any realistic prospect

of finding any such assets in the U.S. or abroad, plaintiffs assert that the Court should not

exercise its discretion under the Declaratory Judgment Act ("DJA") to dismiss the Third

Amended Complaint for two reasons:  first, because, according to plaintiffs, a declaratory

judgment that BCRA is the alter ego of the Republic would aid in resolving a discovery dispute

that has "repeatedly manifested itself in both discovery and execution proceedings—including

ongoing disputes in plaintiffs' actions against the Republic" (Pls. Opp. at 33; *see id.* at 35,

---

been purchasing government bonds in order to give a "further monetary stimulus to the economy."  *See* Ushkow Decl. Ex. 20.  The Bank of Japan similarly purchases government bonds.  *See* Ushkow Decl. Ex. 21.

[12]   To the extent that plaintiffs' allegations are insufficient to withstand a motion to dismiss, plaintiffs are not entitled to discovery to cure those defects.  (*See* Pls. Opp. at 54.)  Discovery exists to develop facts alleged in a complaint, not to search for a viable claim.  *KBL Corp.* v. *Arnouts*, 646 F. Supp. 2d 335, 346 n.6 (S.D.N.Y. 2009) ("Discovery is unwarranted where it would function as a fishing expedition for evidence . . . .  Indeed, allowing the plaintiff to conduct discovery in order to piece together a claim would undermine the purpose of Federal Rule of Civil Procedure 12(b)(6), which is to streamline litigation by dispensing with needless discovery and factfinding where the plaintiff has failed to state a claim under the law.") (internal quotation marks and citation omitted).

38-39); and, second, because plaintiffs may someday find some attachable assets somewhere (*id.* at 34-36).[13]

Plaintiffs' discovery theory is putting the cart way before the horse—courts do not engage in plenary proceedings in the hopes of avoiding discovery disputes in another matter; and they do not do so because that would be an entirely improper use of declaratory judgment.  A declaratory judgment action is non-justiciable "[w]here the relief sought 'would not resolve the entire case or controversy as to any [party] . . . , but would merely determine a collateral legal issue governing certain aspects of . . . pending or future suits.'"  *Jenkins* v. *U.S.*, 386 F.3d 415, 418 (2d Cir. 2004) (quoting *Calderon* v. *Ashmus*, 523 U.S. 740, 747 (1998)).  *Accord Kensington Int'l Ltd.* v. *Republic of Congo*, No. 03 Civ. 4578, 2007 WL 1032269, at *17 (S.D.N.Y. Mar. 30, 2007) (whether an alter ego declaration is intended for future use in "other courts" is "not a factor" the court considers in determining whether to entertain a declaratory judgment action).

Further, this improper use of a declaratory judgment action would, in substance, be an attempt to circumvent the immunity from discovery enjoyed by BCRA, as a presumptively separate and independent instrumentality of the state.  If plaintiffs want discovery of BCRA, such discovery is limited to verifying specific factual allegations crucial to an immunity determination.  *See EM Ltd.*, 473 F.3d at 486 (plaintiff was "not entitled to any other discovery" where the only identified asset was "never an attachable asset" of the debtor); *see also Walters* v. *Indus. & Commer. Bank of China, Ltd.*, 651 F.3d 280, 297 (2d Cir. 2011) (emphasizing that "the burden of identifying specific, recoverable assets" is on the party seeking discovery of sovereign property); *First City, N.A.* v. *Rafidain Bank*, 150 F.3d 172, 176 (2d Cir. 1998) ("until she has

---

[13]     Plaintiffs request money judgments in addition to the declaratory judgment but do not dispute that the money judgments do not stand on their own.  *See* Pls. Opp. at 38 n.16.

shown a reasonable basis for assuming jurisdiction, she is not entitled to any other discovery"); s*ee also Seijas* v. *Republic of Argentina*, No. 11-1714-cv, 2012 WL 5259030, at *1-2 (2d Cir. Oct. 25, 2012) (affirming this Court's denial of discovery because plaintiffs failed to establish "a reasonable basis for assuming jurisdiction" even after assuming as true supposed alter ego facts similar to those alleged here).  The Court should not entertain a declaratory judgment action in order to override these limitations.

Plaintiffs' theory that the immunity afforded BCRA's assets "may change over time" because the scope of "paradigmatic central banking activity" may change (Pls. Opp. at 36 n.15) or that plaintiffs may find attachable assets here or abroad (*id.* at 34, 36) is also flawed. With respect to the possibility that the immunity of BCRA assets will change, plaintiffs ignore the fact that the same would be true for an alter ego declaratory judgment; it would only hold for the specific time and circumstances upon which it was based.  Plaintiffs do not suggest that the supposed lack of independence of the Central Bank is a permanent state—in fact, their allegations are peculiarly dependent on the particular time and the particular individual in the presidential office.[14]  Were the Court to declare that BCRA was the Republic's alter ego now, that would say nothing as to how the relationship between the two entities may be in the future, rendering the declaratory judgment irrelevant if a change occurs.

Plaintiffs' argument that they may find non-immune assets in the United States or abroad is practically the definition of an entirely hypothetical exercise.  The unrebutted foreign-law affidavits submitted with our opening papers show that central bank immunity is commonly stronger abroad than in the United States and that foreign courts will often not recognize such a

---

[14]    For example, plaintiffs' assertion that "the Republic has had a remarkable 7 BCRA Governors since 2001" (Pls. Opp. at 15) depends for its force entirely on including the period 2001-2002, the height of the financial crisis, during which the Central Bank had five governors.

declaratory judgment.  (*See* BCRA Br. at 20-21.)  If and when plaintiffs identify attachable assets in the United States and seek to attach them, there will be time enough to adjudicate the immensely complex issues raised by the Complaint.

## II.   BCRA IS IMMUNE FROM JURISDICTION UNDER THE FSIA.

### A.   The Court Cannot Impute the Republic's Waiver to BCRA.

Plaintiffs deny that the Second Circuit in *NML Capital*, 652 F.3d at 195-96, rejected the theory that an express waiver of the Republic can be imputed to BCRA on the basis of an alter ego finding.  (Pls. Opp. at 27.)  Plaintiffs assert that the Second Circuit merely found that "a waiver of immunity must specifically refer to central bank assets to overcome § 1611(b)(1)."  (*Id.*)  That is nonsense, and it makes no sense to think the Second Circuit would so hold.

Section 1611(b)(1) specifies only that the requisite waiver extend to the entity in question, not to the property for which attachment is sought:  it provides for immunity for specified property "unless *such bank or authority*, or its parent foreign government, has explicitly waived *its* immunity from attachment in aid of execution, or from execution." 28 U.S.C. § 1611(b)(1) (emphasis added).  Plainly, if a waiver explicitly waived the immunity from attachment and execution of the Republic *and* of the Central Bank of Argentina, there would be an explicit waiver of the Central Bank's immunity for purposes of that section.  But it is undisputed that no such waiver exists.

The Second Circuit did not suggest a different test.  Its reasoning focused on whether the waiver extended to the Central Bank, not whether the waiver mentioned particular assets at issue.  The Court said:

> The District Court concluded that the Republic had explicitly
> waived *its* immunity . . .  However, the District Court also
> concluded that "there has been no waiver of immunity *with respect*

> *to BCRA.*" *EM Ltd.,* 720 F. Supp. 2d at 297 (emphasis supplied).
> We agree. Waiver under the FSIA must be "clear and
> unambiguous." *Carpenter v. Republic of Chile,* 610 F.3d 776, 779
> (2d Cir. 2010). In circumstances in which we have recognized the
> waiver of immunity with respect to an agency or instrumentality of
> a foreign state, that waiver has specifically embraced the foreign
> state *and* the relevant agency or instrumentality. *See, e.g., LNC
> Invs., Inc. v. Republic of Nicaragua,* 115 F. Supp. 2d 358, 361
> (S.D.N.Y. 2000), *aff'd sub nom., LNC Invs., Inc. v. Banco Central
> De Nicaragua,* 228 F.3d 423 (2d Cir. 2000) (waiving immunity
> "[t]o the extent that the Republic or any Governmental Agency has
> or hereafter may acquire any immunity from jurisdiction of any
> court").
>
> Here, while the Republic waived immunity under the FSIA for
> "the Republic or any of its revenues, assets or property," the
> Republic's waiver did not mention the "instrumentalities" of the
> Republic or BCRA in particular, much less BCRA's reserves at
> FRBNY. As we previously observed, "although the Republic's
> waiver of immunity from attachment is worded broadly, it does not
> appear to clearly and unambiguously waive BCRA's immunity
> from attachment, as it must do in order to be effective." *EM I,* 473
> F.3d at 485 n.22.

652 F.3d at 195-96 (emphasis in original). Read in context, the Second Circuit's language

emphasizing "much less BCRA's reserves at FRBNY" cannot be read as a holding that the only

reason the waiver did not apply was because it did not mention the Central Bank's assets. All of

the rest of its discussion, and its reference to the language in its prior holding in *LNC* (which

refers to a waiver of the entity's immunity, not to the assets), would make no sense. Rather, the

problem was that the waiver did not refer separately to the Central Bank, notwithstanding an

alleged alter ego relationship between the Republic and the Central Bank.

Indeed, this is precisely how plaintiffs themselves have always understood the

opinion—until it served their purposes to try to read it otherwise. In their unsuccessful petition

for certiorari from the Second Circuit decision, plaintiffs vehemently argued that the Second

Circuit's holding "cannot be reconciled" with plaintiffs' view that a waiver by a sovereign can be

imputed to its alter ego instrumentality. Plaintiffs stated:

-10-

> There is no dispute in this case that Argentina explicitly waived its immunity from attachment and execution in the underlying bond documents.  The Second Circuit, however, held that, despite the district court's alter-ego finding, this waiver did not apply to BCRA because BCRA was not specifically named in the waiver.  That holding conflicts with this Court's decision in *Bancec*, which held that "where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created . . . *one may be held liable for the actions of the other*."

Petition for Writ of Certiorari, *EM Ltd.* v. *Republic of Argentina*, No. 11-604, at 24 (Nov. 15, 2011) (emphasis added by plaintiffs) (Ushkow Decl. Ex. 22).

The Second Circuit's holding that an alter ego finding would not result in imputation of the Republic's express waiver of sovereign immunity to BCRA is binding on this Court.  Plaintiffs try another tack to avoid this result—and their prior reading of the opinion—by arguing that "[t]he very fact that the Second Circuit even reached 1611(b)(1) in its decision demonstrates that the Republic's waiver of immunity can be imputed to BCRA."  (Pls. Opp. at 28.)  That is simply false.  The Second Circuit held that "the analysis of the immunity of a foreign central bank's property *begins with* § 1611(b)(1)," *NML Capital*, 652 F.3d at 191 (emphasis in original), and "[w]e think that the District Court misread the FSIA when it concluded that a court facing the question of whether the assets of a central bank are attachable property under the FSIA must first decide whether the central bank is entitled to the presumption of independence from its parent state under *Bancec*."  *Id.* at 187.  The Court did not, therefore, first decide that it had jurisdiction under Sections 1605 and 1609 and then move to the exception under Section 1611, as plaintiffs posit.  Instead, the Court jumped straight to the exception, holding that the Court did not need to decide whether this Court's alter ego finding was valid since the Second Circuit was vacating the entire opinion and order regardless.

Plaintiffs are thus also wrong in arguing that *this Court's* prior holding on waiver is "binding on Defendants" (Pls. Opp. at 26) or that the alter ego ruling generally is "law of the case" (*id*. at 1).  Even if this Court had made a broad alter ego finding making BCRA liable for all the Republic's debts—which it did not because the prior alter ego finding related only to property at the FRBNY—that decision was vacated by the Second Circuit, and so is *not* the law of the case.  *See O'Connor* v. *Donaldson*, 422 U.S. 563, 577 n.12 (1975) ("Of necessity our decision vacating the judgment of the [lower court] deprives that court's opinion of precedential effect, leaving this Court's opinion and judgment as the sole law of the case."); *see also Durning* v. *Citibank, N.A.*, 950 F.2d 1419, 1424 n.2 (9th Cir. 1991) ("A decision may be *reversed* on other grounds, but a decision that has been *vacated* has no precedential authority whatsoever.") (emphasis in original).  Plaintiffs cite no legal authority—nor can they—to the contrary.

In the end, plaintiffs' authority that the Republic's waiver can be imputed to BCRA if this Court ultimately determines that BCRA is the alter ego of the Republic boils down to one unpublished district court opinion, *Kensington Int'l Ltd.* v. *Republic of Congo*, No. 03 Civ. 4758, 2007 WL 1032269 (S.D.N.Y. Mar. 30, 2007), which is no longer good law after the Second Circuit's decision in *NML Capital*, and is in any case inapposite.[15]  The facts in *Kensington* were starkly different.  Plaintiffs do not even allege that BCRA is a sham entity, that

---

[15]     Plaintiffs also cite *U.S. Fid. & Guar. Co.* v. *Braspetro Oil Servs. Co.*, 199 F.3d 94, 98 (2d Cir. 1999), for the proposition that "the acts of a state's 'alter ego' may be attributed to the state in determining whether § 1605(a)(2) applies."  (Pls. Opp. at 26.)  But in that case the subsidiary's (Brasoil's) commercial acts were attributed to its parent (and its parent's parent), for which the subsidiary was found to have acted as agent in committing the jurisdictional acts.  This is completely different from the present case for two reasons:  plaintiffs here are trying to impute the acts of a parent (the Republic) to its subsidiary (BCRA), which is backward—the parent does not act as agent for the subsidiary; and in any case attempting to impute from one entity to another a waiver that is by its terms limited is not the same as imputing commercial acts from the actor to the purported beneficiary.

there is a commingling of assets in the sense at issue in *Kensington*,[16] or that the Republic has abused BCRA's corporate form by engaging in "unnecessarily complex transactions and charades for the purpose of confounding its creditors," *Kensington,* 2007 WL 1032269, at *9; *see also Seijas*, 2012 WL 5259030, at *8-9 (similarly distinguishing *Kensington*).  To the contrary, BCRA has been completely transparent with the Court and plaintiffs—without waiving its sovereign immunity—by providing highly detailed accounts of transactions carried on through the FRBNY Account.[17]  *Kensington* does not govern here.

> **B.   Plaintiffs Failed to Plead Facts Sufficient to Establish That the Commercial Activity Exception to FSIA Immunity from Jurisdiction Applies to BCRA.**

Having originally argued that they met the commercial-activity-in-the-United-States prong of § 1605(a)(2), plaintiffs now add arguments under the act-performed-in-the-United-States-in-connection-with-commercial-activity-elsewhere prong.  But the shift in position is fruitless.  Plaintiffs acknowledge that under either prong "the Second Circuit has required a 'degree of closeness' between the 'gravamen' of Plaintiffs' complaint" and the relevant activity in the United States.  (Pls. Opp. at 31 (citing *Kensington*, 505 F.3d at 156).)[18]  Plaintiffs struggle,

---

[16]   Indeed, the Second Circuit has twice found that BCRA's FRBNY Account holds funds of BCRA in which the Republic does not have a property interest. *EM*, 473 F.3d at 472; *NML Capital*, 652 F.3d at 194-95. *Cf. Kensington*, 2007 WL 1032269, at *10, 16.

[17]   *See, e.g.*, Ushkow Decl. Ex. 23, at 9-10 (BCRA proposing to produce documents showing transactions settled through the FRBNY account and make available a deponent explaining such central banking activity). Ultimately, the Bank entered into a detailed stipulation of facts (Grosso Decl. Ex. 138) recounting facts regarding BCRA's transactions at the FRBNY in lieu of a deposition.  Likewise, in a later attachment proceeding, certain judgment creditors alleged that BCRA settled a payment through the FRBNY Account for which the Republic was originator.  Not only did BCRA voluntarily disclose the details of all transactions settled through the FRBNY Account for a period of several days—again, without waiving its sovereign immunity and while opposing a motion for broader, unwarranted discovery—BCRA also explained the mechanics of the transaction in question. *See EM Ltd.* v. *Republic of Argentina*, 865 F. Supp. 2d 415, 423 (S.D.N.Y. 2012) (vacating attachment orders of BCRA funds at the FRBNY because, among other reasons, the steps of the payment process confirmed that "the Republic had no interest in the funds contained in the accounts").

[18]   Plaintiffs cite *BP Chems. Ltd.* v. *Jiangsu Sopo Corp.*, 285 F.3d 677, 682 (8th Cir. 2002), and *Sun* v. *Taiwan*, 201 F.3d 1105, 1109 (9th Cir. 2000), for the proposition that one element of a plaintiff's claim that concerns commercial activity carried on in the United States is sufficient for the commercial activity exception to

(continued . . . )

however, to enumerate any activity—commercial or noncommercial—BCRA "performed" in the United States that is so related to the cause of action.

First, plaintiffs say that "BCRA has issued regulations requiring Argentine banks to sell so-called 'excess U.S. dollar positions' to BCRA at the FRBNY, and requiring exporters to sell the U.S. dollar proceeds of their exports to BCRA at the FRBNY." (Pls. Opp. at 32.)  It is beyond dispute that BCRA's act of issuing regulations does not take place in the United States, and it cannot constitute the requisite commercial activity outside the United States.  As this Court has already found, the "issuance of regulations limiting foreign currency exchange is a sovereign activity [and not a commercial activity], because such authoritative control of commerce cannot be exercised by a private party." *EM Ltd.*, 720 F. Supp. 2d at 302 (citing *Republic of Argentina* v. *Weltover, Inc.*, 504 U.S. 607 (1992)).

Next, plaintiffs make new arguments that "BCRA also engages in spot transactions at the FRBNY to buy and sell dollars" and acquires dollar reserves through such transactions in the United States.  (Pls. Opp. at 32.)  Just as the U.S. payments arising out of the prepayment agreements challenged in *Kensington* v. *Itoua* did not confer jurisdiction there, the precise mechanics of how the Bank acquires dollars clearly is not the "gravamen" of the Complaint here.  If BCRA decided to purchase its dollars from another location, outside the United States, it would have no bearing on plaintiffs' core claim that the Republic improperly borrowed funds from BCRA in Argentina and then used those funds to pay creditors other than plaintiffs.  *See* 505 F.3d at 156 (finding commercial activity exception to immunity was not met where the pre-payment agreement scheme set forth in plaintiff's complaint would have had the

---

apply.  (Pls. Opp. at 31.)  The Second Circuit expressly rejected this standard in *Kensington* v. *Itoua*, 505 F.3d at 156-57.

same effect on the judgment creditor regardless of whether oil and payments were sent to the

United States or elsewhere).  Or, as the Supreme Court articulated the test in *Saudi Arabia* v.

*Nelson*, these connections are insufficient as a basis for jurisdiction under the FSIA because the

acts in the United States "alone entitle [plaintiffs] to nothing under their theory of the case."  507

U.S. 349, 358 (1993).

Plaintiffs also claim that the commercial activity exception applies due to the use

of BCRA's account at the FRBNY when "BCRA is acting as 'fiscal agent for the National State'

and 'execut[ing] certain payment instructions of the Republic.'"  (Pls. Opp. at 32.)  Again, the

processing of payments for the Republic is entirely incidental to the Government's supposed

excessive borrowing of funds that the Government, at most, *then* uses to pay other creditors.

BCRA's settlement of accounts in the United States, combined with all other conduct in the

United States, does not entitle plaintiffs to relief and is far removed from the gravamen of

plaintiffs' alter ego theory.

Finally, plaintiffs argue that the commercial activity exception applies because

"BCRA engages in banking activities in the United States . . . and relies on its special immunity

under § 1611(b) of the FSIA to shield the funds in those transactions from the Republic's

creditors—all the while allowing the Republic to take those assets at will, without recourse.  This

constitutes fraud and injustice."  (Pls. Opp. at 31-32.)  It is not—and cannot be—a "fraud or

injustice" to invoke the protection and immunities expressly granted by Congress and

specifically held applicable—regardless of alter ego status—to the Central Bank.[19]

---

[19]     Similarly, plaintiffs invoke, in a footnote, the third prong of Section 1605(a)(2), commercial activity
outside the United States that has a direct effect in the United States.  Plaintiffs say this is met by "the use of
BCRA's purportedly separate status to block creditors' efforts to attach or execute upon BCRA's assets."  (Pls. Opp.
at 31 n.12.)  This throwaway argument makes no sense.  The Second Circuit has specifically found that creditors
could not attach or execute upon BCRA's assets irrespective of whether BCRA is entitled to a presumption of

(continued . . . )

**III.    PLAINTIFFS LACK STANDING TO BRING THIS ACTION AGAINST BCRA.**

Plaintiffs lack standing to bring a declaratory judgment action against BCRA because it is not "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Bryant* v. *New York State Educ. Dep't*, 692 F.3d 202, 211 (2d Cir. 2012) (quoting *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  Plaintiffs cite two cases that are inapposite.  *Amusement Indus., Inc.* v. *Midland Avenue Assocs., LLC*, 820 F. Supp. 2d 510 (S.D.N.Y. 2011), states only that a money judgment may ordinarily redress a monetary loss, but makes no mention of whether that applies when a court has already determined that the judgment cannot be enforced irrespective of the outcome of the action, and says nothing about declaratory judgments, which, as plaintiffs concede (Pls. Opp. at 38 n.16), is the basis for plaintiffs' claim to jurisdiction.  *Carl Marks & Co., Inc.* v. *Union of Soviet Socialist Republics*, 665 F. Supp. 323 (S.D.N.Y. 1987), *aff'd*, 841 F.2d 26 (2d Cir. 1988), concerned the retroactive application of the FSIA to the Soviet Union and whether the Soviet Union had an expectation that rises to the level of an antecedent right.  The case had nothing to do with standing.

## CONCLUSION

The Court should grant BCRA's motion to dismiss and award costs and fees.

---

independence under *Bancec*.  *NML Capital*, 652 F.3d at 197.  By definition, the conduct causing this effect cannot be "legally significant conduct" as required by the Second Circuit's precedents.  *See Hanil Bank* v. *PT. Bank Negara Indon. (Persero)*, 148 F.3d 127, 133 (2d Cir. 1998); *Antares Aircraft, L.P.* v. *Federal Republic of Nigeria*, 999 F.2d 33, 36-37 (2d Cir. 1993).

Dated:  New York, New York
        March 18, 2013

                                        s/ Joseph E. Neuhaus
                                        _____
                                        Joseph E. Neuhaus
                                        Michael J. Ushkow
                                        Taly Dvorkis
                                        Zeh S. Ekono
                                        SULLIVAN & CROMWELL LLP
                                        125 Broad Street
                                        New York, New York  10004
                                        Tel.: (212) 558-4000

                                        *Counsel for Banco Central de la*
                                        *República Argentina*